UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION


IN RE ROADRUNNER TRANSPORTATION       Case No.:  17-cv-144-PP
SYSTEMS, INC. SECURITIES LITIGATION


**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I. NATURE OF THE ACTION ............................................................................................. 1

II. JURISDICTION AND VENUE ...................................................................................... 19

III. PARTIES ......................................................................................................................... 19

    A. Roadrunner and the Executive Defendants .......................................................... 19

    B. Defendants HCI Equity Partners, HCI Equity Management, and Scott D. Rued ............ 22

IV. BACKGROUND ALLEGATIONS ................................................................................ 23

    A. Roadrunner's "Asset-Light," "Variable Cost Structure" and "Independent Contractor"
    Driver Based Business Model ............................................................................... 23

    B. Roadrunner's May 2010 Initial Public Offering After Streamlining its Cost
    Structure to Weather An Industry Downturn In Tonnage ..................................... 26

    C. Pursuit of a "Selective" Aggressive Acquisition Strategy .................................. 27

    D. Roadrunner's Leverage Ratios – Vitally Important Metrics ................................ 28

    E. Deliberate, Constant Attention to Controlling Costs to Attain Profitability ......... 30

    F. Strong Pressures to Portray Success .................................................................... 31

V. MATERIAL MISSTATEMENTS AND OMISSIONS DURING THE CLASS
PERIOD ........................................................................................................................... 32

    A. The False and Misleading 2012 Reported Financial Results and Related Statements ...... 32

    B. The False and Misleading 2013 Reported Financial Results and Related Statements ...... 35

    C. The False and Misleading 2014 Reported Financial Results and Related Statements ...... 49

    D. The False and Misleading 2015 Reported Financial Results and Related Statements ...... 62

    E. The False and Misleading 2016 Reported Financial Results and Related Statements ...... 85

VI. DEFENDANTS TRICKLE THE TRUTH OUT OVER A LONG PERIOD OF TIME .. 97

    A. Initial Admission of Falsely Reported Leverage Ratios ...................................... 97

    B. Partial Admissions of Materially False Financial Reporting and Need for
    Restatement ........................................................................................................... 99

    C. Long Overdue and Delayed Restatement ........................................................... 102

    D. Defendants Admit to Cleaning House to Change the "Tone From the Top" ......... 105

    E. Defendants Admit "Material Weakness" Ineffective Internal Controls and
    Procedures and Accounting Manipulation .......................................................... 105

    F. Additional Admissions and Revelations Re: Tractor Lease Purchase Guaranty
    Program ............................................................................................................... 107

G.      Impact of Restatement ................................................................ 109

VII.    ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER ................................ 110

        A.      The Control Environment Enabled Defendants' Accounting Manipulations and

                False Financial Reporting: Books Do Not Cook Themselves ......................... 110

        B.      Armbruster's Post Class Period Termination and Flight From Roadrunner Amid

                DiBlasi's Demotion ................................................................ 114

        C.      Motive – Need For Capital Infusions via Expanded Credit Facilities To Successfully

                Operate and Fund Acquisitions ...................................................... 115

        D.      Motive: Growth by Acquisition – in Roadrunners' "DNA" – and Knowledge:

                Based on Representations and Admissions of Successful Integration of Acquired

                Companies ......................................................................... 117

        E.      Motive: "At-Risk" Executive Compensation Plans Based on Meeting Performance

                Goals and Stock Price Performance .................................................. 120

        F.      Suspicious Insider Trading in Amounts Dramatically out of Line with Prior Trading

                History ........................................................................... 121

        G.      Knowledge From Keen and Constant Focus On Controlling "Costs" – Critically

                Important to Roadrunner's Profitability and Success ................................. 129

        H.      Knowledge Arising From Access to Roadrunner's Sophisticated Systems Of

                Reporting Operational Metrics ...................................................... 133

        I.      SOX Duties and False SOX Certifications ............................................ 135

VIII.   DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES .................................. 137

        A.      Duties of the Chief Financial Officer and Chief Executive Officer under GAAP

                and SEC Regulations ............................................................... 138

        B.      Generally Accepted Accounting Principles and SEC Rules ............................ 139

        C.      Specifically Relevant GAAP Requirements ........................................... 140

IX.     LOSS CAUSATION AND ECONOMIC LOSS .............................................. 144

X.      PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET ....................... 146

XI.     NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION

        DOCTRINE ........................................................................ 147

XII.    CLASS ACTION ALLEGATIONS ....................................................... 148

XIII.   CLAIMS .......................................................................... 150

Lead Plaintiff in the above-captioned consolidated action, Public Employees' Retirement System of Mississippi ("Lead Plaintiff" or "Mississippi PERS"), alleges the following based upon the investigation of counsel, which includes a review of United States Securities and Exchange Commission ("SEC") filings by Roadrunner Transportation Systems, Inc. ("Roadrunner" or the "Company"), as well as regulatory filings, reports, advisories, press releases, and other public statements issued or rendered by the Company, or the defendants as named herein, and media reports about the Company. Lead Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Roadrunner common stock between March 14, 2013, and January 30, 2017, inclusive (the "Class Period"), against the defendants as named herein for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. During the Class Period, Roadrunner issued its annual reports on Form 10-K covering years 2012, 2013, 2014 and 2015, containing the Company's audited financial statements, and related interim financial statements on Form 10-Q through the third quarter of 2016.

2.     The Exchange Act, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), was enacted to promote the dissemination of truthful information to the investment community and thereby strengthen the integrity of our capital markets, which are vital to the nation's economic well-being. Roadrunner, its former chief executive officer ("CEO") Mark A. DiBlasi ("DiBlasi"), and its former chief financial officer ("CFO") Peter R.

1

Armbruster ("Armbruster") (collectively, the "Executive Defendants" who, with Roadrunner, are collectively the "Roadrunner Defendants"), violated this basic principle and tenant of the federal securities laws. Throughout the Class Period, Roadrunner and the Executive Defendants issued or otherwise engaged in a series of materially false and misleading statements to, and omissions from, the investment community, quarter after quarter, and year after year, regarding Roadrunner's financial results, performance metrics and known risks, causing investors to suffer significant economic harm.

3.      Meanwhile, the Roadrunner Defendants, as alleged more fully below, engaged in the sale of Roadrunner common stock that they directly owned, pocketing for themselves ***insider selling proceeds of over $6.3 million***, while taking advantage of the artificial inflation embedded in Roadrunner's stock price as a consequence of their materially false and misleading statements and omissions. These false and misleading statements pushed the trading price of Roadrunner stock toward a record high near $30 a share, which Roadrunner's influential control persons and largest shareholders, the "HCI Entities," as defined below, wished to achieve and exploit, enabling them to profitably divest a substantial amount of their holdings and garnering proceeds of more than $159 million before the truth was finally disclosed.

4.      On January 31, 2018, the Company issued a restatement of its financial results reported through the Class Period (hereinafter the "Restatement"), with a stinging indictment of its former executive management's misconduct, and disclosed that the Department of Justice and the Securities and Exchange Commission were conducting their own investigations.

5.      Roadrunner is primarily a trucking company engaged in delivering freight, transporting it from location to location on behalf of customers. Roadrunner became a public company in May 2010 after a successful initial public offering in which it raised $117 million to

2

fund its operations. Roadrunner's business model as an "asset-light" transportation and logistics service provider ostensibly afforded a "variable cost structure" that it continually represented provided it with an advantage over its competitors because it enabled the Company — which relied heavily on independent contractor drivers, many of whom leased their own tractors — to quickly and efficiently address ever-changing macroeconomic conditions, transportation costs, and "capacity."

6. In a quest to become a multi-billion dollar company and increase its business footprint and breadth of offered services, Roadrunner engaged in a strategy of growth through acquisition of companies that it represented were a good "fit" and would be "immediately accretive." Roadrunner's impulse to acquire other transportation companies to sustain its growth in revenues and expand its business footprint was deeply embedded in its "DNA" and was fundamental to its business model. From 2009 through July 2015, Roadrunner acquired no less than 20 transportation and logistics companies, all the while touting its rapid growth as it portrayed the successful implementation of this aggressive acquisition strategy.

7. In order to accomplish this acquisition spree, Roadrunner needed to secure adequate funding. To that end, Roadrunner secured loans through ever-expanding credit facilities provided by lenders. These credit facilities, and the funds that they provided, became the life blood of Roadrunner's existence. As its appetite for acquisition and capital infusion increased, Roadrunner's credit facility with its lenders ultimately increased from a mere $55 million in May 2010, when Roadrunner became a publicly traded company, to $700 million by July 2015.

8. In order to secure and maintain its credit extension lifeline, Roadrunner executed credit agreements containing important financial reporting and debt ratio covenants to which it was required to adhere, including a "total cashflow leverage" ratio, also referred to as a "leverage

ratio," which Roadrunner could not exceed. Exceeding this leverage ratio covenant triggered Roadrunner's obligations under the credit facility, including a requirement that it must immediately repay its debt, which would have wreaked financial havoc upon the Company, especially as its cash position diminished. The investment community was keenly attentive to Roadrunner's leverage ratio and it was a focus of securities analyst inquiries and discussions on quarterly conference calls with the Executive Defendants during the Class Period.

9.      Beyond the Company's cash flow and leverage ratios, Roadrunner and the Executive Defendants were keenly and necessarily aware of, and obsessed with, controlling costs. It is always necessary to keep a constant, vigilant eye on operational costs and performance metrics in a transportation company. In order to operate profitably, Roadrunner's costs with respect to its transportation operations were fundamentally important and highly critical to the setting of competitive rates in pricing. Shipping rates or customer pricing were dictated by the Company's profit margins and ultimate profitability. Roadrunner's "asset-light" and "variable cost structure" heightened the need for the Executive Defendants to know — to the penny — its driver payable and transportation related costs and expenses, as they impacted Roadrunner's earnings, earnings before income taxes, depreciation, and amortization ("EBITDA"), and leverage ratios.

10.     By the advent of the Class Period, the entire trucking industry was being confronted with a critical shortage of reliable quality drivers, threatening a lack of so-called "capacity." New federal regulations also threatened to cut into driver work hours and consequent income. In combination with industry and macroeconomic trends, these forces put downward pressure on Roadrunner's stock price and performance metrics, the "at-risk" compensation of the Executive Defendants, and the success of Roadrunner's acquisition strategy. This landscape

4

frustrated the goal of Roadrunner's then largest and significant shareholder, the private investment group controlled by HCI Equity Partners, L.L.C. and referred to as the "HCI Entities,"[1] managed by Roadrunner's chairman of the board and defendant, Scott D. Rued, (collectively the "HCI control persons"), to divest a substantial portion of the Company's stock, including through a secondary offering at a target price around $30 per share. In the face of this landscape, the defendants needed to provide the market with favorable financial results in order to buoy and move its stock price higher and comfort investors that it was successfully implementing its acquisition spree, without violating its debt covenants, or otherwise jeopardizing its business success and vitality.

11.     To that end, Roadrunner and the Executive Defendants, CEO DiBlasi and CFO Armbruster, reported false financial results that portrayed Roadrunner's results of operations and consequent performance metrics, including its expenses, net income, earnings per share, EBITDA, and leverage ratios, to be materially more favorable or less adverse than they actually were, while concealing from investors the true financial profile and known risks of investment in the Company. In their effort to buoy or otherwise increase Roadrunner's stock price, the Executive Defendants, DiBlasi and Armbruster, exploited the Sarbanes-Oxley Act of 2002's ("SOX") requirement that executives who were responsible for and knowledgeable about Roadrunner's accounting and internal controls expressly certify that its financial statements were fairly stated and that its internal controls over financial reporting were effective, which they certainly were not.

12.     Complimenting their materially false financial statements and omissions, and their deceptively misleading and fraudulent SOX certifications, the Executive Defendants repeatedly

---

[1] The "HCI Entities" consist of HCI Co-Investors III, L.P.; HCI Equity Partners III, L.P.; TC Roadrunner-Dawes Holdings, L.L.C.; TC Sargent Holdings, L.L.C.; and Thayer Equity Investors V, L.P.

5

comforted and assured investors, during quarterly conference calls with analysts, in press releases, and in filings with the SEC, with representations demonstrating their ability to perform and execute, manage costs, and monitor, measure, and implement specific metrics and productivity measures. The Executive Defendants also periodically announced the implementation of "cost measures" and "pricing initiatives" that they deployed in order to improve control and align Roadrunner's costs with current business levels.

13. Quarter after quarter and year after year, the Executive Defendants deceived the market by falsely stating Roadrunner's financial results and performance metrics. On May 20, 2013, defendants DiBlasi and Armbruster took advantage of the stock price inflation caused by their deceit, selling substantial and unusual amounts of stock. Defendant DiBlasi sold 44,794 shares of Roadrunner stock for proceeds of more than $910,000. That same day, defendant Armbruster sold 130,000 shares for proceeds of more than $2.1 million. Taking advantage of their deceptive misconduct, in August 2013, with its share price successfully inflated to close to $30 per share by the Executive Defendants' false statements, as Roadrunner's chairman of the board, Scott D. Rued, and the HCI Entities desired, Roadrunner consummated a secondary offering of approximately 5 million shares to the public. The August 2013 secondary offering, at a trading price near Roadrunner's historical high, buoyed and artificially inflated as a consequence of defendants' deceptive conduct, enabled the HCI Entities — managed by Rued, who signed each of the Company's annual reports during the Class Period — to sell almost 3.5 million shares of Roadrunner common stock between August 19 and August 30, 2013, reaping proceeds of more than $88 million. DiBlasi, who made false statements and executed false and deceptive SOX certifications, reaped proceeds of more than $950,000 from sales made shortly after the secondary offering. In the months thereafter, DiBlasi continued to sell, netting proceeds

6

of more than $841,000 in March 2013 and more than $776,000 in March 2014, each sale made at near Class Period highs for the trading price of Roadrunner stock. All the while and thereafter, Roadrunner's stock price remained artificially inflated as a consequence of defendants' relentless stream of false financial reporting and related statements, which underreported Roadrunner's operating expenses during the Class Period in the aggregate amount of $94.25 million (excluding an impairment charge for goodwill).

14.     As the Class Period progressed, the Company continuously reported false and misleading financial results and, among other things, concealed from the market the fact that its earnings per share consistently and materially fell below quarterly guidance during the over two year period from September 30, 2013 through each and every quarter of 2014 and 2015.

15.     In addition, Roadrunner's financial statements in its Annual Report on Form 10-K for the fiscal year ending December 31, 2014, (the "2014 10-K") and its quarterly reports filed with the SEC on Form 10-Q and specifically for the 1Q'15 and 2Q'15 time periods (ending March 31, 2015 and June 30, 2015, respectively), concealed the fatal flaws in its independent driver ("IC") guaranteed tractor lease programs designed as recruiting inducements, but which were structurally unsound because of boomeranging expense obligations embedded in them. The programs exposed the Company to significant expenses arising from the fact that Roadrunner was guaranteeing and obligating itself with respect to a large fleet of older, deteriorating tractors and related poor equipment associated with those leases, contrary to the Company's "asset-light" model, and without sufficient maintenance escrow accounts on the old trucks, or adequate reserves on the Company's books. Defendants deceived investors with false assurances that associated lease guarantees had no material impact on the Company's financial results, that any guarantee payments were "*de minimis*" and that its "off balance sheet agreements" did not

7

occasion any material risk to investors. The combination of these material misrepresentations and omissions served to create the impression that the expense and depth of known risk associated with the guaranteed lease programs were essentially benign. Not so.

16.     In the midst of this ongoing deception, the HCI Entities managed by defendant Rued sold another 2 million shares of Roadrunner common stock, netting proceeds of $48,680,000 on August 7, 2015. The collective insider Class Period sales by the Executive Defendants and the HCI Entities managed by Rued were suspicious in both their timing and amount, and dramatically out of line with their prior trading history. All the while, Rued, DiBlasi and Armbruster signed each Form 10-K communicating Roadrunner's annual financial results through the Class Period. And DiBlasi and Armbruster signed each Form 10-Q communicating Roadrunner's annual financial results and SOX certifications throughout the Class Period. Reaping huge proceeds from the sale of Roadrunner stock for themselves and for the HCI Entities to which they were beholden was a powerful motive for the Roadrunner Defendants to deceive the market.

17.     In October 2015, well after the Company had begun in Q1'15 to pull back from further lease program guaranty commitments as the Roadrunner Defendants privately became increasingly aware that such programs were structurally unsound and not viable, Roadrunner disclosed that the Company was terminating its Tractor Lease Purchase Guarantee Program and taking a charge of $5 million. Upon this news, Roadrunner stock fell from $17.67 per share immediately prior to the adverse announcement to a close of $9.34 per share on October 27, 2015, on volume of over 4.73 million shares – 22 times the Company's average daily trading volume. Still, the defendants did not reveal that the Company's financial results were misstated. They failed to disclose the true depth of materializing expenses associated with the continuing

8

guaranteed tractor lease programs, and they concealed the nature of the large fleet of old, deteriorating vehicles and equipment to which the Company remained tethered.

18.     Defendants continued to issue false financial statements through Q4 2015 and 2016 that deceived the market along with their false and misleading SOX certifications and material omissions. On a May 2016 earnings conference call regarding Roadrunner's stated Q1 2016 financial results, then CFO Armbruster played coy regarding the Company's leverage ratio, refusing to provide the exact ratio number, stating that it was "above 3.5 but less than 3.75," and representing it was "under" the covenant's 3.75 "requirement." When an analyst commented "I'm not understanding why that number is so secretive … it's an important number for investors that are trying to figure out what the leverage is …," Armbruster boldly and falsely declared that Roadrunner was "in compliance with all bank covenants as of March 31, 2016."

19.     Armbruster even played coy with the SEC in June, 2016 when the SEC inquired about the Company's reported financial results in its 2015 10-K for the year ending December 31, 2015, and its Q1 2016 10-Q for the quarter ending March 31, 2016. The SEC was concerned that Roadrunner had not conducted an interim goodwill impairment analysis for its Less-Than-Truckload ("LTL") operating segment despite significant declines in segment revenues and a market capitalization below the segment's net assets. The SEC asked Roadrunner to disclose its "actual ratios/amounts related to any material debt covenant." Armbruster argued that an interim goodwill impairment was not required and did not disclose Roadrunner's true leverage ratio, concealing the very information that the SEC wanted disclosed. In a conference call with analysts on July 27, 2016, Armbruster once again falsely assured investors and represented that Roadrunner was in compliance with "all bank covenants." Then, on November 10, 2016, after previously providing evasive and untruthful answers about the leverage ratio and debt covenants,

and amid inquiry by the SEC, Roadrunner was compelled to concede that, in fact, it had violated its debt covenants for **several quarters** going back to Q4 2015. However, investors were still not yet apprised of the Company's true leverage ratios.

20.     Later, when the market closed on January 30, 2017, and with a new president at the helm, Roadrunner announced that it would need to restate its prior period financial statements – which were materially false, as more fully discussed below – while admitting that it had previously been aware of "potential accounting discrepancies." At that time, Roadrunner vaguely disclosed that it had overstated earnings from its 2014 through 2016 reporting periods by approximately $20-$25 million and that the goodwill it reported on its balance sheet had been impaired in the amount of $175 million to $200 million. By carrying inflated goodwill on its books, the Roadrunner Defendants overstated the Company's assets and shareholder equity. The Roadrunner executives also disclosed that the Company's investigation of its materially false accounting was "expanding" and that its contemplated Restatement, which then CEO DiBlasi indicated would be issued in March 2017, would include reporting periods from 2013 through 2016. On release of this news, the Company's share price fell from a close on January 30, 2017 of $11.54 per share to a closing price on January 31, 2017 of $7.92 per share – a drop of approximately 33% reflecting a stunned investment community.

21.     In a conference call with analysts on January 31, 2017, DiBlasi finally disclosed that Roadrunner's Tractor Lease Purchase Guarantee Program experienced "escalating costs" and "created a lot of costs and a lot of other service issues and driver turnover," with a resulting "drop in EBITDA" and "increased" "debt leverage ratio." New President and COO Stoelting disclosed more of the adverse truth, when he admitted that not only had Roadrunner contracted on "costly" "used-trucks" starting "back in 2013," instead of "trucks that really run," it had to

replace the used truck fleet with "new trucks" going forward and build in "maintenance escrows" for each truck because the Company "didn't have that before." DiBlasi further informed investors that Roadrunner was still "exiting costly tractor lease purchase programs" that will "remove costs of anywhere from $5 million to $7 million." The next day, the stock closed lower still, at $7.54 per share. By the end of the first quarter of 2017, on March 29, the stock price closed at just $6.34 per share. Meanwhile, the market and investors awaited a full and complete disclosure of the truth of Roadrunner's previous and materially false and misleading financial statements. After all, the defendants had admitted that the Company's financial statements should not be relied upon and needed to be restated.

22.     Despite the representation that the Company anticipated rendering its Restatement by March, 2017, a full year elapsed as the investment community was kept in the dark, with no financial reporting made by the Company to either the SEC or the New York Stock Exchange. In the interim, a house cleaning excised from executive positions of management and control those individuals who had been responsible for the misconduct that deceived the market. On March 29, 2017, Class Period CFO Peter Armbruster "left" the Company – the product of his being terminated for cause. In May 2017, Class Period CEO DiBlasi was unceremoniously removed from his executive position and demoted. More recently, in November 2017, Class Period chairman of the board Rued, the general manager of the HCI Entities, and a signatory to Roadrunner's false and misleading 2012 Form 10-K, 2013 Form 10-K, 2014 Form 10-K and 2015 Form 10-K, was dethroned. Roadrunner also "terminated" its "Advisory Agreement" with defendant HCI Equity Management, L.P. for which defendant HCI Equity Partners is the general partner.

11

23.     As written by Chief Justice Louis D. Brandeis, "sunlight is said to be the best of disinfectants." On January 31, 2018, after a year-long investigation by a new management team, among others, and in the face of simultaneously disclosed *investigations* by the *Department of Justice* and the *Securities and Exchange Commission*, which are currently on-going, Roadrunner finally revealed the extent and gravity of its false and misleading financial reporting and related misstatements which had deceived investors for years. Roadrunner issued a formal Restatement, amending its 2015 10-K and restating prior financial reporting periods. Roadrunner also filed its long-delayed 2016 10-K for the 2016 fiscal year ending December 31, 2016, and filed amendments to its quarterly Report on Form 10-Q for the first, second and third quarters of 2016. Roadrunner restated its annual results from 2013 through 2015 and booked material adjustments to its financial statements going as far back as 2011. It was disclosed that the level and depth of accounting fraud at Roadrunner, which was engineered and permitted by its prior management, was deeper and more prolonged than initially revealed a year earlier.

24.     The Company's internal investigation identified "accounting errors that impacted substantially all financial statement line items and disclosures," and identified "material weaknesses in our internal control over financial reporting." Net income had been overstated by approximately $66.5 million from 2011 through the third quarter of 2016. Roadrunner restated many of the most important and basic financial metrics and results of performance impacting the market's assessment of Roadrunner's financial health and its stock price: net income, EBITDA, and earnings per share. These, in turn, were highly germane to the status of its cash flow and compliance with Roadrunner's leverage ratio covenants. Investors were informed that profitability in Roadrunner's Truck Load Logistics ("TL") segment declined as a result of "higher operating expenses, primarily from increased equipment leasing, insurance, maintenance

and payroll cost." It was also revealed that Roadrunner experienced a decline in adjusted EBITDA in 2016 impacted by "higher than normal non-allocated operating cost" associated with "lease purchase guarantee programs," among other things. And it was revealed that Roadrunner's impairment of goodwill was actually $360.3 million, far higher than previously estimated by a substantial order of magnitude, requiring the Company to book an impairment for goodwill for Q3 2016 that effectively wiped out asset values approximating the Company's entire market capitalization. As a consequence of the Restatement's fraud related disclosures, the price of Roadrunner's common stock fell from a close of $7.14 per share on January 30, 2018 to $3.57 per share at the close of trading on January 31, 2018, and fell further still thereafter, closing at $4.10 a share on February 8, 2018.

25.     Roadrunner's restated financial results, dating back to at least the advent of the Class Period and before, reflect a very different profile of the Company's financial position and status compared to what the market had been led to believe all along.

26.     The Restatement reflected restated net income of $31.685 million for the 2012 fiscal year ending December 31, 2012 (FY 2012) which was originally reported in the amount of $37.53 million on March 14, 2013 in its 2012 10-K. In addition, the chart below illustrates Roadrunner's restated "net income" respecting fiscal years 2013 through 2016 and quarterly reporting periods versus the amounts it originally reported in its false and misleading financial statements issued during the Class Period.

Amounts
in thousands

Net Income By Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---|---|---|---|---|
| 2016-Q3 * | 7,939 | 3,391 | (4,548) | -57.3% |
| 2016-Q3 | 7,939 | (319,618) | (327,557) | -4125.9% |
| 2016-Q2 | 1,798 | (2,739) | (4,537) | -252.3% |

13

| Quarter | Originally Reported | Restated* | Decrease ($) | Decrease (%) |
|---|---|---|---|---|
| 2016-Q1 | 3,065 | 900 | (2,165) | -70.6% |
| 2015-Q4 | 12,134 | 3,524 | (8,610) | -71.0% |
| 2015-Q3 | 5,791 | 1,705 | (4,086) | -70.6% |
| 2015-Q2 | 16,471 | 10,571 | (5,900) | -35.8% |
| 2015-Q1 | 13,604 | 9,820 | (3,784) | -27.8% |
| 2014-Q4 | 12,379 | 4,719 | (7,660) | -61.9% |
| 2014-Q3 | 14,413 | 8,298 | (6,115) | -42.4% |
| 2014-Q2 | 14,768 | 11,663 | (3,105) | -21.0% |
| 2014-Q1 | 10,414 | 8,030 | (2,384) | -22.9% |
| 2013-Q4 | 11,214 | 10,385 | (829) | -7.4% |
| 2013-Q3 | 13,230 | 12,409 | (821) | -6.2% |
| 2013-Q2 | 13,970 | 13,220 | (750) | -5.4% |
| 2013-Q1 | 10,582 | 9,906 | (676) | -6.4% |

\* Net Income - Excluding Goodwill Impairment
\*\*Restated 2013 quarterly net income estimated based on Company-disclosed change to net income for fiscal year 2013 weighted by respective 2013 quarterly revenue. This applies to restated net income figures for 2013 quarterly periods throughout.

27.     The Restatement reflected diluted earnings per share of $0.98 for FY 2012, which was originally reported in the amount of $1.16 on March 14, 2013 in its 2012 10-K. Additionally, the chart below illustrates Roadrunner's restated "diluted earnings per share" respecting fiscal years 2013 through 2016 and each quarterly reporting period, compared to the amount its false, deceptive and misleading financial statements originally represented during the Class Period:

Amounts in thousands

Earnings Per Share-Diluted By Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---|---|---|---|---|
| 2016-Q3* | 0.21 | 0.09 | (0.12) | -57.9% |
| 2016-Q3 | 0.21 | (8.34) | (8.55) | -4071.4% |
| 2016-Q2 | 0.05 | (0.07) | (0.12) | -240.0% |
| 2016-Q1 | 0.08 | 0.02 | (0.06) | -75.0% |
| 2015-Q4 | 0.32 | 0.09 | (0.23) | -71.9% |
| 2015-Q3 | 0.15 | 0.04 | (0.11) | -73.3% |
| 2015-Q2 | 0.42 | 0.27 | (0.15) | -35.7% |

14

| | | | |
|---|---|---|---|
| 2015-Q1 | 0.35 | 0.25 | (0.10) | -28.6% |
| 2014-Q4 | 0.32 | 0.12 | (0.20) | -62.5% |
| 2014-Q3 | 0.37 | 0.21 | (0.16) | -43.2% |
| 2014-Q2 | 0.38 | 0.30 | (0.08) | -21.1% |
| 2014-Q1 | 0.27 | 0.20 | (0.07) | -25.9% |
| 2013-Q4 | 0.29 | 0.27 | (0.02) | -7.4% |
| 2013-Q3 | 0.35 | 0.33 | (0.02) | -6.1% |
| 2013-Q2 | 0.37 | 0.35 | (0.02) | -5.3% |
| 2013-Q1 | 0.29 | 0.27 | (0.02) | -6.1% |

\* Earnings Per Share-Diluted - Excluding Goodwill Impairment
\*\*Restated 2013 quarterly diluted earnings per share estimated based on Company-disclosed change
to diluted earnings per share for fiscal year 2013 weighted by respective 2013 quarterly revenue.
This applies to restated diluted earnings per share figures for 2013 quarterly periods throughout.

28.    The Restatement reflected EBITDA of $69.993 million for FY 2012 versus the

originally reported EBITDA in the amount of $78.449 million as falsely stated in the Company's

2012 10-K on March 14, 2013. Additionally, the chart below illustrates Roadrunner's restated

"EBITDA" respecting fiscal years 2013 through 2016, and each quarterly reporting period

compared to the originally reported EBITDA during the Class Period:

Amounts in
thousands

EBITDA By Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---|---|---|---|---|
| YTD 9/30/16* | 28,626 | 20,538 | (8,088) | -28.3% |
| 2016-Q3 | 28,626 | (351,543) | (380,169) | -1328.1% |
| 2016-Q2 | 18,160 | 10,405 | (7,755) | -42.7% |
| 2016-Q1 | 20,162 | 16,285 | (3,877) | -19.2% |
| 2015-Q4 | 33,738 | 21,731 | (12,007) | -35.6% |
| 2015-Q3 | 22,802 | 15,900 | (6,902) | -30.3% |
| 2015-Q2 | 38,777 | 29,085 | (9,692) | -25.0% |
| 2015-Q1 | 33,679 | 27,281 | (6,398) | -19.0% |
| 2014-Q4 | 32,504 | 23,919 | (8,585) | -26.4% |
| 2014-Q3 | 31,599 | 23,569 | (8,030) | -25.4% |
| 2014-Q2 | 32,679 | 25,259 | (7,420) | -22.7% |
| 2014-Q1 | 23,982 | 17,822 | (6,160) | -25.7% |
| 2013-Q4 | 23,250 | 21,261 | (1,989) | -8.6% |

15

| | | | |
|---|---|---|---|
| 2013-Q3 | 27,688 | 25,720 | (1,968) | -7.1% |
| 2013-Q2 | 28,244 | 26,445 | (1,799) | -6.4% |
| 2013-Q1 | 22,492 | 20,870 | (1,622) | -7.2% |

\* EBITDA - Excluding Goodwill Impairment
\*\* Restated 2013 and 2014 quarterly EBITDA estimated based on Company-disclosed change to
EBITDA for fiscal years 2013 and 2014, weighted by 2013 and 2014 quarterly revenue,
respectively. This applies to restated EBITDA figures for 2013 and 2014 quarters throughout.

29.     Albeit too little too late with respect to aggrieved Class Members, Roadrunner acknowledged that it had taken steps, as it must, to improve corporate governance, "leadership and finance teams" and "compliance programs." It appointed a new independent chairman of the board, replacing defendant Rued. It acknowledged the replacement of the former management team (of which DiBlasi and Armbruster were at the top), with new, experienced executives, including a new chief executive officer, president and chief operating officer, chief financial officer, and chief information officer, in the hopes this new executive leadership team would contribute to a "positive change in the tone from the top."

30.     Defendants DiBlasi and Armbruster were responsible for establishing and maintaining adequate internal control over financial reporting both under the Exchange Act and the criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Framework"). Internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting in preparation of financial statements disseminated to the public, in accordance with General Accepted Accounting Principles ("GAAP").

31.     In that regard, Roadrunner's long overdue 2016 10-K, filed on January 31, 2018, disclosed and confirmed several other findings adverse to the defendants, and wholly

16

contradicted the Executive Defendants' false and misleading SOX certifications. The Roadrunner executives "*did not maintain an effective control environment* based on the COSO Framework."[2] This **material weakness** in the control environment itself evinced a **lack of** "*commitment to integrity and ethical values*." The "*tone from former executive management*" – the Executive Defendants herein – did not "create the proper environment for effective internal control over financial reporting**,**" or ensure that "relevant information was communicated" and "not withheld from our independent directors."

32.     In a further stinging indictment of prior executive management headed by DiBlasi and Armbruster, the Company admitted that Roadrunner's "*oversight processes* and *procedures* that guide individuals in applying internal control over financial reporting were **not adequate** in **preventing** or **detecting material accounting errors, or omissions** due to inadequate information." Also troubling, consistent with an atmosphere and tone created by and emanating from its "former executive management" – the Executive Defendants – Roadrunner's investigation found that there was "*management override of internal controls, including recording improper accounting entries, recording accounting entries that were inconsistent with information known by management at the time*" while "*not communicating relevant information within*" Roadrunner and even "*withholding information from our independent directors*." This misconduct and acts of deception, buoying and inflating Roadrunners stock price, are the very hallmarks of securities and accounting fraud, for it is axiomatic that *books do not cook themselves*.

33.     As a consequence of the Roadrunner Defendants' materially false and misleading statements and omissions, reported false financial results, exploitation of SOX certifications and lack of integrity and ethics, which derived from and were a product of the "tone from the top"

---

[2] Emphasis added throughout unless otherwise noted.

maintained by the Executive Defendants, and which deceived the market, Class Members suffered massive damages, having purchased stock at artificially inflated levels at prices that were tainted and distorted by defendants' fraudulent scheme. Meanwhile, the defendants have profited handsomely, collectively reaping over $165 million in insider sales of Roadrunner shares that they directly or beneficially owned during the Class Period, without disclosure of the truth.

34. The following chart illustrates the artificial inflation the Roadrunner Defendants' false statements caused to be embedded in Roadrunner's stock price, and the successful buoying and inflation of the trading price of its shares that was taken advantage of as a consequence of propitiously timed insider selling:



## II.     JURISDICTION AND VENUE

35.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

36.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. § 77v).

37.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Defendant Roadrunner maintained its corporate headquarters in this District throughout the Class Period, and certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District.

38.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.     PARTIES

39.     Lead Plaintiff provides retirement, disability, and survivor benefits to employees of the State of Mississippi's public school districts, municipalities, counties, community colleges, state universities, and other public entities such as libraries. Attached hereto as Exhibit A is a schedule of Lead Plaintiff's transactions in the Company's stock during the Class Period.

### A.     Roadrunner and the Executive Defendants

40.     Defendant Roadrunner, a Delaware corporation, is a transportation and logistics service provider, offering a suite of global supply chain solutions. At all times relevant hereto, Roadrunner's principal executive offices were located at 4900 S. Pennsylvania Ave., Cudahy,

Wisconsin 53110. On May 24, 2017, Roadrunner announced that it was relocating its headquarters to Downers Grove, Illinois. Roadrunner's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RRTS."

40. Defendant Mark A. DiBlasi ("DiBlasi") was the Company's chief executive officer ("CEO") at all times material to the Class Period, until his demotion from that office in May 2017, and served as the Company's president from January 2006 until January 2016.

41. Defendant Peter R. Armbruster ("Armbruster") was the Company's chief financial officer ("CFO"), treasurer and secretary from December 2005 until he "left" the Company on March 29, 2017, after Roadrunner terminated him for cause.

42. Defendants DiBlasi and Armbruster are collectively referred to herein as the "Executive Defendants." Each of the Executive Defendants: (a) directly participated in the management of the Company; (b) was directly involved in the day-to-day operations of the Company at the highest levels; (c) was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; (d) was directly or indirectly involved in the oversight or implementation of the Company's internal controls; (e) was aware of or deliberately or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or (f) approved or ratified these statements in violation of the federal securities laws.

43. Because of their positions within the Company, DiBlasi and Armbruster had access to undisclosed information about Roadrunner's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other

corporate officers and employees, attendance at management and board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

44. The Executive Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Executive Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

45. DiBlasi and Armbruster possessed the power and authority to control the contents of Roadrunner's reports to the SEC, press releases, presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Executive Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. The Executive Defendants are liable for the false statements pleaded herein, as those statements were the result of the collective actions of the Executive Defendants.

46. Each of the Executive Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Roadrunner common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Roadrunner's business,

operations, management and the intrinsic value of its securities; and (ii) caused Lead Plaintiff and other shareholders to purchase Roadrunner common stock at artificially inflated prices.

### B. Defendants HCI Equity Partners, HCI Equity Management, and Scott D. Rued

47. Defendant HCI Equity Partners, L.L.C. ("HCI Equity Partners") is a private investment management firm comprised of HCI Equity Management L.P. ("HCI Equity Management") and several other interrelated investment advisors and affiliated organizations, identified in the paragraph below. HCI Equity Partners is, in turn, the general partner of defendant HCI Equity Management. Both HCI Equity Partners and HCI Equity Management are headquartered at 1730 Pennsylvania Ave, N.W., Washington, D.C.

48. Following the 2010 initial public offering, HCI Equity Partners controlled approximately 52% of the outstanding stock of Roadrunner, or 16.576 million shares, consisting of 14.25 million shares of Roadrunner common stock as well as warrants for the purchase of an additional 2.336 million shares. The 14.25 million shares of Roadrunner common stock controlled by HCI Equity Partners were held as follows: 11,632,192 shares held by Thayer Equity Investors V, L.P. ("Thayer"); 24,639 shares held by TC Roadrunner-Dawes Holdings, L.L.C. ("TC Roadrunner"); 24,455 shares held by TC Sargent Holdings, L.L.C. ("TC Sargent"); 2,528,947 shares held by HCI Equity Partners III, L.P. (f/k/a Thayer Hidden Creek Partners II, L.P.) ("Partners III"); and 36,662 shares held by HCI Co-Investors III, L.P. (f/k/a THC Co-Investors II, L.P.) ("Co-Investors III") (collectively the "HCI Entities"). In addition, Thayer Equity Investors V held warrants to purchase an additional 2,314,217 shares of Roadrunner stock and TC Sargent Holdings, L.L.C. held warrants to purchase an additional 21,243 shares of Roadrunner stock. Throughout the Class Period, HCI Equity Partners has been identified in filings with the SEC as the beneficial owner of all of the shares held by the above entities.

49.     Defendant Scott D. Rued, ("Rued") is an individual who served as the general manager of the HCI Equity Partners at all times material, including before and during Roadrunner's August 2013 offering, as more fully discussed below. Rued was Roadrunner's chairman of the board at all times material to the Class Period and until November 2017. Rued is one of three co-founders and managing partners of HCI Equity Partners.

## IV.     BACKGROUND ALLEGATIONS

### A.     Roadrunner's "Asset-Light," "Variable Cost Structure" and "Independent Contractor" Driver Based Business Model

50.     Roadrunner is a transportation and logistics services provider that offers a full suite of transportation solutions, including customized and expedited less-than-truck load, truck load and intermodal brokerage, and domestic and international air. The Company also provides third-party logistics and transportation management solutions. Roadrunner maintains three operating segments: Truckload Logistics, LTL, and Global Solutions, and characterizes itself as an "asset-light" transportation and logistics services provider featuring a "low cost, high quality business model" and "comprehensive portfolio of transportation solutions" that provides a competitive advantage enabling profitable growth and value creation to its shareholders.

51.     LTL services provided by Roadrunner through the Class Period involved the transport of consolidated freight from several shippers to multiple destinations on one vehicle. These services included pick-up, consolidation, line-haul, deconsolidation and delivery of shipped freight or items. The phrase "line haul" refers to the longest leg in the LTL shipment process. In dispatching a load, a line haul coordinator uses technology systems to "optimize cost-efficiency" and service by assigning the load to the appropriate third-party transportation provider, whether an independent contractor or a purchased power transportation service. Roadrunner maintained that its method of operation involved fewer handlings, consolidations,

23

and deconsolidations per less-than-truckload shipments. Form 10-K for the fiscal year ending December 31, 2015, executed by defendants Rued, DiBlasi, and Armbruster on March 1, 2016 ("2015 10-K").

52. Roadrunner's Global Solutions business offered a "one-stop" domestic and international transportation and logistics solution, including what the Roadrunner Defendants represented to be "*the most cost-effective*" and "time-sensitive modes of transportation" within the Company's broad network. During the Class Period, Roadrunner's Global Solutions offered services including pricing, contract management, transportation mode and carrier selection, freight tracking, freight bill payment and audit, cost reporting and analysis, and dispatch. Roadrunner represented throughout the Class Period that its "customized global solutions was designed to allow our customers to reduce operating costs, redirect resources to core competencies, improve supply chain efficiency, and enhance customer service." (*2015 10-K*).

53. Roadrunner represented that it "continuously" focused on "building and enhancing our relationships with reliable transportation providers to ensure that we not only secure competitive rates, but that we also gain access to consistent capacity." So-called "purchased transportation costs" in Roadrunner's Truckload ("TL"), LTL, and Global Solutions segments were, by the Company's own admission, "the largest component of our cost structure." (*2015 10-K*). Roadrunner typically paid "third-party carriers either a contracted per mile rate or the cost of a shipment less our contractually agreed upon commission," generally within 7 to 10 days from the date the shipment is delivered," and boasted that it paid "our third-party carriers promptly in order to drive loyalty and reliable capacity." (*2015 10-K*).

54. Roadrunner's business model relied heavily upon independent contractor ("IC") drivers. By the start of the Class Period, the trucking industry was experiencing a critical

24

shortage of truck drivers, creating market concerns regarding what is commonly referred to as "capacity."[3] Recruiting and maintaining a sufficient stable of quality drivers to haul freight is critically important to every trucking company. Mindful of this issue, and in a continuing effort to comfort the market about the Company's advantageous positioning with respect to possessing sufficient "capacity" amid driver shortage challenges generally affecting the industry, Roadrunner favorably portrayed its flow of quality drivers available for recruitment, their retention and, to that end, its favorable compensation and treatment of its drivers.

55. By the advent of the Class Period, DiBlasi had comforted investors with representations that the Company was experiencing "solid growth" of operators and "good flow simply because we pay in the top tier for independent contractors," and "give them consistent dispatches," with "consistency in our LTL network," while providing drivers with "the miles they need in order to make a good living" (November 2, 2010 earnings conference call).

56. Indeed, during a May 2, 2012 earnings conference call, DiBlasi reiterated that Roadrunner has "***several incentives*** in the marketplace that are ***very competitive for ICs***" that the Company's "turnover ratio is still in the 40% to 50% range, which is one of the best in the industry and "we do pay in the top tier," while giving "very consistent dispatches to our LTL ICs and … the miles they need in order to be successful businessmen." During a February 6, 2013 earnings conference call, DiBlasi boasted that Roadrunner's "***asset-light business model***" was "***positioned perfectly*** for continued market share gains," adding "our business model is scalable and flexible and our ***cost structure is variable*** and ***requires minimal investment in transportation equipment and facilities***," while assuring the market that Roadrunner was "***much more cost effective than competitors*** in the LTL ***market.***"

---

[3] As of August 13, 2014, the American Trucking Associations estimated that the United States was short approximately 30,000 truck drivers – a number expected to surge to 239,000 by 2022.

**B. Roadrunner's May 2010 Initial Public Offering After Streamlining its Cost Structure to Weather An Industry Downturn In Tonnage**

57.     According to the American Trucking Association ("ATA"), beginning in October 2006, the over-the-road freight sector experienced year-over-year declines in tonnage, primarily reflecting a weakening freight environment in the United States construction, manufacturing, and retail sectors. During 2009, Roadrunner's LTL tonnage decreased 4.6% as compared to 2008, while LTL tonnage in the United States over-the-road freight sector declined 23.2% during the same period.

58.     From the latter part of 2008 through early May, 2010 – a period of approximately 18 months - Roadrunner completed a number of operating improvements such as headcount reductions, terminal consolidations, and carrier delivery agent rate reductions, that were designed to streamline its cost structure, improve its operating efficiency and enhance its margins. By the time it became a public company in May 2010, it was also capitalizing upon those improvements, enhancing its competitive position and endeavoring to accelerate earnings growth by implementing additional initiatives designed to, among other things, reduce per-mile cost, reduce stock handling costs, and enhance its real-time metric reporting to further reduce operating expenses.

59.     On May 12, 2010, Roadrunner became a public company through the offering and sale of 9 million shares of its common stock at $14.00 per share, realizing proceeds, before expenses, of $117,180,000 ("May 2010 Offering"). Roadrunner's largest inside shareholder was the HCI Entities, which owned 52% of the Company's outstanding common stock upon conclusion of the May 2010 Offering. In its May 2010 prospectus, Roadrunner emphasized that its "***variable cost, non-asset based operating model serves as a competitive advantage***" allowing Roadrunner to "provide our customers with cost-effective transportation solutions,

26

regardless of broader economic conditions" making the Company "well positioned for continued growth, profitability and market share expansion as an anticipated rebound occurs in over-the-road freight sector." (*May 2010 Prospectus Summary.*)

### C.      Pursuit of a "Selective" Aggressive Acquisition Strategy

60.      Commencing with its May 2010 Offering, the Roadrunner Defendants told investors that Roadrunner had built its LTL, TL brokerage, and transportation management solutions (later to be known as "Global Solutions") platforms by "successfully completing and integrating a number of *accretive acquisitions*." Investors were assured that Roadrunner's "scalable platform, experienced management team, and *ability to* identify, execute and *integrate acquisitions*" provided it with advantages when seeking potential acquisition candidates. Roadrunner represented that its ability to leverage its infrastructure and technology capacity enabled it to maximize the benefits of acquisitions and its "extensive strategic planning and execution throughout the recent downturn," made the Company "uniquely positioned to take advantage of continuing consolidation opportunities," especially given its "improved capital position" as a consequence of the May 2010 Offering.

61.      Between 2011 and July 2015, Roadrunner acquired fourteen companies, as more fully reflected in the table below:

| Date of Acquisition | Name / Location of Acquired Company | Cost of Acquisition |
|---|---|---|
| February 3, 2011 | Morgan Southern, Inc. Peachtree City, Georgia | $20.0 million |
| May 31, 2011 | Bruenger Trucking Company Wichita, Kansas | $10.6 million, plus an earn-out capped at $3.0 million |
| August 1, 2011 | The James Brooks Company Fresno, California | $7.5 million |
| August 31, 2011 | Prime Logistics Corporation (Prime) Plainfield, Indiana | $97.5 million |
| February 24, 2012 | Capital Transportation Logistics (CTL) Nashua, New Hampshire | $6.25 million |
| April 19, 2012 | D&E Transport Clearwater, Minnesota | $11.2 million, plus an unspecified |

27

| | | earn-out |
|---|---|---|
| June 4, 2012 | CTW Transport | $7.5 million, plus an unspecified earn-out |
| August 3, 2012 | R&M Transportation, and Sortino Transportation Omaha, Nebraska | $24.4 million, plus an earn-out capped at $5.0 million |
| August 13, 2012 | Expedited Freight Systems, Inc. (EFS) Kenosha, Wisconsin | $10.0 million, plus an unspecified earn-out over 4 years |
| November 5, 2012 | Central Cal Transportation Fresno, California | $4.0 million, plus an unspecified earn-out |
| November 12, 2012 | A&A Express Brandon, South Dakota | $24.0 million, plus an earn-out capped at $2.5 million |
| December 21, 2012 | Direct Connection Transportation (DCT) Phoenix, Arizona | $1.3 million |
| April 30, 2013 | Wando Trucking (Wando) Charleston, South Carolina | $9.0 million |
| April 30, 2013 | Adrian Carriers, Inc., and C.B.A. Container Sales, Ltd. Milan, Illinois | $14.2 million, plus an earn-out capped at $6.5 million |
| July 25, 2013 | Marisol International LLC Springfield, Missouri | $66.0 million, plus an earn-out capped at $2.5 million |
| February 24, 2014 | Rich Logistics, and Everett Transportation Inc. Little Rock, Arkansas | $48.0 million |
| March 14, 2014 | Unitrans International Corp. (Unitrans) Los Angeles, California | $55.5 million |
| July 21, 2014 | ISI Acquisition Corp., and ISI Logistics South, Inc. Kokomo, Indiana | $13.0 million |
| August 27, 2014 | Active Aero Group Holdings, Inc. (AAGH) Belleville, Michigan | $115.0 million |
| July 28, 2015 | Stagecoach Cartage and Distribution El Paso, Texas | $35.0 million, plus an earn-out capped at $5.0 million |

### D. Roadrunner's Leverage Ratios – Vitally Important Metrics

62. In the wake of the Great Recession of 2008, the investment community paid close attention to corporate debt levels as a barometer of corporate financial health. During the Class Period, Roadrunner experienced an increasing debt burden due to its aggressive acquisition strategy, which was important to its success and growth. Roadrunner maintained vitally important credit facilities and lines of credit with lenders. Its first credit agreement with its lender, US Bank, entered into on May 18, 2010, contained various financial covenants and imposed obligations upon Roadrunner with respect to its financial reporting, the maintenance of books and records and its so-called "leverage ratio." The original credit agreement provided up

28

to $55 million for Roadrunner's use. By the end of 2016, Roadrunner had entered into its Sixth Amended and Restated Credit Agreement dated September 24, 2015, and its credit facility had expanded to $700 million.

63.     Roadrunner's credit agreements throughout the Class Period contained two important financial covenants to which Roadrunner was required to adhere in order to avoid default and the potential immediate calling of repayment of the loans. These covenants are a "*Fixed Charge Coverage Ratio*" and a "*Total Cash Flow Coverage Ratio*," the latter ratio being the more important of the two to the market. As defined by each credit agreement, "*Total Cash Flow Leverage Ratio*" means the ratio of (a) Total Funded Debt to (b) EBITDA, or, following a permitted acquisition, pro forma EBITDA. In its discussions with the investment community, the Roadrunner Defendants, when speaking about the "Total Cash Flow Leverage Ratio," typically referred to it as Roadrunner's "leverage ratio," or sometimes as its "debt to EBITDA ratio."

64.     Roadrunner's ability to maintain its credit facilities with lenders and access substantial sums of money to fuel its operations and, in particular, its growth by acquisition strategy, was significant to its business health and profitability and was part of the total mix of information that the investment community found important in making investment decisions regarding the Company. Roadrunner's leverage ratio was an important yardstick and a key metric with respect to the Company's true financial condition and performance.

65.     Defendants were keenly aware of the critical importance of Roadrunner's ability to access funds provided by its credit facility and lines of credit. Although it increased the Company's debt burden, the credit financing served as a critical financial lifeline. Any loss of such a lifeline, or any significant prejudice to its ability to secure credit or an expansion of its credit facilities, represented a significant financial calamity respecting Roadrunner's business

29

model that could bring about a serious adverse financial consequence should it default in its obligations and covenants under its credit facility. This was especially important given Company cash flows.

66. As more fully alleged below, Roadrunner's leverage ratios were ongoing topics of attention from the investment community. Its leverage ratios were important to investors' assessment as to whether Roadrunner was in compliance with the covenants and conditions of its credit agreements, and with respect to their assessment of the depth of risk of investment in the Company.

**E. Deliberate, Constant Attention to Controlling Costs to Attain Profitability**

67. Roadrunner's business required deliberate attention to controlling costs in order to operate profitably. Roadrunner's executives and decision makers, like those at other transportation service providers or trucking companies, required granular level information in order to manage costs and achieve profitability, thus necessitating an obsessive, acute focus and firm handle on costs, operational metrics, and key performance indicators.

68. There are a number of key performance indicators ("KPIs") that are well known within the trucking and freight industry and used as metrics in order to address costs and manage company profitability. KPIs that were required to be focused upon, and constantly assessed and evaluated during the Class Period included: total whole vehicle cost, average running cost, average standing cost, average driver cost, average cost per unit delivered, total maintenance cost, total cost for temporarily contracted drivers, total cost for temporarily contracted vehicles, total cost for leased vehicles, and total cost for overtime. In addition to KPIs, there are several key operational perspective metrics that were also required to be continuously assessed at all times material hereto, including: fuel consumption (kilometer per liter), total kilometers run, total

30

kilometers run empty, percentage of kilometers run empty, percentage of vehicle fill, percentage of time utilization, and percentage of utilized time used for transport.

69.     The cost of recruiting, hiring, maintaining, or otherwise employing drivers, whether independent contractors or otherwise, and controlling driver cost, necessitated a **constant focus on what was being paid with respect to driver and transportation cost and related expenses incurred by the Company**. Such driver related expenses were required to be known to executive management so that, among other things, they could be factored into the determination of rates to set for customer shipping needs.

70.     The Roadrunner Defendants were required to and did devote their attention to such metrics, discussing with or reporting to the market on metrics such as, among their things, line haul costs-per-mile, independent contractor driver contract rates, capacity costs, spot rates, weight-per-shipment, margins, margin expansion, yield, operating ratios, and leverage ratios, in addition to reporting Roadrunner's purported financial results.

## F.     Strong Pressures to Portray Success

71.     By the advent of the Class Period, Roadrunner was facing both strong competition and a deepening industry-wide problem of an insufficient number of truck drivers, or "capacity." The constant issue of "capacity" was exacerbated and rendered even more important as a consequence of new federal legislation and "hours-of-service-rules" that were changing the number of hours a truck driver could work hauling freight in a manner that confronted drivers with the prospect of diminished earnings, which, in turn, increased the importance of Roadrunner's recruitment and retention of quality drivers.

72.     Competition and market headwinds put pressure on Roadrunner to convince investors that it was growing, prospering, and that its growth by acquisition strategy was

successful. Roadrunner repeatedly alleged that it was a "preferred merger partner," offering a "culture" desired by all carriers seeking a merger partner or buyer. In addition, and faced with this competitive landscape and market headwinds, Roadrunner's controlling insiders and largest shareholders, managed by defendant Rued, were intent upon divesting a substantial portion of their shares at beneficial prices in order to reap significant profits from their substantial investment in Roadrunner's common stock.

73. Convincing the market that Roadrunner's growth by acquisition strategy was positioning it for success, without threatening or causing it to violate its debt and leverage ratio covenants, was dependent in large part upon Roadrunner's financial success and performance, which, in turn, drove the trading price of its common stock. To that end, commencing with the beginning of the Class Period and over a number of years thereafter, the Roadrunner Defendants engaged in a steady drumbeat of false and deceptive financial reports and related misrepresentations and omissions as part of their scheme to inflate or otherwise buoy and maintain the trading price of Roadrunner stock by portraying and skewing the Company's financial results, condition and performance metrics to be more favorable than they actually were and/or to conceal adverse trends and business developments.

## V. MATERIAL MISSTATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A. The False and Misleading 2012 Reported Financial Results and Related Statements

74. The Class Period commences with Roadrunner's March 14, 2013 issuance and filing with the SEC of its Annual Report on Form 10-K for its 2012 fiscal year, ending December 31, 2012 (the "2012 10-K"). Roadrunner's 2012 10-K, which was executed by defendants Rued, DiBlasi, and Armbruster, disclosed net income of $37,530,000, EBITDA of $78,449,000, diluted

earnings per share of $1.16, and a goodwill asset value on the Company's balance sheet of $442,143,000. By reporting diluted earnings per share of $1.16 for the fiscal year ending December 31, 2012, Roadrunner reaffirmed and provided comfort to the market that the earnings guidance it gave to the market on October 31, 2012, had, in fact, been attained. Each of these reported results, including net income, earnings per share, and EBITDA were highly important metrics that the market absorbed in setting a trading price for the Company's stock.

75. The 2012 10-K also contained the Executive Defendants' SOX certifications wherein they collectively and affirmatively certified that, "***based on***" their "***knowledge***," the disclosure does not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made in light of the circumstances under which such statement were made, not misleading with respect to the period covered by this report." The Executive Defendants collectively certified that "based on" their "knowledge," "the financial statements and other financial information included in this report, fairly present in all material respects, the financial condition, results of operations and cash flows" of Roadrunner for that period. Investors were assured that management is "responsible for establishing and maintaining adequate internal control over financial reporting … to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." Defendant Armbruster certified that the Executive Defendants were "responsible for establishing and maintaining disclosure controls and procedures" and "internal control over financial reporting," and that the Executive Defendants designed or caused to be designed under their supervision "such disclosure controls and procedures" to "ensure that material information … is made known" to them, to "provide reasonable assurance regarding the reliability of our financial reporting and the

33

preparation of financial statements … in accordance with generally accepted account principles," and that they had disclosed, based on their evaluation of internal control over financial reporting, to Roadrunner's auditors and audit committee "all significant deficiencies and material weaknesses in its internal controls" and "any fraud … that involves management … who have a significant role" in Roadrunner's "internal control over financial reporting." Nowhere in Roadrunner's 2012 10-K did the Executive Defendants disclose that the Company's internal controls and procedures were, in fact, inadequate, deficient, and rife with material weakness, or that its financial results were false and were not stated in accordance with generally accepted accounting principles.

76.     The issuance and filing of the 2012 10-K helped buoy the trading price of Roadrunner's common stock and also helped create the foundation for its price surge and thereby enable the selling insider shareholders, including the HCI Entities managed by Rued, and the Executive Defendants, to thereafter sell a substantial amount of their shareholdings at artificially inflated prices while the market and investment community remained deceived. On March 15, 2013, the closing price of Roadrunner's common stock was $23.42 per share, buoyed by the aforesaid misstatements after a prolonged period of trading prices in 2012 that were as low as $14.16 per share, never higher than $19.13 per share, and were previously largely trading below $23.42 a share throughout most of the first quarter of 2013.

77.     In truth, and unknown to the market, the reported financial results in Roadrunner's 2012 10-K were materially false. Roadrunner materially understated its FY 2012 operating expenses by over $8,000,000, thus favorably skewing its net income, diluted earnings per share and EBITDA – important metrics. Roadrunner's true FY 2012 net income was actually $31,685,000 not $37,530,000. Its true 2012 diluted earnings per share – which the Roadrunner

Defendant's had guided the market in October 2012 to believe would be between $1.15 - $1.19, and which the 2012 10-K reported was $1.16 — was materially short of guidance, falling at $0.98 diluted earnings per share. EBITDA, reported in the 2012 10-K to be $78,449,000, was actually $69,993,000, also materially and significantly lower than represented.

78.    Beyond its materially false reported financial results and metrics signaling its business performance for FY 2012, the Executive Defendant's certifications under Sarbanes Oxley were flagrantly false and untrue, which the Company – now under new management – admitted and acknowledged on January 31, 2018, as more fully discussed below.

**B.    The False and Misleading 2013 Reported Financial Results and Related Statements**

79.    After the close of business on May 1, 2013, Roadrunner issued a press release reporting its financial results for the three months ended March 31, 2013 ("Q1 2013 Press Release"). The Company's Q1 2013 Press Release reported net income of $10.6 million, which was represented to be a "33.4% increase" over the prior year quarter. Roadrunner's Q1 2013 diluted income per share was reported to be $0.29, "an increase of 16.0% from the first quarter of 2012 diluted EPS of $0.25." The Company stated: "excluding the impact of the December 2012 stock offering, Roadrunner's diluted income per share would have increased $0.07 per share over the first quarter 2012, an increase of 28.0%." Notably, the 2013 First Quarter Segment Information referred in the Q1 2013 Press Release "exclude[d] intercompany eliminations and corporate expenses." The Company also reported approximately $441.7 million in goodwill on the balance sheet as of March 31, 2013. Commenting on Q2 2013 earnings guidance, CFO Armbruster stated, "diluted income per share … to be between 0.35 and 0.38 compared to … 0.32 in the prior year quarter."

80. In the follow-on May 1, 2013 Company earnings conference call with financial analysts after the close of the market, defendant Armbruster represented that Roadrunner achieved diluted EPS for Q1 2013 of $0.29 and that its leverage ratio was "well below" two-times debt to EBITDA. During the May 1 call with analysts, defendant DiBlasi responded to an analyst's question by discussing the Company's growth in its truckload segment and its acquisition strategy. DiBlasi said that "six of the eight acquisitions we made last year were in the truckload segment. Those are starting to now grow at the type of growth and expansion...that we expect once we make acquisitions. We've integrated them and now we're starting to reap some of the benefits...." The six truckload segment acquisitions increased the stated goodwill that the Company carried on its balance sheet. DiBlasi added during the call that the Company's "diversification of...purchased transportation, the increased utilization of independent contractors, [and] the recruiting of more independent contractors" serve to "mitigate" line haul costs and "keep that cost at a static level."

81. On May 10, 2013, the Company filed with the SEC a Report on Form 10-Q for the quarter ended March 31, 2013 ("Q1 2013 10-Q") that reported the Company's first quarter 2013 financial results. The Company's Q1 2013 10-Q reported net income of $10,582,000, diluted earnings per share of 0.29 and an asset value for goodwill of $441,667,000. The Q1 2013 10-Q stated that the Company's internal controls over financial reporting were effective as of March 31, 2013. The Q1 2013 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants attesting, as before, that the financial statements for the respective reporting period are not untrue, are fairly stated, and that the Executive Defendants established, and maintained disclosure controls, procedures and internal controls over financial reporting that they designed to ensure that material information was made known to them and to

provide reasonable assurance regarding the reliability of Roadrunner's financial reporting, and that they evaluated their effectiveness. Nowhere did the Executive Defendants disclose that, in truth, Roadrunner's internal controls were significantly deficient and plagued with material weaknesses in their design, implementation or operation, or that Roadrunner's financial results were falsely stated. As with the 2012 10-K, every 10-K and 10-Q issued by the Executive Defendants during the Class Period contained the same boilerplate representations regarding "Controls and Procedures" and SOX certifications, without disclosure of material weakness and ineffectiveness of internal controls, or the fact that reported financial results for each such respective reporting period were materially false and violated generally accepted accounting principles.

82. Following the issuance of Roadrunner's Q1 2013 Press Release announcing its financial results on May 1, 2013, the trading price of its common stock climbed from $22.29 a share at the close of trading on May 1, 2013, just before the announcement, to a close of $25.68 per share on May 10, 2013, following the filing of Roadrunner's 10-Q. During that period, Roadrunner stock traded as high as $25.74 per share. On May 20, 2013, defendants DiBlasi and Armbruster started to take advantage of the stock price inflation caused by their deceit, selling substantial and unusual amounts of stock. Defendant DiBlasi sold 44,794 shares of Roadrunner stock for proceeds of more than $910,000. That same day, defendant Armbruster sold 130,000 shares for proceeds of more than $2.1 million.

83. Fueled by the Roadrunner Defendants' false financial results and statements, and absent disclosure of the truth, the trading price of Roadrunner common stock continued to climb from $29.84 at the close of trading on July 25, 2013 to close at $30.36 per share by the end of trading on July 30, 2013.

84.     In a press release issued after the close of the market on July 31, 2013, Roadrunner reported financial results for the three and six months ended June 30, 2013 ("Q2 2013 Press Release"). The Company's Q2 2013 Press Release reported net income of $13,970,000 and diluted earnings per share of $0.37. The 2013 second quarter segment information reported in the announcement "exclude[d] intercompany eliminations and corporate expenses." The Company also reported $459.8 million in goodwill on the balance sheet as of June 30, 2013. Commenting on Q3 2013 earnings guidance, Armbruster stated, "[w]e expect diluted income per share … to be between $0.36 and $0.39 …."

85.     In a July 31, 2013 earnings conference call with analysts, CFO Armbruster represented to the investment community that Roadrunner's diluted EPS had increased to $0.38, and comforted investors that Roadrunner's leverage ratio "continued to be well below 2 times" debt to EBITDA. Armbruster stated that the Company's management team "enhances the smooth integration of our many acquisitions," each of which contributed to the increasing goodwill on the Company's balance sheet.

86.     As DiBlasi admitted to securities analysts in the July 31, 2013 conference call, HCI was intent on selling a substantial amount of HCI Entity related shares after the stock attained a price of $30 per share. A strategic secondary offering provided a path for enabling the HCI Entities to substantially divest their holdings while Roadrunner's stock was trading at a highly inflated price per share, at or near its historic highs.

87.     On August 9, 2013, the Company filed with the SEC a Form 10-Q for the quarter ended June 30, 2013 ("Q2 2013 10-Q") that provided its financial results for the second quarter ending June 30, 2013. The Q2 2013 10-Q reported net income for the quarter of $13,970,000, and diluted earnings per share of $0.37. The Q2 2013 10-Q further stated that the Company's

38

internal controls over financial reporting were effective as of June 30, 2013. The Q2 2013 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants attesting that the financial statements were not untrue, were fairly stated, and that the Executive Defendants established and maintained internal controls over financial reporting that they designed and evaluated, with the same SOX representations and assurances as noted previously.

88. As a consequence of the foregoing statements about its financial results in Q2 2013, the trading price of Roadrunner's common stock was buoyed and maintained at and around the target $30 per share sought by the Roadrunner Defendants and its controlling shareholders, the HCI Entities, trading between $30.23 per share at the close of trading on August 1, 2013 to $29.78 by the close of trading on August 9, 2013, far higher than the $14 per share at which it had traded at its initial public offering on May 12, 2010.

89. In August 2013, market headwinds were confronting the Company and Roadrunner's aggressive acquisition strategy was facing a lack of suitable acquisition targets that could be immediately accretive. As a consequence, the defendants pushed harder to complete Roadrunner's secondary offering.

90. To that end, by its Prospectus dated August 13, 2013, which was executed by the Executive Defendants, Roadrunner offered 1.5 million shares of its common stock on the open market in conjunction with the offering of 2.8 million shares of its common stock by its selling shareholders, including a substantial block of shares sold by its controlling shareholders, the HCI Entities. Roadrunner's common stock was offered at the price of $27.00 per share which, though not as high as $30 per share, was still close to the highest trading price its stock had ever enjoyed since it became a public company in May 2010, and substantially higher than its trading price immediately before the commencement of the Class Period and through all of 2012.

39

91.     As a consequence of the August 13, 2013 secondary offering, Roadrunner secured approximately $38 million in proceeds. The HCI Entities, of which Mr. Rued was a beneficial owner and general manager, and defendant DiBlasi, collectively secured proceeds of more than $89 million from the offering and sales made between August 19, 2013 and August 30, 2013.

92.     In an after-hours press release dated October 30, 2013 ("Q3 2013 Press Release"), Roadrunner reported financial results for the three and nine months ended September 30, 2013, disclosing net income of $13.2 million, which increased 34% "over the prior year quarter," and diluted earnings per share of $0.35, which increased 12.9% over the prior year." The Company also reported $515.86 million in goodwill on the balance sheet as of September 20, 2013. Commenting on Q4 2013 guidance, Armbruster stated, "[w]e expect diluted income per share … to be between $0.31 and $0.35…."

93.     During an earning's conference call with the investment community on October 30, 2013, the Executive Defendants reported diluted EPS of $0.35 and that Roadrunner's leverage ratio was "well below 2 times" debt to EBITDA. Defendant DiBlasi spoke about the Company's acquisitions, stating "we are fully capable, from a management standpoint, to effectively assimilate each of these opportunities." DiBlasi added in response to an analyst inquiry: "We're one of the few companies in transportation that has a proven, effective, efficient way in which to acquire companies and integrate them and we do it in a very profitable managed way in which we systematically and incrementally improve our profitability."

94.     In its Report on Form 10-Q for Q3 2013 dated November 8, 2013 ("Q3 2013 10-Q") reporting the Company's earnings, expenses, and related metrics of performance, Roadrunner reported net income of $13,230,000, diluted earnings per share of $0.35, and an asset value for goodwill of $515,862,000. Roadrunner's Q3 2013 10-Q included the Executive

40

Defendants' representations regarding "Controls and Procedures" and their executed SOX certifications that the financial statements were not untrue, were fairly stated, that the Executive Defendants established and maintained disclosure controls and procedures and internal controls over financial reporting that they designed and evaluated and that such internal controls were effective.

95. Roadrunner's Q3 2013 10-Q also informed investors about its vitally important and newly initiated Tractor Lease Guaranty Program. No doubt mindful of its constant refrain and representation that Roadrunner was an "asset-light" company that utilized IC drivers, thus enabling it to control its costs more effectively than asset-based competitors, and the unavoidable fact that guarantying driver leases involved a potential layer of operational costs and expenses, the Roadrunner Defendants created the impression that the Program's "potential" financial cost was benign and its associated guaranty costs were not material. To that end, in a footnote to the financial statements contained in Roadrunner's Q3 2013 10-Q, executed by Executive Defendants DiBlasi and Armbruster on November 8, 2013, Roadrunner stated, in pertinent part, as follows with respect to its Tractor Lease Guaranty Program:

> The company provides a **guarantee** for a portion of the **value** of **certain independent contractors' (IC) leased tractors**. The guarantees expire at various dates through 2020.
>
> The potential maximum exposure under these lease guarantees was approximately $7.4 million as of September 30, 2013. The potential maximum exposure represents the Company's commitment on remaining lease payments on guaranteed leases as of September 30, 2013. **However**, upon an IC default, the **company** has the **option to purchase** the tractor **or return the tractor** to the leasing company if the residual value is greater that the company's guarantee. Alternatively, the Company can **contract another IC to assume the lease**.

96. Beyond discussing its purportedly viable options, and neutralizing concern about its contingent lease guaranty exposure and associated financial cost, the footnote added:

41

There were **no material IC defaults** during the three and nine months ended September 30, 2013 and payments made by the Company under the guarantee were *de minimis*.

97.     The foregoing statements in paragraphs 95 and 96 comforted investors by creating the impression that any financial risks and costs associated with Roadrunner's tractor lease program were benign. Except for changing approximate amounts of guaranty commitments and quarterly time frames, Roadrunner repeated these comforting statements in its 10-Q and/or 10-K filings thereafter, up to (but not including) its 10-Q Report for the period ending September 30, 2015. As a consequence of the Roadrunner Defendants' false and misleading statements and omissions on Roadrunner's Q3 2013 financial results, Roadrunner's stock price was buoyed and remained artificially inflated in the face of independent market forces putting downward pressure on the transportation industry, closing at $26.50 per share on October 31, 2013. Thereafter, the Roadrunner Defendants continued to report false financial results and conceal material information from the investment community, causing the trading price of Roadrunner's stock to remain artificially inflated or otherwise fortifying or buoying its stock price amid market forces and headwinds.

98.     In an after-hours Company press release issued on February 5, 2014, Roadrunner reported financial results for the three and twelve months ended December 31, 2013 ("Q4 2013 Press Release"). In discussing the Company's fourth quarter and FY 2013 performance, DiBlasi stated in pertinent part:

> …Our consolidated net income available to common stockholders increased 30.6% to $49.0 million in fiscal 2013 from $37.5 million in fiscal 2012. Our diluted income per share available to common stockholders increased 11.2% to $1.29 in fiscal 2013 from $1.16 in fiscal 2012.

EBITDA for fiscal year 2013 was reported at $101,674,000. Commenting on guidance for the first quarter of 2014, Armbruster stated "we expect diluted income per share available to

common stockholders to be between $0.27 and $0.30, compared to diluted income per share …
of $0.29 in the prior year quarter." The 2013 Fourth Quarter Segment Information reported in the
announcement "exclude[d] intercompany eliminations and corporate expenses."

99.     During Roadrunner's February 5, 2014 earnings conference call with the
investment community reporting on the Company's Q4 2013 and FY 2013 performance, CFO
Armbruster stated that Roadrunner had a leverage ratio of "well below 2 times" debt to EBITDA.
CFO Armbruster reported an increase in Q4 2013 net income available to common shareholders
of 17.7% compared to Q4 2012, and represented that Q4 2013 diluted income per share was
$0.29, which was "equal to the prior year." Roadrunner's diluted earnings per share reportedly
fell just below its previously issued low end of guidance by $0.02 per share for Q4 2013, despite
the fact that it was falsely inflated - a material fact concealed by the defendants.

100.     During the Q4 2013 call, DiBlasi was questioned by Raymond James analyst Art
Hatfield, who pointed out that more recent acquisitions were not as accretive as the Company's
acquisitions had been historically. DiBlasi denied that the 2013 deals were not as accretive as
earlier ones, stating: "No, that's not the case at all. Our deals are just as accretive as they have
been, our multiples are just as good as they have been in the past." Nevertheless, each of its
Class Period acquisitions, including those in the Company's TL and Global Solutions segments,
contributed incremental increases to the goodwill carried on the balance sheet.

101.     On March 13, 2014, Roadrunner filed its Annual Report on Form 10-K for the
twelve months ending December 31, 2013 ("2013 10-K") executed by defendants Rued, DiBlasi
and Armbruster. In the 2013 10-K, Roadrunner reported consolidated diluted earnings per share
of $1.29, EBITDA of $101,674,000, and net income of $48,996,000. The Executive Defendants'
SOX certifications were filed with the 2013 10-K as Exhibits 31.1 and 31.2, wherein they

43

certified that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and further certified that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]" The Roadrunner Defendants further declared in the 2013 10-K that management is "responsible for establishing and maintaining adequate internal control over financial reporting … to provide reasonable assurances regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." The Executive Defendants further represented that Roadrunner's internal controls were effective and did not disclose any material weaknesses in internal controls, nor any fraudulent conduct by management with significant control over the Company's financial reporting, such as themselves.

102.    The 2013 Form 10K contained certain representations about the Company's debt covenants, including the covenants setting a minimum fixed charge ratio and maximum adjusted leverage ratio, noting the importance of these covenants to the Company. The 2013 10-K financial statements also contained footnote disclosures addressing the Company's accounting policies, acquisitions, its goodwill and intangible assets, and its guarantees. The Company reported $518.7 million of goodwill on its balance sheet.

103.    Complimenting the aforesaid financial disclosures, Roadrunner's 2013 Form 10-K, under a section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), uniformly represented and re-assured investors that it was "a

leading asset-light transportation and logistics service provider" with a "business model" that is "highly scalable and flexible, featuring a variable cost structure that requires minimal investment (as a percentage of revenues) in transportation equipment and facilities, thereby enhancing free cash flow generation and returns on our invested capital and assets." Commencing with its 2013 10-K, in a section entitled "Off Balance Sheet Arrangements," the MD&A stated the following regarding the Company's tractor lease guaranty obligation as of December 31, 2013:

> We **do not have** any **transactions**, **arrangements or other relationships** with unconsolidated entities **that are reasonably likely to materially affect our financial condition**, changes in financial condition, **revenues or expenses, results of operation**, liquidity or capital resources. We have no special purpose or limited purpose entities… that expose us to liability that is not reflected in the financial statements. However… we provide a **guarantee** for a **portion** of the **value** of **certain IC leased tractors**.

104. In a footnote to the financial statements contained in Roadrunner's 2013 10-K, the Roadrunner Defendants repeated the same discussion found in its 3Q'13 10Q that "there were no material IC defaults" respecting its Tractor Lease Guaranty Program and that "payments made by the Company under the guarantees were *de minimis*." These statements, alone and in combination with Roadrunner's financial disclosures in its 10-Q filing, as recited above, conveyed the clear message to and created the impression in the market that the Tractor Lease Guaranty Program relied upon by the Company to secure quality driver capacity was a success that, in practice, created minimal financial cost and was not reasonably likely to materially affect its financial condition.

105. The foregoing reported financial results and representations of Roadrunner's financial performance, made between February 5, 2014 and March 13, 2014, inclusive, buoyed and artificially inflated the trading price of Roadrunner's common stock amid downward pressure in the market. Artificial inflation remained embedded in and continued to distort

Roadrunner's stock price, which fluctuated between a low of $21.28 per share at the close of trading on February 10, 2014 to a high of $25.71 at the close of trading on March 6, 2014.

106.    Beginning January 30, 2017, the Roadrunner Defendants conceded that their reported financial results and metrics of performance respecting the above reporting periods were materially false and that the Company's true earnings were materially overstated and its true expenses understated, as more fully alleged below.

107.    On January 31, 2018, and with the benefit of new management and a new chairman of the board of directors, Roadrunner issued its year-long awaited Restatement, disclosing specific and material prior financial reporting falsehoods, together with executive management misconduct and material weaknesses in its internal control over financial reporting designed and implemented by the Executive Defendants, wholly contradicting their SOX certifications, as more fully discussed at Part VI *infra*. Roadrunner's reporting of its important financial results regarding net income, EBITDA, and earnings per share, for and within fiscal year 2013, were materially false and misleading and their true results, as restated, are reflected in the charts below:

Amounts in
thousands

2013 Net Income By Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---------|--------------------|-----------------|--------------|--------------|
| 2013-Q4 | 11,214 | 10,385 | (829) | -7.4% |
| 2013-Q3 | 13,230 | 12,409 | (821) | -6.2% |
| 2013-Q2 | 13,970 | 13,220 | (750) | -5.4% |
| 2013-Q1 | 10,582 | 9,906 | (676) | -6.4% |

*Restated 2013 quarterly net income estimated based on Company-disclosed change to net income for fiscal year 2013 weighted by respective 2013 quarterly revenue.

Amounts in
thousands

2013 EBITDA By Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---|---|---|---|---|
| 2013-Q4 | 23,250 | 21,261 | (1,989) | -8.6% |
| 2013-Q3 | 27,688 | 25,720 | (1,968) | -7.1% |
| 2013-Q2 | 28,244 | 26,445 | (1,799) | -6.4% |
| 2013-Q1 | 22,492 | 20,870 | (1,622) | -7.2% |

* Restated 2013 quarterly EBITDA estimated based on Company-disclosed change to EBITDA for fiscal years 2013, weighted by 2013 quarterly revenue.

Amounts in
thousands

2013 Earnings Per Share-Diluted by Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---|---|---|---|---|
| 2013-Q4 | 0.29 | 0.27 | (0.02) | -7.4% |
| 2013-Q3 | 0.35 | 0.33 | (0.02) | -6.1% |
| 2013-Q2 | 0.37 | 0.35 | (0.02) | -5.3% |
| 2013-Q1 | 0.29 | 0.27 | (0.02) | -6.1% |

*Restated 2013 quarterly diluted earnings per share estimated based on Company-disclosed change to diluted earnings per share for fiscal year 2013 weighted by respective 2013 quarterly revenue.

108.    As the official Restatement issued January 31, 2018 reveals:

(a)    Roadrunner's reported financial results disseminated during the period violated GAAP and materially understated its true operating expenses by $6,511,000 for FY 2013. As a result of Roadrunner's improper and false accounting, Roadrunner's critically important performance metrics were made to appear more favorable than they really were. Net income, EBITDA, and diluted earnings per share were materially inflated, as more fully noted in the charts above.

(b)    Given the falsity of its reported earnings and EBITDA, Roadrunner's important leverage ratio, which was significant to investors given its debt ratio covenants with its lenders and cash flow position, was less favorable and higher than stated, thus

47

deceiving investors with regard to the true status and depth of risk of default with regard to Roadrunner's financial covenants in its existing credit facility.

(c)    The Executive Defendants' Sarbanes-Oxley certifications, and other statements pertaining to Roadrunner's internal controls during the period, were false and materially misleading because, at the time the Executive Defendants signed or made the statements, they knew or recklessly disregarded that: (1) the Company's reported financial statements were not fairly stated; (2) the financial statements materially understated expenses and materially overstated net income EBITDA and earnings per share; and (3) there were material weaknesses in the Company's disclosure controls and controls over financial reporting.

109.    Roadrunner's accounting violations led to the issuance of financial reports that did not fairly present its results, violated GAAP and subsequently triggered investigations by the Department of Justice and the SEC; they were not the product of inadvertence. As the new management has now acknowledged, the Company needed to clean house and change the culture and tone at the top that did not ensure or promote ethical behavior and integrity. Armbruster was terminated for cause. DiBlasi was demoted. Rued was removed as chairman of the board and HCI Equity Management's advisory agreement was terminated. The Roadrunner Defendants' conduct skewed Roadrunner's reported financial results, buoying or inflating its common stock price, and deceived innocent investors. This conduct was knowing and reckless, especially given the designed ineffectiveness of the internal controls over financial reporting that the Executive Defendants exploited, executing and disseminating false and misleading SOX certifications while they concealed the truth from independent board members (not Rued who was not

independent whatsoever) and the market, even as they engaged in insider selling enriching themselves, as more fully demonstrated in Part VII, F below.

### C. The False and Misleading 2014 Reported Financial Results and Related Statements

110. On April 30, 2014, Roadrunner issued a press release after the close of trading, reporting its financial results for the quarter ended March 31, 2014 ("Q1 2014 Press Release"). In discussing the Company's first quarter performance, the Q1 2014 Press Release quoted CEO DiBlasi, who reported on the Company's segment results and said:

> We were pleased with our first quarter results given the impact from severe winter weather throughout the quarter... Our first quarter operating income, excluding acquisition transaction expenses of $0.4 million, improved 2.5% over the prior year quarter to $19.6 million. Our first quarter EBITDA improved 6.6% over the prior year quarter to $24.0 million.

The representation regarding improved EBITDA was significant to investors and financial analysts. The Q1 2014 Press Release reported net income for the quarter of $10,414,000 compared to $10,582,000 for the first quarter of the prior year, and diluted income per share of $0.27 compared to $0.29 in Q1 2013. Commenting on guidance for the upcoming second quarter of 2014, Armbruster said "[w]e expect diluted income per share … to be between $0.37 and $0.41."

111. During an April 30, 2014 earnings conference call with the investment community reporting on the Company's quarterly performance for the period ending March 31, 2014, defendant Armbruster reiterated that Roadrunner's diluted earnings per share for Q1 2014 was $0.27, with net income on a consolidated basis of $10,414,000, and EBITDA of $23,982,000.

49

112. During the April 30, 2014 conference call with securities analysts, CEO DiBlasi was asked by one analyst how Roadrunner is positioned in an increasingly challenging driver market. Analysts recognized that hiring quality IC drivers who were content with financially lucrative work diminished the risk of defaulting on their lease payments, or walking away from a lease and triggering Roadrunner's guaranty obligations. To that end, the Roadrunner Defendants buttressed the false impression that any financial cost associated with the seemingly successful Tractor Lease Guaranty Program was benign. They hailed Roadrunner's success in quality IC driver recruitment, retention and turnover, respecting which the program was viewed by the market as playing a helpful and vital role. DiBlasi represented that Roadrunner was "positioned very well," reporting that "recruiting quality drivers is getting tougher and tougher," and that "we actually disqualify a lot more at the beginning than we ever had in the past," while representing that Roadrunner was still enjoying a "very good flow." DiBlasi further stated that Roadrunner had "built up a very strong reputation within the industry as a preferred carrier to work with from an independent contractor's perspective."

113. The representation that Roadrunner was in the enviable position of disqualifying drivers in an environment in which it was getting tougher to recruit quality drivers furthered the very favorable impression in the market that Roadrunner was strongly positioned because of a strong flow of quality applicant drivers, so much so that it enjoyed the luxury of rejecting many prospects over more qualified drivers. Assertions of strength of recruitment and retention further bolstered the market impression that Roadrunner's Tractor Lease Guaranty Program was a successful incentive occasioning "*de minimis*" financial cost for the Company. DiBlasi's statement further reinforced the impression and gave assurance to the market that Roadrunner was being selective with respect to its driver recruitment and that its practices with respect to

50

drivers enabled it to attract quality IC drivers who preferred to work with the Company. In that regard, DiBlasi assured investors during the April 30, 2014 earnings conference call that Roadrunner was still "very successful in terms of bringing new IC's on board" and continued to keep a very "positive turnover rate compared to the industry." This statement further solidified the impression that Roadrunner attracted and maintained a fleet of quality and contented IC's respecting which there was very little risk of them walking away from and defaulting on a tractor lease guaranteed by Roadrunner. At no time did DiBlasi alert the market to the fact that "*asset-light" Roadrunner was tethering itself to a fleet of old, deteriorating tractors and equipment or the program's serious risk of boomeranging expenses* that would inevitably wind up on the Company's balance sheet.

114.   On May 8, 2014, the Company filed a Form 10-Q with the SEC for the quarter ended March 31, 2014 ("Q1 2014 10-Q"), which provided the Company's first quarter 2014 financial results and positions. The Q1 2014 10-Q reported consolidated diluted earnings per share of $0.27, and net income of $10,414,000. EBIDTA was reported to be $23.982 million. Goodwill was valued at $570,483,000 on the Company's balance sheet. The Q1 2014 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants, who represented that the financial statements were fairly stated and the Company's disclosure controls and controls over financial reporting were effective as of March 31, 2014.

115.   The foregoing statements regarding Roadrunner's financial results for Q1 2014 helped fortify and buoy its stock price and maintain the artificial inflation embedded within it as a consequence of defendants' false and deceptive misrepresentations. Roadrunner's stock price climbed from a closing price of $24.63 a share just prior to the Q1 2014 Press Release and

51

conference call with analysts, to a high of $26.06 by the close of trading on May 12, 2014, reaching as high as $26.38 per share within that time frame.

116.    On July 9, 2014, Roadrunner announced that it had expanded the Company's existing credit facility to $550 million from $368 million through 2019. "This agreement is a testament to the confidence our banking partners have in Roadrunner," said DiBlasi. "The amendment reflects the Company's strong capital position and financial flexibility, providing an ongoing ability to drive growth organically and through strategic acquisitions. We are extremely pleased with the support of our bank group and look forward to continuing our relationship with such strong business partners."

117.    On July 30, 2014, after the close of the market, Roadrunner issued a press release announcing its second quarter 2014 financial results (Q2 2014 Press Release), stating in pertinent part, as follows:

> …Second quarter 2014 net income available to common stockholders was $14.8 million compared with $14.0 million in the prior year quarter. Second quarter 2014 diluted income per share available to common stockholders was $0.38 compared with $0.37 in the prior year quarter.
>
> Roadrunner's August 2013 stock offering increased the weighted averaged diluted shares outstanding for the quarter ended June 30, 2014 by approximately 1.5 million shares and impacted diluted income per share available to common stockholders by $0.01 from the prior year quarter.
>
> ***
>
> Roadrunner's earnings before interest, taxes, depreciation, and amortization ("EBITDA"), a non-GAAP financial measure, of $32.7 million for the quarter ended June 30, 2014 represents an increase of 15.7% from EBITDA of $28.2 million for the quarter ended June 30, 2013.

In the Q2 2014 Press Release, Armbruster provided third quarter 2014 guidance stating, "[w]e expect diluted income per share … to be between $0.37 and $0.41, compared with diluted income per share available to common stockholders of $0.35 in the prior year quarter."

118.    During the Company's earnings conference call with the investment community on July 30, 2014, which was headed by the Executive Defendants, CFO Armbruster represented that net income for Q2 2014 was $14.8 million compared to $14.0 million for Q2 2013 and diluted earnings per share was $.038 compared to $0.37 for Q2 2013.

119.    On August 7, 2014, the Company filed a Form 10-Q with the SEC for the quarter ended June 30, 2014 ("Q2 2014 10-Q"), which provided the Company's second quarter 2014 financial results. In the Q2 2014 10-Q, Roadrunner represented net income of $14,768,000 for the period ending June 30, 2014, versus $13,970,000 for the second quarter of the prior year, and diluted earnings per share of $0.38, a penny higher than the reported $0.37 for Q2 2013. As stated before, in each of its prior Form 10-Q's since Q3 2013, the Roadrunner Defendants repeated their boilerplate statements creating the impression that any financial risk associated with the Company's Tractor Lease Guaranty Program and potential driver defaults was benign, using such terms as "immaterial" and "*de minimis*."

120.    Roadrunner's Q2 2014 10-Q stated that the Company's internal controls over financial reporting were effective as of June 30, 2014. The Q2 2014 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants, attesting that the financial statements were fairly stated and the Company's disclosure controls and controls over financial reporting were effective.

121.    Roadrunner's reported financial results disappointed the investment community, which, together with market headwinds, caused its stock price to fall from a close of $27.60 per

share on July 30, 2014, just before the announcement, to $25.14 per share by the close of trading on July 31, 2014, and fall farther still to close at $24.61 at the close of trading on August 7, 2014. However, defendants' continuing market deception enabled Roadrunner's stock to continue to trade at artificially inflated levels as the taint caused by the Roadrunner Defendants' false and misleading statements and financial reporting still distorted and remained embedded, buoying the stock.

122.    On October 29, 2014, Roadrunner disseminated to the public a press release reporting on its third quarter 2014 financial results and performance ("Q3 2014 Press Release"). Roadrunner's Q3 2014 Press Release stated and reported, in pertinent part, as follows:

> …Third quarter 2014 net income available to common stockholders was $14.4 million compared with $13.2 million in the prior year quarter. Third quarter 2014 diluted income per share available to common stockholders was $0.37 compared with $0.35 in the prior year quarter.
>
> * * *
>
> Roadrunner's earnings before interest, taxes, depreciation, and amortization ("EBITDA"), a non-GAAP financial measure, of $31.6 million for the quarter ended September 30, 2014 represented an increase of 14.1% from EBITDA of $27.7 million for the quarter ended September 30, 2013. EBITDA before $1.9 million acquisition transaction expenses was $33.5 million in the third quarter of 2014 which was an increase of 18.7% over EBITDA before $0.6 million of acquisition transaction expenses of $28.2 million in the third quarter of 2013…

123.    In discussing the Company's third quarter performance, CEO DiBlasi said:

> Third quarter diluted income per share before acquisition transaction expenses increased 11.4% from $0.36 in the third quarter of 2013 to $0.40 in the third quarter of 2014… Our third quarter 2014 results were impacted by unusually large acquisition transaction expenses primarily related to our Active Aero acquisition, as well as certain settlement and employee transition costs. These costs were substantially offset, on an after-tax basis, by net contingent earnout adjustments of $3.3 million related to prior acquisitions within our TL segment, which also reduced our effective tax rate from 38.7% for the third quarter of 2013 to 32.8% for the third quarter of 2014. Overall, organic and acquisition growth led to a …14.1% improvement in EBITDA over the prior year quarter.

The announcement reported the quarter's results by segment, excluding intercompany eliminations and corporate expenses. Offering guidance for the upcoming fourth quarter of 2014,

54

Armbruster said "[w]e expect diluted income per share … to be between $.33 and $.37, compared with diluted income per share available to common stockholders of $0.29 in the prior year."

124.    On October 29, 2014, the Executive Defendants held an earnings conference call with the investment community reporting on Roadrunner's financial results and performance for Q3 2014, ending September 30, 2014. During the call, CFO Armbruster represented that "EBITDA improved 18.7% to a record of $33.5 million in the third quarter of 2014 compared to $28.2 million" in Q3 2013. DiBlasi represented that "in the third quarter, diluted income per share before acquisition transaction expenses increased 11.4% from the $0.36 in the third quarter of 2013 to $0.40 in the third quarter of 2014."

125.    During the October 29, 2014 conference call with analysts, DiBlasi again reinforced the importance of recruitment, of which the Tractor Lease Guaranty Program was an integral part, and quality driver retention, stating: "we have been very successful in recruiting, and I'm willing to bet more successful than most and still have a very low turnover number." All the while, the Tractor Lease Guaranty Program occasioned the need for Roadrunner to outlay costs for maintenance and repair arising from ever continuing tractor and equipment use, aging, and deterioration; costs that Roadrunner fronted and then recaptured by deducting them from IC driver paychecks. Not only was this a direct expense dilemma for Roadrunner, it was a troubling problem for IC drivers recruited into the program, who were taking home less pay owing to increased repairs and maintenance costs. This problem would be clearly exacerbated by a downturn in Roadrunner's business as it would translate into fewer dispatches and less compensation to drivers. Still, Roadrunner forged on, even as an undisclosed day of reckoning closed in respecting its increasing embrace of potential lease program guarantees, which had

climbed from $7.4 million in 3Q'13 to $13.8 million in 2Q'14, then to $17.6 million by the end of 3Q'14 and to a high of $19.8 million in 4Q'14. The Roadrunner Defendants continued to conceal from the market that Roadrunner was saddled with a fleet of aging used leased tractors and equipment, and the associated material repair and maintenance costs which such a structurally unsound program, lacking adequate or any maintenance escrows, set up to boomerang onto its balance sheet.

126.    On November 6, 2014, the Company filed a Form 10-Q with the SEC for the quarter ended September 30, 2014 ("Q3 2014 10-Q") which provided the Company's third quarter 2014 financial results. The Q3 2014 10-Q reported net income of $14,413,000, a value for its goodwill asset of $668.129 million and diluted earnings per share of $0.37. The same comforting boilerplate representations were included regarding Roadrunner's Tractor Lease Guaranty Program that had been made in prior reporting, reaffirming for the market that the financial risks associated with such leasing programs were benign. Roadrunner's Q3 2014 10-Q stated that the Company's internal controls over financial reporting were effective as of September 30, 2014. The Q3 2014 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants attesting that the financial statements were fairly stated and the Company's disclosure controls and controls over financial reporting were effective.

127.    Roadrunner's reported financial results buoyed its stock price, which closed at $22 per share at the close of trading on October 29, 2014, and $22.20 per share at the close of trading on November 6, 2014. Roadrunner's stock continued to trade at artificially inflated levels as the distorting taint caused by the Roadrunner Defendants' false and misleading statements and reported financial results remained embedded in its price.

128.    On February 4, 2015, Roadrunner issued a press release after the close of the market, announcing results for the fourth quarter and year ending December 31, 2014 ("Q4 2014 Press Release"). The Q4 2014 Press Release stated in pertinent part as follows:

Roadrunner's EBITDA, a non-GAAP financial measure, of $32.5 million for the quarter ended December 31, 2014 represented an increase of 39.8% from EBITDA of $23.3 million for the quarter ended December 31, 2013.

129.    In discussing the company's fiscal year 2014 performance ending December 31, 2014, CEO DiBlasi reported on the Company's segment results and said:

For the year ended December 31, 2014… [n]et income available to common stockholders increased 6.1 % to $52.0 million from $49.0 million in 2013. Our EBITDA increased 18.8% to $120.8 million in 2014 from $101.7 million in 2013. Diluted earnings per share available to common stockholders was $1.32 in 2014 compared to $1.29 in 2013. The 2014 results include acquisition transaction expenses of $2.3 million, or $0.04 diluted earnings per share, and the 2013 results include acquisition transaction expenses of $0.9 million, or $0.02 diluted earnings per share.

130.    The Q4 2014 Press Release reported net income of $12,379,000, an increase of 10.4%, and diluted earnings per share of $0.32, an increase of 10.3%, for the fourth quarter of 2014. CFO Armbruster was quoted in the Q4 2014 Press Release as stating: "cash flow from operations for the fourth quarter was approximately $23 million despite funding working capital growth. Our leverage ratio, defined as net debt of $418.7 million to proforma adjusted EBITDA (proforma for the results of our 2014 acquisitions prior to our ownership and related transaction costs) of $144.8 million, ended 2014 at 2.89 times."

131.    In the announcement, the Company reported its Quarterly Segment Information, excluding intercompany eliminations and corporate expenses. The Q4 2014 Press Release quoted Armbruster who gave guidance for the first quarter of 2015 stating, "[w]e expect diluted earnings per share available to common stockholders to be between $0.34 and $0.37, compared with diluted earnings per share available to common stockholders of $0.27 in the prior year quarter."

57

132.     During Roadrunner's 4Q'14 and FY'14 earnings conference call after the close of the market on February 4, 2015, Armbruster represented that "EBITDA improved 39.8% to a record $32.5 million for the fourth quarter of 2014" and that fourth quarter diluted earnings per share "increased 10.3%" from $0.29 in the fourth quarter 2013 to $0.32 in the fourth quarter 2014. Armbruster represented that Roadrunner's "leverage ratios" ended 2014 "at 2.89 times." DiBlasi reported: "We're not concerned right now at the leverage level. We still generate significant free cash flows as a company." Armbruster added, "in 2015 we'll generate cash to pay down that debt, plus the EBITDA will improve in 2015 over 2014. So that debt to EBITDA ratio will ***continue to come down and improve***."

133.     On March 2, 2015, as noted more fully below, the Company filed with the SEC the 2014 10-K, which provided the Company's fourth quarter 2014 and full year 2014 financial results. Roadrunner's 2014 10-K reported consolidated net income of $51,974,000 for FY 2014 versus $48,996,000 for FY 2013, diluted EPS of $1.32 versus $1.29 for FY 2013, and FY 2014 EBITDA of $120,764,000 compared to $101,674,000 for 2013. The 2014 10-K represented Q4 2014 net income available to common stockholders of $12,379,000, and diluted earnings per share of $0.32. The Company reported goodwill in the amount of $669.65 million on its balance sheet, which included amounts from Class Period acquisitions. The 2014 10-K stated that the Company's internal controls over financial reporting were effective as of December 31, 2014, was signed by defendants Rued, DiBlasi, and Armbruster, and the Executive Defendants signed and certified under the Sarbanes-Oxley Act of 2002 that the financial statements were fairly stated and the Company's disclosure controls and controls over financial reporting were effective as of December 31, 2014.

58

134.    In the face of an escalated landscape of adverse events and conditions, and using virtually identical language as it had used in its 2013 10-K, Roadrunner's MD&A discussion of "Off Balance Sheet Arrangements" contained in its 2014 10-K stated that the Company did "not have any transactions, arrangements, or other relationships with unconsolidated entities that are reasonably likely to materially affect our financial condition," while noting "however … we provide a guarantee for a portion of the value of certain IC leased tractors." Roadrunner's 2014 10-K also reiterated the same footnote disclosure to the financial statements it had previously reported, that "there were no material IC defaults" respecting its guaranteed lease program and that any payments made under it were "*de minimis*." Signaling continuing successful recruitment and expansion of the program, Roadrunner's 2014 10-K noted that the Company's "potential maximum exposure" represented by guaranteed leases as of December 31, 2014, "was approximately $19.8 million." The increased "potential" lease exposure gave the market the impression of greater IC driver recruitment and success. The market was not aware of the fact that Roadrunner had been actively deepening the triggering of lease guaranty obligations by seating drivers in aging, used tractors that increasingly broke down, after which those unfortunate drivers experienced a financial paycheck squeeze after deducting for repairs and maintenance. This was a critical problem in an environment of decreasing tonnage and consequently decreasing driver earnings.

135.    The Company's 2014 10-K footnote on guarantees reported that if there is an IC default, the Company "has the option to purchase the tractor or return the tractor to the leasing company if the residual value is greater than the Company's guarantee," while adding that "alternatively, the Company can contract another IC to assume the lease." No mention was made that the program did not principally deploy new or newer, rather than used or deteriorating,

59

tractors. It was not disclosed that the associated fleet of aging, used and depreciating tractors rendered any option of Roadrunner purchasing or returning the tractor unrealistic, nor was it disclosed that, under the circumstances, other IC driver recruits would not want to assume a lease on such deteriorating equipment in the first place. And nowhere was it disclosed that, in truth, driver lessees were rarely making the $250,000 that Roadrunner had advertised over the internet to further induce their recruitment, or anywhere near that amount, driving their used, aging tractors, especially as business slowed.

136.    The issuance of Roadrunner's 2014 10-K, reporting false and misleading financial results and performance for Q4 2014 and FY 2014, buoyed and fortified the trading price of Roadrunner's common stock with a veneer of distortion. Roadrunner stock closed at $25.74 per share at the close of trading on March 2, 2015, reached as high as $26.73 on March 19, 2015, and continued to trade at artificially inflated prices as the taint caused by the Roadrunner Defendants' ongoing deceptive financial reporting remained embedded therein.

137.    Roadrunner has belatedly conceded, among other things, that its reported financial results respecting its reporting periods in 2014 were materially false and that the Company's earnings per share, net income and EBITDA were overstated:

(a)     Roadrunner's reported financial results disseminated during the period materially understated operating expenses in FY 2014 by $29,024,000, in violation of GAAP: operating expenses were understated in the first, second, third and fourth quarters of 2014 in the amount of $5.9 million, $7.1 million, $7.7 million and $8.3 million, respectively. As a result of these and other improper accounting transactions, Roadrunner's financial metrics were made to appear more favorable than they truly were. Because its operating expenses were materially understated during the period, and in each

quarter thereof, Roadrunner's balance sheet assets were materially overstated, and its critically important financial performance metrics, net income, EBITDA, and earnings per share, were materially inflated and false.

(b)     Given the falsity of its reported earnings and EBITDA, Roadrunner's important leverage ratio metric, which was significant to investors given its debt ratio covenants with its lenders and cash flow position, was falsely reported. In FY 2014, Roadrunner's important leverage ratio, which the Roadrunner Defendants represented was in compliance with credit facility covenants, was materially higher than permitted. Based on the Restatement, Lead Plaintiff is informed and believes that Roadrunner's true leverage ratio for fiscal year 2014 was approximately 4.75:1, a concealed fact that was serious and adverse and, if disclosed, would have significantly upset Roadrunner's investors and shareholders and driven down the trading price of its stock. Its leverage ratio was less favorable and far higher than stated, thus deceiving investors with regard to the true status and depth of risk of default with regard to Roadrunner's financial covenants in its existing credit facility.

(c)     The Executive Defendants' Sarbanes-Oxley certifications, and other statements pertaining to Roadrunner's internal controls during the period, were false and materially misleading because, at the time the Executive Defendants signed or made the statements, they knew or recklessly disregarded that: (1) the Company's reported financial statements were not fairly stated; (2) the financial statements materially misstated net income, EBITDA and earnings per share, and understated its expenses; and (3) there were material weaknesses in the Company's disclosure controls and controls over financial reporting.

138.  The material falsity of Roadrunner's reported quarterly and fiscal year financial results during the respective period in and for 2014 is illustrated in the charts below:

Amounts in
thousands

2014 Net Income By Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---------|--------------------|-----------------| -------------|--------------|
| 2014-Q4 | 12,379 | 4,719 | (7,660) | -61.9% |
| 2014-Q3 | 14,413 | 8,298 | (6,115) | -42.4% |
| 2014-Q2 | 14,768 | 11,663 | (3,105) | -21.0% |
| 2014-Q1 | 10,414 | 8,030 | (2,384) | -22.9% |

Amounts in
thousands

2014 EBITDA By Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---------|--------------------|-----------------| -------------|--------------|
| 2014-Q4 | 32,504 | 23,919 | (8,585) | -26.4% |
| 2014-Q3 | 31,599 | 23,569 | (8,030) | -25.4% |
| 2014-Q2 | 32,679 | 25,259 | (7,420) | -22.7% |
| 2014-Q1 | 23,982 | 17,822 | (6,160) | -25.7% |

2014 Earnings Per Share-Diluted By Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---------|--------------------|-----------------| -------------|--------------|
| 2014-Q4 | 0.32 | 0.12 | (0.20) | -62.5% |
| 2014-Q3 | 0.37 | 0.21 | (0.16) | -43.2% |
| 2014-Q2 | 0.38 | 0.30 | (0.08) | -21.1% |
| 2014-Q1 | 0.27 | 0.20 | (0.07) | -25.9% |

**D.    The False and Misleading 2015 Reported Financial Results and Related Statements**

139.  On April 29, 2015, after the close of the market, Roadrunner issued a press release to the public reporting its first quarter 2015 financial results and business performance ("Q1 2015 Press Release"), stating, in pertinent part, as follows:

Roadrunner's EBITDA, a non-GAAP financial measure, of $33.7 million for the quarter ended March 31, 2015, represented an increase of 40.4% from EBITDA of $24.0 million for the quarter ended March 31, 2014.

140.    In discussing Roadrunner's first quarter performance, CEO DiBlasi reported on the Company's segment results and said:

> For the quarter ended March 31, 2015… [o]ur EBITDA increased 40.4% to $33.7 million in the first quarter of 2015 from $24.0 million in the first quarter of 2014. Net income available to common stockholders increased 30.6% to $13.6 million in the first quarter of 2015 from $10.4 million in the first quarter of 2014. Our diluted earnings per share available to common stockholders increased 29.6% to $0.35 in the first quarter of 2015 from $0.27 in the first quarter of 2014.

141.    The announcement reported the Company's quarterly Segment Information, excluding intercompany eliminations and corporate expenses, and disclosed $669,740,000 million in goodwill on the balance sheet as of March 31, 2015, including amounts resulting from Class Period acquisitions. Commenting on earnings guidance for the second quarter of 2015, CFO Armbruster stated, "[w]e expect diluted earnings per share … to be between $0.43 and $0.46…."

142.    In Roadrunner's earnings conference call with the investment community on April 29, 2015, which was headed by the Executive Defendants, DiBlasi stated that "we were very pleased with our first quarter 2015 performance, especially in the rebound of our LTL business segment," representing that "the momentum in our business continues to be positive, especially the results we're seeing in our LTL segment." EBITDA reportedly increased 40.4% to $33.7 million from $24 million in Q1 2014, net income increased 30.6% to $13.6 million in Q1 2015 from $10.4 million in Q1 2014 and diluted earnings per share increased 29.6% to $0.35 in Q1 2015 from $0.27 per share in Q1 2014.

143.    On May 7, 2015, the Company filed a Form 10-Q with the SEC for the quarter ended March 31, 2015 ("Q1 2015 10-Q"), which provided its first quarter 2015 financial results.

63

The Q1 2015 10-Q reported net income of $13,604,000 versus $10,414,000, and diluted earnings per share of $0.35 versus $0.27. The Q1 2015 10-Q stated that internal controls over financial reporting were effective as of March 31, 2015. The Q1 2015 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants, who, as many times before, represented that the financial statements were fairly stated and that the Company's disclosure controls and controls over financial reporting were effective.

144.  Although adverse conditions associated with the Tractor Lease Guaranty Program worsened in Q1 2015, the Company's Q1 2015 Form 10-Q, filed with the SEC on May 7, 2015 (the "Q1 2015 10-Q"), nevertheless reported financial statements with footnote disclosures that spoke positively about it, without any hint of problems, stating:

> The company provides a guarantee for a portion of the value of certain independent contractors' (IC) leased tractors. The guarantees expire at various dates through 2020.

> The potential maximum exposure under these lease guarantees was approximately $19.3 million as of March 31, 2015. The potential maximum exposure represents the Company's commitment on remaining lease payments on guaranteed leases as of March 31, 2015. However, upon an IC default, the company has the option to purchase the tractor or return the tractor to the leasing company if the residual value is greater that the Company's guarantee. Alternatively, the Company can contract another IC to assume the lease.

145.  Roadrunner's Q1 2015 10-Q again neutralized any concern about its contingent lease guaranty exposure and blunted its associated financial cost by representing that:

> There were no material IC defaults during the 3 months ended March 31, 2015 and 2014 payments made by the Company under the guarantee were *de minimis*.

146.  Despite recognizing that the program Roadrunner relied upon as integral to IC driver recruitment and retention was structurally unsound and not viable, with associated material costs boomeranging onto the Company's balance sheet, DiBlasi again spoke to the market about topics related to the program during a Q1 2015 earnings call on April 29, 2015 and

concealed its adverse truth exclaiming, "we have been successful at recruiting and retaining [drivers] … and our turnover ratio continues to be half of what the industry average is." DiBlasi's statements, and those contained in Roadrunner's Q1 2015 10-Q, as discussed above, continued to foster the impression that the Tractor Lease Guaranty Program was viable and did not realistically occasion material costs and expense to the Company.

147.    The false financial reporting and related statements to the investment community from April 29, 2015 through May 7, 2015 fortified and buoyed the trading price of Roadrunner stock, which continued to trade at artificially inflated levels. Roadrunner's stock price closed at $24.30 per share on April 29, 2015, before the issuance of the Q1 2015 Press Release. Roadrunner stock closed higher at $24.47 on April 30, 2015, closed at $25.45 on May 7, 2015, and continued to trade at artificially inflated prices thereafter as a result of the price distortion caused by defendants' false and misleading financial statements.

148.    On July 29, 2015, Roadrunner issued a press release reporting its second quarter 2015 results ending June 30, 2015 ("Q2 2015 Press Release"), stating, in pertinent part, as follows:

> Net income available to common stockholders for the period was $16.5 million, compared to $14.8 million in the second quarter of 2014. Diluted earnings per share available to common stockholders for the three months ended June 30, 2015 was $0.42, compared to $0.38 in the prior year quarter.
>
> Included in the second quarter 2015 results are approximately $1.2 million of severance expenses related to the separation with a former company executive officer. Adjusted operating income was $32.4 million, compared with $27.0 million in the prior year quarter. Adjusted net income available to common stockholders was $17 .2 million, compared to $14.8 million in the prior year quarter. Adjusted diluted earnings per share available to common stockholders was $0.44, compared to $0.38 a year ago.
>
> ***
>
> Roadrunner's EBITDA, a non-GAAP financial measure, of $38.8 million for the quarter ended June 30, 2015 represented an increase of 18.7% from EBITDA of $32.7 million for the quarter ended June 30, 2014. EBITDA, excluding the severance expenses described

above, was $40.0 million in the second quarter of 2015, which was an increase of 22.3% over $32.7 million in the second quarter of 2014.

149.     In discussing the Company's second quarter 2015 performance, DiBlasi reported on the Company's segment results and said:

> Second quarter adjusted diluted earnings per share increased 15.8% from $0.38 in the second quarter of 2014 to $0.44 in the second quarter of 2015…
>
> * * *
>
> Our EBITDA, excluding the severance expenses described above, increased 22.3% to a record $40.0 million in the second quarter of 2015 from $32.7 million in the second quarter of 2014.

150.     Commenting on guidance for the third quarter of 2015, Armbruster said, "we expect diluted earnings per share available to common stockholders, excluding acquisition transaction expenses, to be between $0.43 and $0.47."

151.     Importantly, by no later than Q1'15, adverse business conditions and metrics of performance being experienced by the Company affecting IC driver income deepened. The percentage increase in shipments for the LTL segment when compared to prior year sequential quarters had slowed to a virtual crawl throughout all of FY'14 (ending December 31, 2014) and through 1Q'15. In 2Q'15, shipments in the LTL segment fell precipitously compared to the prior year's sequential quarters. Reported tonnage in the LTL segment was down in 4Q'14. This decline continued through 1Q'15, 2Q'15 and the balance of FY'15, both when compared sequentially to prior quarters in FY'14 and as each quarter unfolded from 4Q'14 onward, as the chart below illustrates:

| QUARTER | TONNAGE |
|---------|---------|
| 1Q 2014 | 380.5 |
| 2Q 2014 | 406.0 |
| 3Q 2014 | 410.5 |
| 4Q 2014 | 371.9 |
| 1Q 2015 | 349.9 |
| 2Q 2015 | 359.7 |

|  |  |
|---|---|
| 3Q 2015 | 336.1 |
| 4Q 2015 | 310.8 |

152.    During the Company's earnings conference call with analysts headed by the Executive Defendants on July 29, 2015, after the close of the market, Armbruster reported and represented that "EBITDA, excluding the one-time executive officer severance expense of $1.2 million, improved 22.3% to a record $40 million in the second quarter of 2015, compared with $32.7 million in the prior year quarter." Armbruster further comforted the market by representing that "overall for the quarter, *we achieved all-time records* for … *net income* and *EBITDA*." When one analyst inquired on the call about "deleveraging" for the "back half of 2015," Armbruster responded "not at this time," and later represented Roadrunner's "long-term goal is to be around two times debt to EBITDA ratio," although "due to the acquisition opportunities, we're willing to be around our current three times debt to EBITDA ratio." DiBlasi closed out the conference call by stating, in part, "Overall, we felt like we had a very positive quarter, very good trends in our business segments."

153.    In the Q2'15 earnings conference call of July 29, 2015, DiBlasi continued to comfort investors stating "we have been successful recruiting and retaining drivers throughout the year … and our turnover ratio continues to be half of what the industry average is," adding "[r]eturning and retention costs … continue to go up due to the price … of bringing on quality drivers." Completing his remarks on this continuing theme, DiBlasi represented to the market that Roadrunner still runs a "100% IC fleet in our LTL operation today," adding "we expect to be able to continue to recruit, in terms of quality drivers for LTL." DiBlasi's statements, conveying the impression that the Company had quality drivers content to remain driving for it, and enjoyed selective strength in recruitment with favorable turnover rates signifying content IC drivers, further camouflaged the truth about the structural unsoundness and depth of economic risk and

costs of the Tractor Lease Guaranty Program, which Roadrunner heavily relied upon as an inducement to recruit IC drivers.

154.  On August 3, 2015, the Company filed a Form 10-Q with the SEC for the quarter ended June 30, 2015 ("Q2 2015 10-Q"), which provided its second quarter 2015 financial results and positions. The Q2 2015 10-Q reported Roadrunner's goodwill asset value at $670,077,000, which continued to include amounts resulting from Class Period acquisitions, net income of $16.5 million, and diluted earnings per share of $0.42. Roadrunner's Q2 2015 10-Q stated that the Company's internal controls over financial reporting were effective as of June 30, 2015. The Q2 2015 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants, representing that the financial statements were fairly stated and that Roadrunner's disclosure controls and controls over financial reporting were effective.

155.  Despite poor conditions that had previously caused an even deeper recognition by the Roadrunner Defendants that the Tractor Lease Guaranty Program was not viable, Roadrunner's 2Q 2015 10-Q, executed by the Executive Defendants on August 3, 2015, again stated incompletely:

> The company provides a guarantee for a portion of the value of certain independent contractors' (IC) leased tractors. The guarantees expire at various dates through 2020.
>
> The potential maximum exposure under these lease guarantees was approximately $17.8 million as of June 30, 2015.  The potential maximum exposure represents the Company's commitment on remaining lease payments on guaranteed leases as of June 30, 2015. However, upon an IC default, the company has the option to purchase the tractor or return the tractor to the leasing company if the residual value is greater that the company's guarantee. Alternatively, the Company can contract another IC to assume the lease.

156.  Once again, Roadrunner's Q2 2015 10-Q contained financial statements with footnote disclosures about guarantees that furthered the impression that the Program's contingent lease guaranty financial exposure was benign, repeating and representing the following:

There were no material IC defaults during the three and six months ended June 30, 2015 and 2014. Payments made by the Company under the guarantee were de minimis.

157.    As before, the Roadrunner Defendants were not wholly transparent, despite having spoken to the market about the Company's Tractor Lease Guaranty Program and its financial cost and status, and about directly related topics on multiple occasions. Nowhere did the Roadrunner Defendants disclose that they had already realized that the program tethered the Company to a fleet of used, deteriorating tractors and equipment, and was not viable. Nowhere was it disclosed that its associated costs were already so significant that Roadrunner needed to pull back from and no longer guarantee leases on used tractors, which itself carried material financial costs. Nowhere did the Roadrunner Defendants disclose to the market that one of the Company's most important incentives to recruit IC drivers was proving to be a financial albatross that needed to be jettisoned. Indeed, the fact that any "potential" cost associated with the Tractor Lease Guaranty Program had diminished in Q2'15 to $17.8 million from $19.8 million by the end of FY'14 and $19.3 million in 1Q'15, was itself deceptive, without disclosing these adverse events and explaining that, rather than a sign of diminished potential cost, the decline was, in fact, a result of a conscious effort to exit the Tractor Lease Guaranty Program with respect to used tractors because it was not viable and was causing Roadrunner economic harm. Nowhere did the Roadrunner Defendants alert investors that Roadrunner was changing course by starting to only seat drivers in new tractors, which made it more difficult to recruit since such equipment was too expensive for most potential IC's, thereby contradicting DiBlasi's continuous untrue portrayals about the strength and advantageous positioning of Roadrunner's recruitment of drivers and "capacity."

158.    Indeed, the Roadrunner Defendants' prior use of the qualifying and limiting word "certain" when they described the Tractor Lease Guaranty Program in Roadrunners' 2014 10-K

69

MD&A discussion about providing a guarantee of a portion of the value of "certain IC leased tractors," had also fueled the continuing false impression that such guarantees were not significant. This is especially true when read in connection with the representation that Roadrunner's off-balance sheet arrangements were not likely to have a material effect on the Company's financial condition and expenses.

159. The cumulative impact of Roadrunners' statements in its 2014 10-K and Q1 2015 and 2Q 2015 reports on Form 10-Q about the Company's Tractor Lease Purchase Guaranty Program were designed to and did create the impression that the program's financial exposure was benign. By stating, without disclosing the adverse truth, that there were no "material IC defaults" and guaranty payments were ***de minimis,***" the Roadrunner Defendants spoke deceptively. Their statements that, upon IC default, the Company has the "option to purchase… or return the tractor… if the residual value is greater than the Company's guarantee," or alternatively, it can "contract another IC to assume the lease," were illusory, because the Tractor Lease Guaranty Program obligation was tethered to an increasingly aging fleet of used tractors, occasioning greater repair as they quickly depreciated and increasingly required extensive maintenance.

160. As the used tractors become older, the associated costs of repairing or restoring them increased, as did their mileage, while their durability and reliability declined. Roadrunner could not realistically or effectively replace one defaulting IC on the same increasingly aging used-tractor lease with another IC driver, especially as it was already experiencing escalating maintenance and repair costs such that the Company no longer viewed the program as viable.

161. According to United States Department of Labor estimates, truck drivers typically earn on average about $52,000 per year, while the American Trucking Association has a lower

70

estimate of approximately $40,000. Induced by Roadrunner's over-promising and under delivering, its IC drivers typically wound up saddled and over-extended with lease payments deducted each week from modest amounts of money driving for Roadrunner – often too modest to merit continuing to pay maintenance costs on older, aging tractors. Thus, as vehicles aged, IC drivers were increasingly confronted with the Hobson's choice of one day having to walk away from the lease and their livelihood because they could not afford the cost of the maintenance and repair of their aging, used leased vehicles. This was often compounded by the lack of sufficient net compensation for drivers after deducting lease payment obligations and other costs, which did not make it economically feasible for drivers to continue with the Company.

162.    During the Class Period, Roadrunner failed to adequately book escrows on driver accounts to repurpose and recondition the tractors in the program. This effectively placed its IC drivers in a financial position that greatly increased both the risk of tractor lease defaults and the depth of financial cost arising from Roadrunner's guaranty obligations. It was deceptive and misleading for Roadrunner to suggest to the market that an IC driver lease assumption was a reliable point of the program, and it was deceptive to discuss that option without disclosing the factual reality making it an unlikely option in any event. The program itself was structurally unsound for these reasons.

163.    The Executive Defendants' statements reporting Roadrunners' financial results and performance for Q2 2015, which were disseminated to the market on July 29, 2015 and August 3, 2015, once again buoyed the trading price of Roadrunner's common stock, causing it to reach a high of $26.95 and close at $26.19 a share on July 29, 2015, after closing at $25.41 a share on July 28, 2015. Thereafter, Roadrunner's common stock traded at closing prices above $26 a share through August 3, 2015, when it closed trading at $26.03 per share and then fell

below $26 a share immediately thereafter. Roadrunner's common stock continued to trade at artificially inflated levels due to the fraud-related taint embedded in its stock price.

164.     On September 28, 2015, Roadrunner announced the expansion of its existing credit facility from $550 million to $700 million through 2019. "This agreement is a testament to the confidence our banking partners have in Roadrunner," said DiBlasi. "The amendment reflects the Company's strong capital position and financial flexibility, providing an ongoing ability to drive growth organically and through strategic acquisitions. We are extremely pleased with the support of our bank group and look forward to continuing our relationship with such strong business partners."

165.     Despite DiBlasi's indication to the market that the expansion of the existing credit facility to $700 million would provide an "ongoing ability" to drive growth "through strategic acquisitions," in truth, the Company's last acquisition remained Stagecoach in July 2015, for a total amount of $35 million and an earn out capped at $5 million. There was not a single acquisition of a new company thereafter.

166.     On October 26, 2015, Roadrunner issued a press release announcing that it was revising its guidance for Q3 2015 and stating that it expected Q3 2015 diluted earnings per share available to common stockholders, excluding transaction expenses, to be between $0.14 and $0.17. Roadrunner explained that, among other things, the reduction in Q3 2015 guidance reflected "losses" associated with the "termination" of certain "independent contractor lease purchase guaranty programs, which are expected to have an impact of 0.08 per share," along with "continuing soft demand for TL, LTL, and intermodal services from customers in selected industrial sectors."

167. As a result of the October 26, 2015 announcement issued after the close of the market, Roadrunner stock declined $8.33 per share, from $17.67 a share at the close of trading on October 26, 2015 to $9.34 per share at the close of trading on October 27, 2015, on massive volume of 4,733,200 shares. Previously, Roadrunners' average daily trading volume was less than 210,000 shares. The market continued to remain unaware of the true adverse related facts that were being concealed by the Roadrunner Defendants.

168. The revelations regarding the costs associated with the "termination" of Roadrunner's Tractor Lease Purchase Guaranty Program failed to disclose the fact that Roadrunner's reported financial results were in fact false. The disclosures did not put investors or shareholders on notice that the defendants had been deceiving them all along, and did not fully or adequately disclose the structural unsoundness of Roadrunner's guaranteed lease programs and their true depth of economic and investment risk. Price distorting artificial inflation, caused by the false and misleading financial reporting, and lack of full and adequate disclosure of the adverse truth respecting the program, remained embedded in Roadrunner's stock price.

169. On November 5, 2015, the Company issued a press release reporting its third quarter 2015 financial results ("Q3 2015 Press Release"). Roadrunner's Q3 2015 Press Release stated in substantial part as follows:

> Net income available to common stockholders for the period was $5.8 million, compared to $14.4 million in the third quarter of 2014. Diluted earnings per share available to common stockholders for the three months ended September 30, 2015 was $0.15, compared to $0.37 in the prior year quarter. Diluted earnings per share available to common stockholders for the third quarter of 2015 was $0.16 before acquisition transaction expenses of $0.6 million, compared with $0.40 in the prior year quarter before acquisition transaction expenses of $1.9 million.

> Included in third quarter 2015 results is a charge of approximately $5.0 million associated with the termination of certain independent contractor ("IC") lease purchase guarantee programs and a $3.9 million increase in insurance and claims expenses over the prior

73

year quarter. Collectively, these two charges reduced diluted earnings per share by approximately $0.14 during the quarter.

*** 

Roadrunner's EBITDA, a non-GAAP financial measure, of $22.8 million for the quarter ended September 30, 2015 represented a decrease of 27.8% from EBITDA of $31.6 million for the quarter ended September 30, 2014. EBITDA, excluding the $5.0 million charge associated with the termination of certain IC lease purchase guarantee programs and the $3.9 million of increased insurance and claims expenses described above, was $31.7 million for the quarter ended September 30, 2015. EBITDA, excluding the $5.0 million charge associated with the termination of certain IC lease purchase guarantee programs, the $3.9 million of increased insurance and claims expenses in the third quarter of 2015, and the $1.2 million of severance expenses described above, was $105.4 million for the nine months ended September 30, 2015.

Commenting on fourth quarter 2015 guidance, Armbruster stated: "[w]e expect diluted earnings per share available to common stockholders, excluding acquisition transaction expenses, to be between $0.31 and $0.35."

170. During the Company's November 5, 2015 conference call with analysts, DiBlasi stated:

[W]e recorded a charge in the quarter of approximately $5 million related to the termination of certain IC lease purchase guarantee programs, which reduced earnings per share by $0.08.

To better explain, we saw a significant increase in the number of ICs participating in lease purchase programs requiring a guarantee from us during the second half of 2014. However, the decline in quality and performance of the equipment in some of these programs caused escalating repair and maintenance expenses for our ICs, which coupled with the softened demand experienced during the third quarter resulted in an increased turnover and default by certain ICs.

As a result, we have experienced an acceleration of our IC recruiting costs, guaranteed payments, and re-seeding and reconditioning costs associated with these lease purchase programs. Accordingly, we decided to terminate certain lease purchase guarantee programs in favor of new lease purchase programs that do not involve a guarantee from us, and only utilize newer equipment that is under warranty. We believe such programs will be more cost effective for both us and for our independent contractors.

DiBlasi's disclosure of a $5 million charge arising from lease guarantees and the "termination" of Roadrunner's Tractor Lease Purchase Guaranty Program left analysts seeking to ascertain

their ultimate adverse impact on important related subjects such as recruitment and turnover. One analyst inquired "***Can you give us any sense if this has had any impact on recruiting or turnover within your IC segment***," adding "***are you guys now trued up*** for the changes you made to that lease program?"

171. Compelled by the inquiry to respond, DiBlasi stated, "It does have an impact on our recruiting abilities… when you're putting an independent contractor in a new unit, the cost to that independent contractor is a little higher. That precludes certain independent contractors from affording the ability to get into a truck with us… we have lease purchase programs across all operating segments. So it does impact the flow of drivers and it does impact the cost of recruiting drivers… we have a lot more in our recruiting costs now than we ever have had… we anticipate that cost will continue to ratchet up over time."

172. Importantly, during the call with analysts, BB&T Capital Markets analyst Thom Albrecht asked "how sure can we be that this kind of blowup doesn't portend some sort of major ***accounting issues*** or even multiyear IT challenges?" Defendant DiBlasi falsely denied such issues stating: "[w]e don't see either one of those as an issue, Thom, ***not at all***." Then, he assured the analysts that "***from an accounting perspective*** … ***everything has always been above board*** and will continue to be above board."

173. On the same November 5, 2015 conference call, CFO Armbruster was also compelled to disclose a little more of the truth to market analysts admitting that "with the ***lease purchase program*** that ***we were in***, the ***quality of the equipment was not the best***. So, we had a ***high level of turnover***." Saying that the "quality of the equipment was not the best" was an understatement given that, in fact, "asset-light" Roadrunner was tethered to a fleet of old, deteriorating tractors and equipment without maintenance escrows.

75

174.     Tractor equipment does not fall apart and lose value all at once. A Morgan

Stanley analyst continued to press for more disclosure of the truth and "color." DiBlasi continued

to obfuscate, deceptively and falsely:

> Q: I just wanted to follow up, maybe can you provide a bit more commentary on why
> exactly the quality and performance of the equipment had begun to decline recently? Did
> something change -- why had this not kind of happened historically? Was there
> something different recently? Maybe just some color on that front would be helpful.

> DiBlasi Yes, when we started the initial program back in early 2014, our thought process
> at that time was get a driver in a truck, get him in as cheaply as he can possibly get in,
> because a lot of drivers we're recruiting didn't have the wherewithal to get into an
> expensive piece of equipment. So we thought used equipment would be the way to go.
> What we quickly realized and then it was exacerbated this year was that used equipment
> breaks out more often, it's more costly maintenance repairs, really eat into a contractor's
> ability to be successful.

175.     Although he continued to remain defensive on the call regarding the failed Tractor

Lease Guaranty Program, and had misrepresented its initiation to be "early 2014," despite

previously certifying and executing Roadrunner's Q3 2013 10Q revealing the existence of the

program at that time, after pressured to provide some "color," DiBlasi followed his response by

acknowledging that management *knew earlier in 2015* that the *program was not viable* stating:

> After that wore off and we put another year or year and a half on that piece of equipment,
> then we started to really see maintenance costs and breakdowns occur and *we realized
> earlier this year that this program is not as viable as we thought it was*.

176.     DiBlasi tried to fool the market by falsely deflecting attention away from

management's knowledge that the program was structurally unsound and the need to unwind the

practice, causing it to absorb previously undisclosed loss:

> So we've started to look for ways to change that and new procedures and new operations
> and opportunities with different vendors. And it kind of came to our head in the third
> quarter where we decided we've got to get out of this program. It's no longer viable and
> change the program, get out of the guarantees …

177. Still concealing the whole truth on the November 5, 2015 call, DiBlasi assured the market that Roadrunner was "no longer guarantying any leased equipment" stating, "we've put drivers in new equipment and if that driver turns over and walks away, … that's between the driver and the vendor … the *Company no longer backs stuff or guarantees a portion of that lease*." In truth, Roadrunner had still not been able to fully exit the costly Tractor Lease Guaranty Program, which was still creating additional costs and expenses for the Company, as would only be more fully disclosed over a year later on January 31, 2017. As of November 5, 2015, Roadrunner was still tethered to an old, deteriorating fleet from which it could not readily extricate itself.

178. Following these additional revelations that still failed to disclose the whole truth, amid additional false and misleading statements, the trading price of Roadrunner common stock continued to trade at artificial prices buoyed by the taint and distortion created by the Roadrunner Defendants' false statements and material omissions.

179. On November 9, 2015, the Company filed a Form 10-Q with the SEC for the quarter ended September 30, 2015 ("Q3 2015 10-Q"), which provided its third quarter 2015 financial results. The Q3 2015 10-Q stated that the value of Roadrunner's goodwill asset had increased from $669,652,000 as of December 31, 2014 to $686,987,000 as of September 30, 2015, which included amounts resulting Class Period acquisitions. The Company's diluted earnings per share was reported to have decreased from $0.37 in Q3 2014 to $0.15 per share in Q3'15 (owing to the lease guaranty related charge). The Q3 2015 10-Q stated that the Company's internal controls over financial reporting were effective as of September 30, 2015. The Q3 2015 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the

Executive Defendants attesting that the financial statements were fairly stated and that the Company's disclosure controls and controls over financial reporting were effective.

180.     Roadrunner's financial results, which were adversely impacted by its failed tractor lease guaranty program, causing a significant collapse of the trading price of its common stock, as alleged herein, put even greater pressure on the Executive Defendants to place an untrue favorable spin on the Company's financial performance and business condition. In an effort to rehabilitate and resuscitate the Company's stock price, the Executive Defendants pursued their false financial reporting with even greater earnest.

181.     Roadrunner issued a press release to the financial community on February 3, 2016 reporting on 2015 fourth quarter and year-end financial results ("Q4 2015 Press Release"), which stated and represented in pertinent part:

> Diluted earnings per share available to common stockholders was $0.32 for the fourth quarters of both 2015 and 2014.
>
> ***
>
> Diluted earnings per share available to common stockholders for the year ended December 31, 2015 was $1.23, compared to $1.32 for the prior year.
>
> Included in the results for the year ended December 31, 2015 are approximately $1.2 million of severance expenses related to the separation with a former company executive officer, a $5.0 million charge associated with the termination of certain independent contractor ("IC") lease purchase guarantee programs, and $0.6 million of acquisition transaction expenses. Collectively, these charges reduced diluted earnings per share available to common stockholders by approximately $0.11 for the year ended December 31, 2015. Included in the results for the year ended December 31, 2014 is approximately $2.3 million of acquisition transaction expenses, which reduced diluted earnings per share available to common stockholders by approximately $0.04.
>
> Roadrunner's EBITDA, a non-GAAP financial measure, of $33.7 million for the quarter ended December 31, 2015 represented an increase of 3.8% from EBITDA of $32.5 million for the quarter ended December 31, 2014. Roadrunner's EBITDA of $129.0 million for the year ended December 31, 2015 represented an increase of 6.8% from EBITDA of $120.8 million for the prior year.
>
> ***
>
> For the year ended December 31, 2015, amortization expense of $8.4 million reduced diluted earnings per share available to common stockholders by $0.14, compared to a

reduction of $0.10 per diluted share associated with amortization expense of $5.8 million for the year ended December 31, 2014.

182.     In discussing the Company's performance,  DiBlasi was quoted as stating:

For the quarter ended December 31, 2015,… EBITDA increased $1.2 million to $33.7 million in the fourth quarter of 2015.

For the year ended December 31, 2015, … EBITDA increased $8.2 million from $120.8 million in 2014 to $129.0 million in 2015. Excluding the impact of severance expenses, the charge associated with the termination of certain IC lease purchase guarantee programs and acquisition transaction expenses for 2014 and 2015 described above, EBITDA for the year ended December 31, 2015 was $135.8 million compared to $123.1 million for the year ended December 31, 2014.

We continue to generate positive cash flows from operations. Cash provided by operating activities increased 80.6% from $40.6 million for the year ended December 31, 2014 to $73.4 million for the year ended December 31, 2015 … At December 31, 2015, total debt was $439.4 million and cash and cash equivalents were $8.7 million. Total availability under our credit facility at December 31, 2015 was $234.4 million. While our focus over the past several years has been on strategic growth and acquisition initiatives to position us for the long term, our focus in 2016 will be to continue to enhance cash flow from operations and to reduce our leverage ratio towards our long-term goal of less than 2.5 times EBITDA.

183.     On February 3, 2016, the Executive Defendants hosted an earnings conference call with the investment community reporting on Roadrunner's financial results and performance for Q4 and year end 2015. During the call, CEO DiBlasi represented that "EBITDA increased $1.2 million to $33.7 million in the fourth quarter of 2015" and "increased $8.2 million, from $120.8 million in 2014 to $129 million in 2015." CFO Armbruster also placed a positive spin on Roadrunner's performance, and among other things represented that Roadrunner's debt to EBITDA, also known as its leverage ratio, was "3.3" compared to the then maximum ratio covenant of 3.75 through March 31, 2016. He also reassured investors that Roadrunner's focus in 2016 would be on "enhancing cash flow operations and reducing our leverage ratio towards our long-term goal of less than 2.5 times EBITDA."

79

184.   In Roadrunner's FY'15 conference call with analysts on February 3, 2016, the following colloquy occurred, in pertinent part, between one analyst and CEO DiBlasi:

**Q**: So, Mark, after the disappointment in the third quarter with earnings and the big drop in the stock price, what changed internally? My sense is you don't have something that gets shaken up that much in the market without causing some significant change internally. What are the few things you guys are doing much differently now than you might have been three months ago?

**DiBlasi**: We went through great explanation on the performance of the third quarter. A big portion of that had to do with some very high insurance costs and claims, the lease purchase charge that we took, those had significant impact on our performance…

\*\*\*

We're pretty confident in our ability to have reacted and implemented change internally to get us to the performance levels that we thought were acceptable for the fourth quarter… Obviously, we need to execute and perform like we did in the fourth quarter to build that confidence and credibility back up, but that's exactly what we're doing.

185.   On March 1, 2016, the Company filed a Form 10-K with the SEC for the year ended December 31, 2015 ("2015 10-K"), which provided its fourth quarter 2015 and full year 2015 financial results. The 2015 10-K reported FY 2015 consolidated diluted earnings per share of $1.23 compared to $1.32 for FY 2014, and EBITDA of $128,996,000 for FYI 2015 versus $120,764,000 for FY 2014. Net income for FY 2015 was reported as $48,000,000 compared to $51,974,000 for FY 2014, and $48,996,000 for FY 2013, reflected improvement. The 2015 10-K reported Q4 2015 earnings per diluted share of 0.32 versus 0.32 for Q4 2014. The 2015 10-K stated that the Company's internal controls over financial reporting were effective as of December 31, 2015. The 2015 10-K, which was signed by Defendants Rued, DiBlasi, and Armbruster, included certifications under the Sarbanes-Oxley Act of 2002, executed by the Executive Defendants on February 29, 2016, attesting that the financial statements were fairly stated and that the Company's disclosure controls and controls over financial reporting were effective.

186.    The 2015 10-K contained certain representations about the Company's debt covenants, including the covenants setting a minimum fixed charge ratio and a maximum adjusted leverage ratio, noting the importance of these covenants to the Company. The 2015 10-K also disclosed the Company's year-end financial statements, and included footnote disclosures therein related to the Company's accounting policies, acquisitions, its goodwill and intangible assets, and guarantees. The Company reported goodwill in the amount of $691.1 million on its balance sheet, a figure that included amounts resulting from Class Period acquisitions.

187.    Prior to the announcement of Roadrunner's Q4 2015 and FY 2015 financial results and performance, the Company's stock price languished, closing at just $7.87 per share on February 3, 2016, after falling as low as $6.67 at the close of trading on January 20, 2016. Still, Roadrunner's stock remained tainted all the while, with its stock price distorted as a consequence of the Roadrunner Defendants' false and misleading financial reports and statements. Defendants' false statements rendered on February 3, 2016 after the close of the market helped resuscitate Roadrunner's stock price, which rose to as high as $11.68 a share on February 4, 2016, eventually closing at $10.43 a share on that day on volume of 2,236,300 shares, significantly higher that its normal average daily trading volume. After the close of the market on March 1, 2016, Roadrunner stock traded at $11.84 per share and climbed to a close of $12.00 per share on March 3, 2016, with its share price still tainted by defendants' false representations and resulting embedded artificial inflation.

188.    As conceded by the Company's January 31, 2018 Restatement, Roadrunner's reported financial results for each of its reporting periods in 2015 and fiscal year 2015, ending December 31, 2015, were false and misleading:

(a)  Roadrunner's reported financial results disseminated during the period violated GAAP and made its performance metrics appear to be more favorable and/or less adverse than they actually were. Roadrunner's reported operating expenses were materially understated during the period in the total amount of $31.449 million for FY 2015, and in the amounts of $6.192 million, $9.284 million, $6.256, and $9.717 million for the Q1, Q2, Q3, and Q4 2015 reporting periods, respectively. As a consequence of this material understatement of its operating expenses, Roadrunner's assets were materially overstated, and its reported net income, earnings, EBIT, EBITA, and diluted earnings per share were materially inflated and overstated, as more fully reflected in the charts below:

Amounts in
thousands

### 2015 Net Income By Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---------|---------------------|-----------------|--------------|--------------|
| 2015-Q4 | 12,134 | 3,524 | (8,610) | -71.0% |
| 2015-Q3 | 5,791 | 1,705 | (4,086) | -70.6% |
| 2015-Q2 | 16,471 | 10,571 | (5,900) | -35.8% |
| 2015-Q1 | 13,604 | 9,820 | (3,784) | -27.8% |

Amounts in
thousands

### 2015 EBITDA By Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---------|---------------------|-----------------|--------------|--------------|
| 2015-Q4 | 33,738 | 21,731 | (12,007) | -35.6% |
| 2015-Q3 | 22,802 | 15,900 | (6,902) | -30.3% |
| 2015-Q2 | 38,777 | 29,085 | (9,692) | -25.0% |
| 2015-Q1 | 33,679 | 27,281 | (6,398) | -19.0% |

Amounts in
thousands

### 2015 Earnings Per Share-Diluted By Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---------|---------------------|-----------------|--------------|--------------|
| 2015-Q4 | 0.32 | 0.09 | (0.23) | -71.9% |
| 2015-Q3 | 0.15 | 0.04 | (0.11) | -73.3% |
| 2015-Q2 | 0.42 | 0.27 | (0.15) | -35.7% |

82

| 2015-Q1 | 0.35 | 0.25 | (0.10) | -28.6% |

(b)      Given the falsity of its reported earnings and EBITDA, Roadrunner's important leverage ratio metric, which was significant to investors given its debt ratio covenants with its lenders and cash flow position, was falsely reported and/or in excess of the required ratio of 3.75:1 at that time. Based on the Restatement, Plaintiff is informed and believes that the true leverage ratio for fiscal year 2015 was approximately 4.67:1, in material violation of the maximum leverage ratio to which it was required not to exceed, which at that time was 3.75:1. This placed the Company in default under its covenant, threatening material adverse financial consequences. Roadrunner's leverage ratio was less favorable and materially higher than stated, thus deceiving investors with regard to the true status and depth of risk of default with regard to Roadrunner's financial covenants in its existing credit facility.

(c)      From Q3 2013 and through every quarter through Q4 2015, ending December 31, 2015, Roadrunners true, actual diluted earnings per share fell below the guidance and projections given to the market by the Executive Defendants in the Roadrunner press releases they caused to be issued. While starting in FY 2016 Roadrunner only provided fiscal year earnings per share guidance, the defendants failed to disclose and concealed the fact that the Company had been consistently missing and materially falling below its prior earnings per share guidance, quarter after quarter, ever since Q3 2013 as the chart below reflects:

Amounts in
thousands

Diluted Earnings Per Share By Quarter \ Guidance

| Quarter | Guidance | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---------|----------|---------------------|-----------------|--------------|--------------|
| 2015-Q4 | 0.31-0.35 | 0.32 | **0.09** | (0.23) | -71.9% |
| 2015-Q3 | 0.43-0.47 | **0.15** | **0.04** | (0.11) | -73.3% |
| 2015-Q2 | 0.43-0.46 | **0.42** | **0.27** | (0.15) | -35.7% |
| 2015-Q1 | 0.34-0.37 | 0.35 | **0.25** | (0.10) | -28.6% |
| 2014-Q4 | 0.33-0.37 | **0.32** | **0.12** | (0.20) | -62.5% |
| 2014-Q3 | 0.37-0.41 | 0.37 | **0.21** | (0.16) | -43.2% |
| 2014-Q2 | 0.37-0.41 | 0.38 | **0.30** | (0.08) | -21.1% |
| 2014-Q1 | 0.27-0.30 | 0.27 | **0.20** | (0.07) | -25.9% |
| 2013-Q4 | 0.31-0.35 | **0.29** | **0.27** | (0.02) | -7.4% |
| 2013-Q3 | 0.36-0.39 | **0.35** | **0.33** | (0.02) | -6.1% |
| 2013-Q2 | 0.35-0.38 | 0.37 | 0.35 | (0.02) | -5.3% |
| 2013-Q1 | 0.27-0.29 | 0.29 | 0.27 | (0.02) | -6.1% |

\* Earnings guidance shortfall/misses denoted in red.
\*\*Restated 2013 quarterly diluted earnings per share estimated based on Company-disclosed change to diluted earnings per share for fiscal year 2013 weighted by respective 2013 quarterly revenue. This applies to restated diluted earnings per share figures for 2013 quarterly periods throughout.

(d)      The Executive Defendants' Sarbanes-Oxley certifications, and other statements pertaining to Roadrunner's internal controls during the period, were false and materially misleading because, at the time the Executive Defendants signed or made the statements, they knew or recklessly disregarded that: (1) the Company's reported financial statements were not fairly stated; (2) the financial statements materially misstated net income, EBITDA, earnings per share and expenses; and (3) there were material weaknesses in the Company's disclosure controls and controls over financial reporting such that those controls were not effective. In addition, management was overriding controls, concealing information from independent board members, and operating in an environment in which the "tone from the top" level management, the Executive Defendants, did not promote

84

ethics and integrity in the design or implementation of a system that ensured against such

fraudulent practices.

**E.     The False and Misleading 2016 Reported Financial Results and Related Statements**

189.     On May 4, 2016, Roadrunner issued a Company press release reporting its results

for the first quarter of 2016, ending March 31, 2016 ("Q1 2016 Press Release"), which reported

net income of $3,065,000 and stated, in pertinent part, as follows:

> Diluted earnings per share available to common stockholders was $0.08 for the first quarter of 2016, compared to $0.35 for the first quarter of 2015. Results for the first quarter of 2016 included $0.05 of downsizing costs. For a comparison of diluted earnings per share between the first quarter of 2015 and the first quarter of 2016 see the table in the "2016 First Quarter Results" section below.

> Roadrunner's EBITDA, a non-GAAP financial measure, was $20.1 million for the first quarter of 2016, compared to EBITDA of $33.7 million for the first quarter of 2015.

190.     In discussing the Company's performance, CEO DiBlasi, said:

> For the quarter ended March 31, 2016, consolidated revenue decreased $23.3 million, primarily due to the decrease in fuel surcharge revenue, which impacted revenue by $19.2 million quarter-over-quarter, and the decline in freight rates and volumes across most end markets, net of new business.

> * * *

> We continue to enhance cash flows from operations. Cash provided by operating activities increased 107% from $12.3 million for the first quarter of 2015 to $25.4 million for the first quarter of 2016. Cash provided by operating activities for the twelve months ended March 31, 2016 was $86.5 million … Total availability under our credit facility at March 31, 2016 was $249.2 million. While our focus over the past several years has been on strategic growth and acquisition initiatives to position us for the long term, our focus in 2016 will be to continue to enhance cash flow from operations and to reduce our leverage ratio towards our long-term goal of less than 2.5 times EBITDA.

191.     On May 4, 2016, the Company held a Q1 2016 earnings conference call after the

close of the market, headed by the Executive Defendants, and Curt Stoelting, its then newly

appointed president and chief operating officer ("COO"). During the Q1 2016 conference call,

DiBlasi assured analysts and the market that the Company intended "to aggressively balance cost with current and anticipated business levels." Armbruster promised investors that Roadrunner's "focus in 2016 will be on enhancing cash flow from operations and reducing our leverage ratio toward our long-term goal of less than 2.5 times EBITDA."

192.    During the question and answer session of the conference call with analysts, one analyst asked "I was just curious kind of when you review with your auditors the goodwill that's carried on the books?" CFO Armbruster responded by stating "[w]e do our goodwill impairment test as of June 30th. And we did the test as of June 30, 2015. And it was done again as of September, 2015. And there was no impairment either time with that and with the premium that was calculated. And we did a preliminary test based upon the results right now that we feel, at this time, that there was no impairment," adding "[b]ut again, that valuation is done as of every June 30th." Armbruster comforted the market, while coyly avoiding providing granular detail, assuring investors that "our working capital and our debt pay down continues to improve … ***we do not expect bank covenants to be an issue***." When asked by an analyst on the May 4 2016 call: "But what is that actual ratio right now?", Armbruster answered: "The requirement is 3.75 and we are under the 3.75." The analyst responded: "Is there a reason why you can't actually share the number?" Armbruster responded: "it's above 3.5 but less than 3.75." Then the analyst expressed some concern, as follows:

> Q:… You said that you're between 3.5 and 3.75 now… ***I'm not understanding why that number is so secretive***… it's an ***important number for investors that are trying to figure out what the leverage is***…

> Armbruster: It's between 3.5 and 3.75.

> DiBlasi: It's higher than we'd like… were confident that we'll get whatever modifications we might need in how the formula is calculated or the step-downs to stay in compliance with our bank agreement. That's the key point …. I don't think it's that big of a secret.

> Q:    …if it's not that big of a secret, I don't know why you can't just give us the number … you already said we can't calculate it ourselves …

And defendant Armbruster boldly declared on the call that "***we are in compliance with all bank covenants*** as of March 31, 2016." Nowhere did the Executive Defendants disclose that, in truth, Roadrunner had already violated its leverage ratio covenant and exceeded 3:75:1 as of the end of December 31, 2015, as it was then at approximately 4:67:1, or that its leverage ratio continued to exceed the permitted maximum ratio.

193.    On May 10, 2016, the Company filed a Form 10-Q with the SEC for the quarter ended March 31, 2016 ("Q1 2016 10-Q") which provided the Company's first quarter 2016 financial results. The Q1 2016 10-Q reported the valuation of Roadrunner's goodwill asset as $691,687,000 for the period ending March 31, 2016, which included amounts resulting from Class Period acquisitions, net income of almost $3.1 million compared to $13.6 million in Q1 2015, and diluted earnings per diluted share of $0.08 compared to $0.35 in Q1 2015. The Q1 2016 10-Q reported Roadrunner's cash flows from operating activities, including its net cash provided by operating activities, of $25,426,000 versus $12,284,000 for Q1 2015. The Q1 2016 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants attesting that the financial statements were fairly stated and that the Company's disclosure controls and controls over financial reporting were effective.

194.    Roadrunner's reported Q1 2016 financial results disappointed the investment community, causing its stock price to fall from a close of $10.27 a share on May 4, 2016, just before the announcement, to $7.32 per share by the close of trading on May 5, 2016, and landing at $8.24 per share at the close of trading on May 10, 2016. However, the foregoing disclosures regarding Roadrunner's financial results and metrics for Q1 2016, which failed to fully and

adequately disclose the Company's true financial performance and business condition, or the true depth of the risk of investment, continued to buoy its stock price, and thereby maintain the artificial inflation embedded within it as a consequence of defendants' false and deceptive financial reporting and misrepresentations.

195.     Meanwhile, and further evidencing his scienter, CFO Armbruster was playing coy with the SEC regarding the Company's reported financial results in its Form 10-K for the year ended December 31, 2015 and its Form 10-Q for the quarter ended March 31, 2016. By letter dated June 2, 2016 ("comment letter"), the SEC expressed to Roadrunner concerns arising from significant declines in its revenues and the fact that certain segment market capitalization at the Company was below the reported net assets with respect to the first quarter of 2016, ending March 31, 2016. The SEC was concerned that despite the decline in revenues and market capitalization below net assets with respect to its LTL and Global Solutions segments, the Company had performed an interim goodwill impairment analysis only for its LTL reporting unit as of the end of the first quarter. The SEC asked the Company to disclose in its MD&A the percentage by which the fair value of its reporting units exceeded their carrying values as of the date of the most recent test.

196.     Amid an environment in which Roadrunner's expenses were materially understated, and its financial results were not being truthfully reported, defendant Armbruster, in a responsive letter to the SEC dated June 16, 2016, argued against conducting a goodwill impairment analysis for both the LTL and Global Solutions segments because the Company had revised its internal forecasts and experienced "favorable operating cost improvements," which he represented did not result in a triggering event requiring an interim goodwill impairment analysis

for both of those reporting units. Armbruster signed the Company's response to the SEC's comment letter.

197.    The SEC also commented on the Company's debt covenants, and asked Roadrunner to disclosure the Company's "actual ratios/amounts related to any material debt covenants" and all such required ratios/amounts as of each balance sheet date, including the "specific computations" used by the Company. The SEC commented:

> This will allow investors to better understand and assess your current compliance status and your ability to continue to meet debt covenants.

To be sure, the SEC required Roadrunner to revise its disclosures to explain the reasonably likely impact of a breach on the Company's financial condition or operating performance.

198.    Still, the Roadrunner Defendants failed to disclose that the Company was under-reporting its costs, thereby over-reporting its earnings, or that its true debt to EBITDA ratio placed the Company in default – a key and critically important piece of information that the Company concealed from both the SEC and the investment community.

199.    On July 27, 2016, after the close of the market, Roadrunner issued a Company press release reporting its results for its second quarter of 2016, ending June 30, 2016, ("Q2 2016 Press Release"). Net income for the Q2 2016 quarter was reported at $1,798,000 versus $16,471,000 for the second quarter of 2015. The Q2 2016 Press Release also represented, in pertinent part, as follows:

> Diluted earnings per share available to common stockholders was $0.05 for the second quarter of 2016, compared to $0.42 for the second quarter of 2015. Results for the second quarter of 2016 included $0.05 of downsizing costs.
>
> Roadrunner's EBITDA, a non-GAAP financial measure, was $18.2 million for the second quarter of 2016, compared to EBITDA of $38.8 million for the second quarter of 2015. EBITDA, excluding $2.5 million of downsizing costs, was $20.7 million for the quarter ended June 30, 2016. EBITDA was $38.3 million for the six months ended June 30, 2016, compared to EBITDA of $72.5 million for the six months ended June 30,

89

2015. EBITDA, excluding $5.0 million of downsizing costs, was $43.3 million for the six months ended June 30, 2016.

Cash provided by operating activities increased from $7.7 million for the second quarter of 2015 to $14.3 million for the second quarter of 2016. Cash provided by operating activities increased from $20.0 million for the six months ended June 30, 2015 to $39.8 million for the six months ended June 30, 2016.

200.    In discussing the Company's performance, DiBlasi said:

For the quarter ended June 30, 2016, consolidated revenue decreased $34.5 million, primarily due to continuing declines in freight rates and volumes across most end markets and lower fuel surcharge revenue of $20.1 million quarter-over-quarter.

* * *

During the second quarter, we incurred $3.1 million of downsizing costs in our TL and LTL segments ($0.05 impact on diluted earnings per share). We expect approximately $2.5 million of additional downsizing costs to be incurred in the third quarter of 2016. We expect these downsizing activities will benefit our financial results in future periods.

* * *

We continue to improve cash flows from operations. Cash provided by operating activities increased from $7.7 million for the second quarter of 2015 to $14.3 million for the second quarter of 2016. Cash provided by operating activities for the twelve months ended June 30, 2016 was $93.2 million. At June 30, 2016, total debt was $412.3 million and cash and cash equivalents were $7.8 million….

201.    Commenting on guidance for 2016, Armbruster said:

Due to continuing market trends and historically low freight rates in many end markets, we are lowering our expected EBITDA and diluted earnings per share for the full year 2016. We … anticipate diluted earnings per share available to common stockholders, excluding the impact of downsizing costs, to be in the range of $0.70 to $0.85 for 2016. Our revised guidance assumes that: (i) historic seasonal patterns will increase volumes and slightly improve rates in certain end markets during the second half of 2016; (ii) new business awards will build throughout the year; (iii) cost saving initiatives will benefit results in the second half; and (iv) we do not consummate any new acquisitions. We expect capital expenditures net of proceeds for 2016 to be in the range of $15 million to $25 million.

202.    But in the earnings conference call with the investment community on July 27, 2016, headed by CEO DiBlasi and CFO Armbruster, the truth about Roadrunner's financial

performance and metrics continued to be concealed. DiBlasi told investors that Roadrunner implemented pickup and delivery cost improvements expected to save $5 million annually and also implemented "focus initiatives in claims expense and SG&A cost reductions" and "will have continued cost savings initiatives throughout the rest of 2016." Armbruster assured investors that the Company was in compliance with "all bank covenants," while revealing that "during the quarter, we paid down $9.8 million of bank debt" and that "our bank leverage ratio… at the end of Q2 was approximately 4.3 times compared to a maximum of 4.5 times." Armbruster stated: "we expect to reduce this leverage ratio throughout the rest of 2016," noting that the ratio covenant was going to step down to "4" in Q3 2016, then "3.75" in Q4 2016, and dropping further still to "3.25" for Q2 2017.

203.　On August 8, 2016, the Company filed a Form 10-Q with the SEC for the quarter ended June 30, 2016 ("Q2 2016 10-Q") which provided its second quarter 2016 financial results and positions. The Q2 2016 10-Q reported a goodwill value of $691,687,000, including amounts resulting from Class Period acquisitions, quarterly diluted earnings per share of $0.05, compared to $0.42 per share for Q2 2015, and net income of $4,863,000.  The Q2 2016 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants attesting that the financial statements were fairly stated and that the Company's disclosure controls and controls over financial reporting were effective.

204.　With regard to "goodwill," the Q2 2016 10-Q disclosed that a decline in TL and LTL revenues due to lower freight volumes and pricing, as well as operating cost increases in both reporting units due to higher insurance claims, independent contractor termination costs, and excess capacity during the quarter ended June 30, 2016, resulted in operating performance that fell below the projections used by the Company in its interim goodwill impairment

assessments performed as of September 30, 2015 for the Company's LTL reporting unit, and as of March 31, 2016 for the Company's TL reporting unit. This indicated that the fair value exceeded the carrying value of those segments by approximately 65% and 87% for the LTL and TL reporting units, respectively. Accordingly, the Company acknowledged that it was required to perform an interim goodwill impairment analysis of its TL and LTL reporting units as of June 30, 2016, which would be completed "during the third quarter of 2016."

205.    Roadrunner's disappointing Q2 2016 reported financial results and performance metrics caused the trading price of its stock to decline from a close of $8.99 per share, just before the July 27, 2016 announcement, to $7.27 per share by the close of trading on July 28, 2016. Nonetheless, Roadrunner's stock continued to trade at artificially inflated prices due to the distortion of its stock price and embedded taint caused by the aforesaid false, deceptive and misleading statements and reported financial results, which buoyed and thereby inflated its trading price above what the price at which it would have traded had the truth been fully, fairly and adequately disclosed, and had Roadrunner fairly presented its financial results in accordance with GAAP.

206.    On November 2, 2016, after the close of the market, Roadrunner issued a press release announcing its results for the third quarter of 2016, ending September 30, 2016, ("Q3 2016 Press Release"). The Q3 2016 Press Release reported, in pertinent part, as follows:

> Diluted earnings per share available to common stockholders was $0.21 for the third quarter of 2016, compared to $0.15 for the third quarter of 2015.
>
> Operating income for the third quarter of 2016 included a $4.9 million gain from the sale of a non-core business and $2.1 million of downsizing costs, which together resulted in a $0.05 benefit to diluted earnings per share. Results for the third quarter of 2015 included an $0.08 charge associated with the termination of certain independent contractor ("IC") lease purchase guarantee programs.

***

Roadrunner's EBITDA, a non-GAAP financial measure, was $28.6 million for the third quarter of 2016, compared to EBITDA of $22.8 million for the third quarter of 2015. EBITDA, excluding a $4.9 million gain from the sale of a non-core business and $1.5 million of downsizing costs, was $25.2 million for the quarter ended September 30, 2016. EBITDA, excluding a $5.0 million charge associated with the termination of certain IC lease purchase guarantee programs, was $27.8 million for the quarter ended September 30, 2015.

\*\*\*

We were in compliance with all the financial covenants contained in the amended credit agreement for the four quarters ended September 30, 2016.

Given market conditions and uncertainties, we believe it is prudent at this time to withdraw, and investors should not rely on, our previously issued guidance for the fiscal year ending December 31, 2016. We will not provide guidance until we have more clarity that market conditions and uncertainties have stabilized."

207.    On November 2, 2016, after the close of the market, Roadrunner held a Q3 2016 earnings conference call with the investment community that was hosted by CEO DiBlasi, CFO Armbruster, and COO Stoelting. During the Q3 2016 conference call, Armbruster represented that Roadrunner's **leverage ratio** at the end of Q3 2016, was "approximately 3.99 times, which is at the maximum currently allowed by our bank credit facility," adding "[w]e expect to amend certain financial covenants in our existing bank credit facilities to ensure that we remain in compliance in future periods."

208.    Armbruster also discussed the Company's "annual goodwill impairment analysis" stating that "we concluded that the carrying value of our LTL reporting unit exceeded its fair value," and that Roadrunner was performing "the second step of our goodwill impairment analysis to measure the amount of goodwill impairment," which had not been completed. Continuing to keep investors in the dark, without disclosing specifics needed to make their statements not misleading, Armbruster calmly added that while Roadrunner was "unable to provide a reasonable estimate for the noncash goodwill impairment loss…step two of our

goodwill impairment analysis" was expected to be completed "in the fourth quarter of 2016" and that, while "any such noncash goodwill impairment loss may be material to our results of operation for the three months ending December 31, 2016," it would "have no impact on our business operations, liquidity, credit agreement, or compliance with existing debt agreements." This statement was deceptive and untrue. As the Restatement reveals, as more fully discussed below, Roadrunner's goodwill asset value was already impaired, requiring it to report a goodwill impairment charge at least in the third quarter of 2016, if not sooner, and not the fourth quarter of 2016, of over $360 million. It was not a function of "may," or "could" — the impairment had already occurred.

209.    Although the Executive Defendants acknowledged a poor business environment, at no time did they disclose or issue any admission or statement in the Q3 2016 Press Release or on the Q3 2016 earnings conference call that the Company's current or prior financial results were false. Nor did they give any warnings to investors and the financial community that the Company had misrepresented and underreported its expenses and skewed its financial performance metrics, including its reported net income, EBITDA, earnings per share, and leverage ratio, which was already in default, to look better than they actually were, thereby deceiving the investment community for many a quarter, over several years.

210.    On November 14, 2016, the Company filed a form 10-Q with the SEC for the quarter ended September 30, 2016 ("Q3 2016 10-Q") which provided the Company's Q3 2016 financial results. Roadrunner's Q3 2016 10-Q reported a goodwill asset value of $694,302,000 net income of $7,939,000 compared to $5,791,000 for Q3 2015 and diluted earnings per share of $0.21, compared to $0.15 for the quarter ending September 30, 2015.

211.    On the subject of goodwill, the Company's Q3 2016 10-Q stated as follows:

94

The Company conducts its annual goodwill impairment analysis for each of its four reporting units as of July 1 of each year. As a result of the first step of its annual goodwill impairment analysis as of July 1, 2016, the Company determined that the fair value of the TL, Global Solutions, and Warehousing & Consolidation reporting units exceeded their respective carrying values by 10.0%, 5.3%, and 1.3%, respectively; thus no impairment was indicated for these reporting units. However, the Company determined that the fair value of the LTL reporting unit was less than its carrying value, indicating that the reporting unit's $197.3 million of goodwill, or a portion thereof, **could** be impaired. Therefore, the Company is required to perform the second step of the goodwill impairment analysis for its LTL reporting unit to measure the amount of goodwill impairment. … The Company expects to complete step two of its goodwill impairment analysis for its LTL reporting unit during the fourth quarter of 2016. Any such non-cash goodwill impairment loss **may** be material to the Company's results of operations…

212.    The Q3 2016 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants, who represented that Roadrunner's financial statements were fairly stated its disclosure controls and controls over financial reporting were effective.

213.    Roadrunner's reported financial results and comforting statements once again helped to fortify and buoy its stock price and maintain the artificial inflation embedded within it as a consequence of defendants' false and deceptive misrepresentations. Roadrunner's stock price, which closed at $7.54 on November 2, 2016, immediately before the Q3 2016 Press Release and conference call later that day, closed at $7.50 on November 3, 2010, with sustained price movement to $10.09 by the close of trading on November 14, 2016. Its stock price continued to trade at artificially inflated levels thereafter, reaching $11.74 by the close of trading on Friday, January 27, 2017, shortly before the adverse truth that Roadrunner had been issuing and reporting false and misleading financial statements and performance metrics for quite awhile began to reach the light of day commencing on January 30, 2017.

214.    As noted in the charts below, as more fully set forth in Part VI, Subparts A-E below, and as the Company has now admitted, Roadrunner's reported financial results, metrics

and reported leverage ratios during the entirety of the reporting periods in 2016 ending September 30, 2016, were false and misleading. The Company's operating expenses were understated in the total amount of $19.245 million through September 30, 2016 and in the amounts of $4.444 million, $7.388 million, and $7.413 million for Q1 2016, Q2 2016 and Q3 2016, respectively (excluding the impairment charge for goodwill). As a consequence, important financial and performance results were materially overstated as the charts below indicate:

Amounts
in thousands

Net Income By Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---------|---------------------|------------------|---------------|---------------|
| 2016-Q3 * | 7,939 | 3,391 | (4,548) | -57.3% |
| 2016-Q3 | 7,939 | (319,618) | (327,557) | -4125.9% |
| 2016-Q2 | 1,798 | (2,739) | (4,537) | -252.3% |
| 2016-Q1 | 3,065 | 900 | (2,165) | -70.6% |

* Net Income - Excluding Goodwill Impairment

Amounts in
thousands

Earnings Per Share-Diluted By Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---------|---------------------|------------------|---------------|---------------|
| 2016-Q3* | 0.21 | 0.09 | (0.12) | -57.9% |
| 2016-Q3 | 0.21 | (8.34) | (8.55) | -4071.4% |
| 2016-Q2 | 0.05 | (0.07) | (0.12) | -240.0% |
| 2016-Q1 | 0.08 | 0.02 | (0.06) | -75.0% |

* Earnings Per Share-Diluted - Excluding Goodwill Impairment

Amounts in
thousands

Earnings Per Share-Diluted By Quarter

| Quarter | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---------|---------------------|------------------|---------------|---------------|
| 2016-Q3* | 0.21 | 0.09 | (0.12) | -57.9% |
| 2016-Q3 | 0.21 | (8.34) | (8.55) | -4071.4% |
| 2016-Q2 | 0.05 | (0.07) | (0.12) | -240.0% |

96

| 2016-Q1 | 0.08 | 0.02 | (0.06) | -75.0% |

* Earnings Per Share-Diluted - Excluding Goodwill Impairment

## VI.  DEFENDANTS TRICKLE THE TRUTH OUT OVER A LONG PERIOD OF TIME

### A.  Initial Admission of Falsely Reported Leverage Ratios

215.  On November 10, 2016, and in close proximity to Armbruster's conference call assurances on November 2, 2016 that the Company was in compliance with its leverage ratio covenant, and that the leverage ratio for Q3 2013 was "approximately 3.99 times," the "maximum" then currently allowed, Roadrunner filed a Form 12b-25 notification with the SEC which revealed and admitted, albeit only partially, that, in truth, Roadrunner's leverage ratios were in violation of its covenants, stating in pertinent part:

> *Roadrunner Transportation Systems, Inc. (the "Company") has determined that it is unable to file its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q")* within the prescribed time period without unreasonable effort or expense for the reasons described below.
>
> On November 4, 2016, during the preparation and review of the Company's quarterly compliance certificate required under its credit agreement, *the Company identified a mistake in the calculation of its cash flow leverage ratio for the four quarters ended September 30, 2016*. Based on the corrected calculation, upon the delivery of the quarterly compliance certificate (required to be delivered by November 14, 2016), *the Company would not be in compliance with its cash flow leverage ratio financial covenant for the four quarters ended September 30, 2016* absent a waiver of such anticipated non-compliance by the required lenders under the credit agreement…
>
> ***
>
> [T]he Company is currently engaged in discussions with U.S. Bank and the other lenders under its credit agreement with respect to a waiver of the Company's anticipated non-compliance with, and any actual or potential event of default resulting from such anticipated non-compliance with, the cash flow leverage ratio financial covenant for the four quarters ended September 30, 2016. Although the Company can provide no assurance, it expects to obtain such waiver from U.S. Bank and the required lenders within the permitted extension period. However, the failure to obtain such waiver could have a material adverse effect on the Company's liquidity and financial condition.

97

216. In light of the Company's announcements on January 30-31, 2017 of the need to restate its materially false financial results, this disclosure was itself false and misleading. And the prior inaccurately reported leverage ratios were not the product of a mistake in calculating them. In truth, Roadrunner's leverage ratios had been understated to make them appear to be more favorable than they really were, and in order to conceal the fact that certainly in FY 2014 and in all of FY 2015 and 2016, they exceeded the proscribed limits, in violation of the debt covenant, as more fully illustrated below:

| Cash Flow Leverage Ratio (CFLR) = Funded Debt/EBITDA for 2012-2016 | | | | | | |
|---|---|---|---|---|---|---|
| Year | Required Ratio (Must be Less Than) | Total Debt | EBITDA (Original) | CFLR Ratio (Original) | EBITDA (Restated) | CFLR Ratio (Restated) |
| 2016 | | | | | | |
| 2015 | 3.75:1 | 439,399 | 128,966 | 3.41 | 93,997 | 4.67 |
| 2014 | 3.50:1 | 430,000 | 120,764 | 3.56 | 90,570 | 4.75 |
| 2013 | 3.25:1 | 192,640 | 101,674 | 1.89 | 94,296 | 2.04 |
| 2012 | 3.25:1 | 161,500 | 78,449 | 2.06 | 69,993 | 2.31 |

**Amounts in thousands**
**By Year and Quarter**

| Cash Flow Leverage Ratio (CFLR) = Funded Debt/EBITDA for the previous four quarters | | | | | | |
|---|---|---|---|---|---|---|
| Year | Required Ratio (Must be Less Than) | Total Debt | EBITDA (Original) | CFLR Ratio (Original) | EBITDA (Restated) | CFLR Ratio (Restated) |
| YTD 9/30/2016 | 4.00:1 | 409,400 | 100,686 | 3.99 | 68,959 | 5.94 |
| 2015 | 3.75:1 | 439,399 | 128,966 | 3.41 | 93,997 | 4.67 |
| 2014 | 3.50:1 | 430,000 | 120,764 | 3.56 | 90,570 | 4.75 |
| 2013 | 3.25:1 | 192,640 | 101,674 | 1.89 | 94,296 | 2.04 |
| 2012 | 3.25:1 | 161,500 | 78,449 | 2.06 | 69,993 | 2.31 |

| Cash Flow Leverage Ratio (CFLR) = Funded Debt/EBITDA for the previous four quarters | | | | | | | |
| Quarter | Required Ratio (Must be Less Than) | Total Debt | EBITDA (Original) | CFLR Ratio (Original) | | EBITDA (Restated) | CFLR Ratio (Restated) |
|---|---|---|---|---|---|---|---|
| 2016-Q3 | 4.00:1 | 409,400 | 100,686 | 3.99 | | 68,959 | 5.94 |
| 2016-Q2 | 4.50:1 | 412,250 | 94,862 | 4.35 | | 64,321 | 6.41 |
| 2016-Q1 | 3.75:1 | 422,000 | 115,479 | 3.65 | | 83,001 | 5.08 |
| 2015-Q4 | 3.75:1 | 439,399 | 128,966 | 3.41 | | 93,997 | 4.67 |
| 2015-Q3 | 3.75:1 | 458,000 | 127,762 | 3.58 | | 96,185 | 4.76 |
| 2015-Q2 | 3.50:1 | 430,000 | 136,559 | 3.15 | | 103,854 | 4.14 |
| 2015-Q1 | 3.50:1 | 433,500 | 130,461 | 3.32 | | 100,029 | 4.33 |
| 2014-Q4 | 3.50:1 | 430,000 | 120,764 | 3.56 | | 90,570 | 4.75 |
| 2014-Q3 | 3.50:1 | 443,581 | 111,510 | 3.98 | | 87,912 | 5.05 |
| 2014-Q2 | 3.50:1 | 311,114 | 107,599 | 2.89 | | 90,063 | 3.45 |
| 2014-Q1 | 3.25:1 | 311,383 | 103,164 | 3.02 | | 91,249 | 3.41 |
| 2013-Q4 | 3.25:1 | 192,640 | 101,674 | 1.89 | | 94,296 | 2.04 |
| 2013-Q3 | 3.25:1 | 205,813 | 99,146 | 2.08 | | 91,432 | 2.25 |
| 2013-Q2 | 3.00:1 | 175,000 | 91,887 | 1.90 | | 83,942 | 2.08 |
| 2013-Q1 | 3.25:1 | 157,250 | 84,341 | 1.86 | | 76,126 | 2.07 |
| 2012-Q4 | 3.25:1 | 161,500 | 78,449 | 2.06 | | 69,993 | 2.31 |

Note A - Restated EBITDA figure for Q3-2016 excludes the impact of the goodwill impairment charge. Also note that per the definition of EBITDA in the credit agreements, goodwill impairment is not considered in calculation of the CFLR ratio.

Note B – Leverage ratios in charts above are approximations based upon data from the Restatement and the original, pre-Restatement issued financial statements.

**B.    Partial Admissions of Materially False Financial Reporting and Need for Restatement**

217.    On January 30, 2017, after the market closed, Roadrunner issued a press release

("January 2017 Press Release"), which stated in pertinent part:

**ROADRUNNER TRANSPORTATION SYSTEMS ANNOUNCES
RESTATEMENT OF PRIOR PERIOD FINANCIAL STATEMENTS**

CUDAHY, WI - January 30, 2017 - Roadrunner Transportation Systems, Inc.
("Roadrunner") (NYSE: RRTS), a leading asset-light transportation and logistics service

provider, announced today that on January 27, 2017 its Audit Committee, after considering the recommendation of management, concluded that, as a result of the information obtained to date in connection with an ongoing investigation described below, ***the following financial statements and associated reports of Roadrunner's independent registered public accounting firm, Deloitte & Touche LLP, previously filed with the Securities and Exchange Commission ("SEC") should no longer be relied upon:***

- Ñ *the audited consolidated financial statements and unaudited quarterly information included in Roadrunner's Annual Report on Form 10-K for the year ended December 31, 2014;*

- Ñ *the unaudited condensed consolidated financial statements included in Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2014, June 30, 2014, and September 30, 2014;*

- Ñ *the audited consolidated financial statements and unaudited quarterly information included in Roadrunner's Annual Report on Form 10-K for the year ended December 31, 2015;*

- Ñ *the unaudited condensed consolidated financial statements included in Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2015, June 30, 2015, and September 30, 2015; and*

- Ñ *the unaudited condensed consolidated financial statements included in Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2016, June 30, 2016 and September 30, 2016.*

***Similarly, related press releases, investor presentations or other communications describing Roadrunner's financial statements for these periods should no longer be relied upon.***

***

The investigation into these discrepancies is still ongoing; however, based on the investigation to date, Roadrunner has identified various accounting errors that it currently estimates will require prior period adjustments to Roadrunner's results of operations of between $20 million and $25 million.

These errors principally relate to unrecorded expenses from unreconciled balance sheet accounts including cash, driver and other receivables, and linehaul and other driver payables. As the investigation is ongoing, the estimated amount is preliminary and could change materially. The investigation to date has disclosed that the accounting discrepancies may also affect periods prior to the periods set forth above. Roadrunner has not yet completed its analysis, however, to determine which prior periods may be affected.…

100

In addition, in conjunction with the investigation, Roadrunner is reassessing its internal controls over financial reporting and its compliance programs. The result of this reassessment could lead Roadrunner to conclude that there were deficiencies in Roadrunner's internal controls over financial reporting that constitute material weaknesses and would therefore effect [sic] the conclusions regarding effectiveness previously expressed in Item 9A, Controls and Procedures, of Roadrunner's Annual Report on Form 10-K for the year ended December 31, 2015. Accordingly, management's report on internal controls over financial reporting as of December 31, 2015 and the associated report of Deloitte & Touche LLP should no longer be relied upon.…

218.  Roadrunner shocked the investment community when it initially, but incompletely, revealed on January 30, 2017, after a new COO and president, Curtis Stoelting, was installed, that its reported financial statements in its Forms 10-K and Forms 10-Q for the periods ending from March 31, 2014 through September 30, 2016, as well as its "related press releases, investor presentations or other communications" describing its financial performance for those periods, "should no longer be relied upon."

219.  Initially, on January 30, 2017, Roadrunner reported its anticipated restatement of its financial results would involve "$20 million to $25 million" in "unrecorded expenses," including "cash, driver and other receivables, line-haul and other driver payables." During a January 31, 2017 conference call with analysts, Stoelting revealed a little more adverse news: that the Company's "ongoing investigation" related to the anticipated Restatement had expanded to "other operating units." Stoelting also added that Roadrunner was "reassessing our internal controls over financial reporting and our compliance" and that it was expecting to make changes to its control environment going forward to prevent false accounting and financial reporting.

220.  Stoelting was pressed by an analyst on the January 31, 2017 conference call to reveal more information about the disclosed understatement of expenses of $20 to $25 million. He was asked whether the misstatement was confined "over one period or just over the time frame since the acquisitions in 2011." Stoelting responded that "we're still investigating and we

don't know that those numbers are final, but those numbers would be EBIT, or impact on operating income, and we're still identifying the periods." (The acronym "EBIT" means "earnings before interest and taxes"). After admitting that the years impacted would "probably be 2013, 2014, 2015 and 2016 at this point," and after an analyst inquired as to whether the then estimated range of Roadrunner's false accounting overstatement was "cumulative since 2011," or "per year from 2013," Stoelting made the following revelation:

> "[t]hat's the cumulative impact and we're still determining what periods…how that would split up between prior periods. So we'll have more clarity on that as we go forward. And again, remember *that number can still move*. We're still — *expanding* the investigation and we will work as quickly as possible to finalize, but that won't happen until we finalize all the restatements."

221.    In addition to the foregoing, Roadrunner revealed that it would take a non-cash charge for **goodwill impairment** upon announcing its **fourth quarter 2016 results**, estimated to be between $175 million and $200 million. This was a gross understatement and inaccurate, as the Restatement of January 31, 2018 reveals.

222.    The January 30, 2017 announcement did not reveal the entire depth or magnitude of the false accounting.

### C.    Long Overdue and Delayed Restatement

223.    One year later, on January 31, 2018, in the face of simultaneously disclosed investigations by the Department of Justice and the SEC, which are on-going, Roadrunner's new management finally revealed the extent and gravity of its false and misleading financial reporting and related misstatements, which had deceived investors for years. Roadrunner issued a formal Restatement, amending its Annual Report on Form 10-K for 2015, previously filed with the SEC, restating prior financial reporting periods. The Company also finally filed its Annual Report on Form 10-K for the fiscal year ending December 31, 2016, and filed amendments to its

102

quarterly reports on Forms 10-Q for the first, second and third quarters of 2016. In so doing, Roadrunner restated its annual results from 2013 through 2015 and booked material adjustments to its financial statements going as far back as 2011. The Company disclosed that the level and depth of accounting fraud at Roadrunner, which was engineered, permitted and implemented by the Executive Defendants, its prior management, was deeper and more prolonged than initially revealed in January 2017.

224.    Although any non-independent "internal investigation," even by the Company's new management, is suspect as being incomplete and less than rigorous due to self-serving corporate interests in anticipation of litigation, Roadrunner identified false accounting "that impacted substantially all financial statement line items and disclosures," and identified "material weaknesses in our internal control over financial reporting." Net income was overstated by approximately $66.5 million from FY 2011 through the third quarter of 2016. Operating expenses were understated by $94.25 million, excluding impairment of goodwill charges. Roadrunner restated many of the most important and basic financial metrics and results of performance impacting the market's assessment of the Company's financial health, status, and its stock price: net income, EBITDA, and earnings per share. These, in turn, were highly germane to the status of the Company's compliance with its leverage ratio covenants.

225.    Investors were informed by the Restatement that profitability in Roadrunner's TL segment declined as a result of "higher operating expenses, primarily from increased equipment leasing, insurance, maintenance and payroll cost." It was also revealed that Roadrunner experienced a decline in adjusted EBITDA in 2016 impacted by "higher than normal non-allocated operating cost" associated with "lease purchase guarantee programs," among other things. And it was revealed that Roadrunner's impairment of goodwill was actually $360.3

103

million, far higher than disclosed in January 30, 2017, by a substantial order of magnitude, requiring the Company to book an impairment for goodwill in Q3 2016, not Q4 2016 as represented in January 2017. This massive goodwill impairment charge effectively wiped out assets in an amount approximating Roadrunner's entire market capitalization.

226. Roadrunner's restated financial results, dating back to the advent of the Class Period, when compared to what investors were led to believe all along, reflect a very different profile of the Company's financial position and status with respect to net income, earnings per share, EBITDA, and leverage ratios. This is more fully alleged and illustrated in the charts set forth above in paragraphs 188, 214, and 216.

227. The January 31, 2018 Restatement also reveals that Roadrunner had been consistently missing, and materially falling below, the quarterly earnings per share guidance it had been giving to the market, in each and every quarter since Q3 2013 through Q4 2015, after which it stopped providing quarterly guidance for FY 2016, as more fully illustrated in the chart below.

Amounts in thousands

Diluted Earnings Per Share By Quarter \ Guidance

| Quarter | Guidance | Originally Reported | Restated Amount | Decrease ($) | Decrease (%) |
|---------|----------|---------------------|-----------------|--------------|--------------|
| 2015-Q4 | 0.31-0.35 | 0.32 | **0.09** | (0.23) | -71.9% |
| 2015-Q3 | 0.43-0.47 | **0.15** | **0.04** | (0.11) | -73.3% |
| 2015-Q2 | 0.43-0.46 | **0.42** | **0.27** | (0.15) | -35.7% |
| 2015-Q1 | 0.34-0.37 | 0.35 | **0.25** | (0.10) | -28.6% |
| 2014-Q4 | 0.33-0.37 | **0.32** | **0.12** | (0.20) | -62.5% |
| 2014-Q3 | 0.37-0.41 | 0.37 | **0.21** | (0.16) | -43.2% |
| 2014-Q2 | 0.37-0.41 | 0.38 | **0.30** | (0.08) | -21.1% |
| 2014-Q1 | 0.27-0.30 | 0.27 | **0.20** | (0.07) | -25.9% |
| 2013-Q4 | 0.31-0.35 | **0.29** | **0.27** | (0.02) | -7.4% |
| 2013-Q3 | 0.36-0.39 | **0.35** | **0.33** | (0.02) | -6.1% |

104

| 2013-Q2 | 0.35-0.38 | 0.37 | 0.35 | (0.02) | -5.3% |
| 2013-Q1 | 0.27-0.29 | 0.29 | 0.27 | (0.02) | -6.1% |

\* Earnings guidance shortfall/misses denoted in red.
\*\*Restated 2013 quarterly diluted earnings per share estimated based on Company-disclosed change to diluted earnings per share for fiscal year 2013 weighted by respective 2013 quarterly revenue. This applies to restated diluted earnings per share figures for 2013 quarterly periods throughout.

228.     The market did not know, and the Roadrunner Defendants' false and deceptive accounting concealed, the continuing, material, and significant quarterly misses every quarter since Q3 2013. Even those results that "just missed" estimates during the Class Period look much more positive than the truth, which, as reflected in the chart above, was much worse.

**D.     Defendants Admit to Cleaning House to Change the "Tone From the Top"**

229.     Albeit too little too late for aggrieved Class Members, Roadrunner acknowledged that it had taken steps, as it must, to improve corporate governance, "leadership and finance teams" and "compliance programs." It appointed a new independent chairman of the board, replacing Rued. It acknowledged the replacement of the former management team (of which DiBlasi and Armbruster were at the top), with new executives, including a new chief executive officer, president and chief operating officer, chief financial officer and chief information officer. These changes at the very top of the corporate organization were essential to preventing false statements and lapses from reoccurring with a new leadership team installed to contribute to a "positive change in the tone from the top."

**E.     Defendants Admit "Material Weakness" Ineffective Internal Controls and Procedures and Accounting Manipulation**

230.     The Executive Defendants were responsible for establishing and maintaining adequate internal control over financial reporting, both under the Exchange Act and the criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Framework"). Internal

105

control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting in preparation of financial statements disseminated to the public, in accordance with GAAP. In that regard, Roadrunner's long overdue 2016 Form 10-K, filed on January 31, 2018, disclosed and confirmed several other findings adverse to the defendants, and wholly contradicted the Executive Defendants' false and misleading representations in the Company's SEC filings and their SOX certifications, which they blatantly exploited.

231.    The Restatement admits and concedes that the Roadrunner executives "***did not maintain an effective control environment*** based on the COSO Framework." This ***material weakness*** in the control environment itself evinced a ***lack of*** "***commitment to integrity and ethical values***." The "***tone from former executive management***" – the Executive Defendants herein – did not "***create the proper environment for effective internal control over financial reporting,***" or ensure that "***relevant information*** was communicated" and "not ***withheld*** from Roadrunner's independent directors" or its "Audit Committee."

232.    In a further stinging indictment of prior executive management, the Company admitted that Roadrunner's "oversight processes and procedures that guide individuals in applying internal control over financial reporting were not adequate in preventing or detecting material accounting errors, or omissions due to inadequate information." Also troubling, consistent with an atmosphere and tone created by, and emanating from, its "former executive management" – the Executive Defendants – Roadrunner's investigation found that there was "***management override of internal controls, including recording improper accounting entries, recording accounting entries that were inconsistent with information known by management at the time,***" along with "***not communicating relevant information within***" Roadrunner and, even "***withholding information from our independent directors and Audit Committee.***" This

106

misconduct and acts of deception, buoying and inflating Roadrunners stock price, are the very hallmarks of securities and accounting fraud, for it is axiomatic that **books do not cook themselves**.

**F.    Additional Admissions and Revelations Re: Tractor Lease Purchase Guaranty Program**

233.    During a conference call with analysts on January 31, 2017, DiBlasi disclosed that "in 2016,… the Company also experienced escalating costs related to certain tractor lease purchase programs that were initiated back in 2013." DiBlasi disclosed during the conference call with analysts that the tractor lease programs "created a lot of cost and a lot of other service issues and driver turnover, among other adverse events, "**resulted in a drop in EBITDA,"** **acknowledging that "with the decline in EBITDA, our debt leverage ratio has increased**." DiBlasi further informed investors that Roadrunner was **still** "**exiting costly tractor lease purchase programs that will remove costs anywhere from $5 million to $7 million annually**… and improve service and improve our ability to retain drivers and independent contractors."

234.    After being asked by one analyst on the January 31, 2017 earnings conference call "whose idea was the tractor lease purchase program," president and COO, and now the current CEO, Curtis Stoelting disclosed more of the adverse truth. He stated, in pertinent part "We used used-trucks in the lease purchase program back in 2013… because we could get a lower lease purchase costs, monthly costs, weekly costs, through our independent contractors… as it turns out… it's the fact that a lot of the trucks that we bought in that time frame had… we got more than our fair share, but the good news is we're getting rid of all those costly trucks now and we're replacing them with trucks that really run. We're only putting new trucks into the lease purchase program going forward." Stoelting then continued to expand on prior operational deficits related to the program stating "… **we've built in maintenance escrows** that stay with the

truck so that if a truck comes unseated,… we've got escrow amounts to repurpose and recondition that truck and get it seated very quickly… we have a team that's focused on that 24/7. ***We didn't have that before***."

235.    Recently, on January 31, 2018, upon disclosing that the Company had overstated net income by approximately $66.5 million as discussed above, the Restatement further revealed that the "decline in adjusted EBITDA" was primarily the result of, among other things, "higher operating expenses primarily from increased equipment leasing, insurance, maintenance and payroll costs" and "[h]igher than normal non-allocated operating costs due to reserves for certain lease purchase guarantee programs."

236.    In sum, the lack of viability of the lease program and depth of economic liability partly revealed on November 5, 2015 and January 31, 2017, and more fully revealed on January 31, 2018, did not happen all of a sudden. Tractors did not suddenly deteriorate, fail, or lose their value overnight in Q3 2015. ICs do not suddenly exit the Company and default on their leases in Q3 2015. Tractor maintenance and repair costs and expenses required to be absorbed or fronted by the Company did not suddenly appear then. Roadrunner did not all of a sudden recognize in 3Q'15 the need to extricate itself from numerous lease guarantees and lease purchase programs with a fleet of used, deteriorating tractors to which it had become tethered, and without maintenance escrows. The used tractors leased in the Program accounted for a lease guaranty exposure by the end of September 30, 2013, of $7.8 million. The potential guaranty exposure was $9.3 million by the end of December 31, 2013, $11.4 million by the end of Q1'14, and $13.8 million by the end of Q2'14. The exposure was $19.8 million by the end of 2014, reflecting that the Company had taken on obligations for more and more used, deteriorating tractors, without fully or adequately disclosing the truth about the fleet of deteriorating vehicles to which it was

tethered, the structurally unsound nature of the program, and the boomeranging expense obligations.

237.    Unbeknown to investors. Roadrunner had clearly started to pull-back its Program commitments and recognized that it was not viable no later than within Q1'15, as previously alleged in paragraph 157 above, but still without appropriate disclosure of its true and adverse risk and lack of viability. As a result, the Company's "theoretical" lease guaranty exposure was still being portrayed in a benign light through Q2 2015, declining from $19.8 million at the end of 2014 to $19.3 million by the end of Q1'15, and further declined to $17.8 million by the end of Q2'15.

G.    Impact of Restatement

238.    The release of information about the restatement over the year it took for defendants to make the disclosure impacted the stock price. The Company's stock price fell from a close on January 30, 2017 of $11.54 per share of Roadrunner common stock to a closing price on January 31, 2017 of $7.92 per share – a drop of approximately 33%. The next day, the stock closed at 7.54 per share, and nearly two months later, on March 29, 2017, it closed at $6.34 per share. As a consequence of Roadrunner's announcement and issuance of its Restatement on January 31, 2018, its stock price tumbled further from $7.14 a share at the close of trading on January 30, 2018, to close at $5.46 per share on January 31, 2018, falling further still to as low as $3.52 on February 20, 2018.

239.    As a consequence of the defendants' materially false and misleading statements and omissions, reported false financial results, exploitation of SOX certifications and lack of integrity and ethics, which derived from and were a product of the "tone" from the top set by the Executive Defendants, and which deceived the market, Class Members suffered massive

damages, having purchased stock at artificially inflated levels at prices that were tainted and distorted by the Roadrunner Defendants' fraud. Meanwhile, the defendants have profited handsomely, collectively reaping over $165 million in insider sales of Roadrunner stock that they directly or beneficially owned during the Class Period, as more fully discussed below in Part VII, § F.

## VII.    ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER

240.    In addition to the foregoing, the following allegations give rise to a presumption and strong reference that the Roadrunner Defendants acted with the requisite scienter. The Roadrunner Defendants' material misstatements and omissions, as alleged above, were done knowingly or recklessly and for the purpose and effort of concealing Roadrunner's true operating condition and financial and performance results from the investing public and, in turn, buoying and artificially inflating the trading price of Roadrunner's common stock.

### A.    The Control Environment Enabled Defendants' Accounting Manipulations and False Financial Reporting: Books Do Not Cook Themselves

241.    Executives who manage a corporation, such as the CEO and CFO, set a tone from the top that defines whether they are honorable and ethical in their business approach and have instilled such values in the working environment. In a publicly traded company, the CEO and the CFO – both of whom typically must sign SOX certifications and quarterly and annual financial statements filed with the SEC – are expected to promote a tone that evinces a commitment to integrity and ethical values. To that end, it is well understood and appreciated by CEOs and CFOs of publicly traded corporations that they must design, establish, and maintain adequate and effective internal controls and procedures respecting financial reporting at all times.

242.    Consistent with their deceptive conduct during the Class Period, and as Roadrunner now concedes, the Executive Defendants – Roadrunner's "executive management"

— who were "responsible for establishing and maintaining adequate internal control over financial reporting – which is "a process designed to provide reasonable assurance regarding the reliability of our financial reporting and preparation of our financial statements for external purposes in accordance with generally accepted accounting principles ("GAAP")" and "responsible for reporting on the effectiveness of internal control over financial reporting" – engaged in misconduct respecting the "control environment" constituting "material weaknesses" with regard to the corporation's "commitment to integrity and ethical values."

243.   As Roadrunner now concedes, the "tone from former executive management," (which as more fully alleged herein is ex-CEO DiBlasi and ex-CFO Armbruster), did not "create the proper environment for effective internal control over financial reporting" or ensure that "relevant information was communicated" and "not withheld from [Roadrunner's] independent directors" or its "Audit Committee."

244.   Roadrunner's material weakness in its internal controls over financial reporting and disclosure was a blatant violation and disregard of the Executive Defendants' responsibilities and itself demonstrates misconduct that was knowing, deliberate, and reckless.

245.   Not surprisingly, in this atmosphere and tone evincing a *lack of* "commitment to *integrity and ethical values*," there was such dishonesty afoot within the Company's executive management that, as Roadrunner now admits, there was also "*management override of internal controls, including recording improper accounting entries, recording accounting entries that were inconsistent with information known by management at the time, not communicating relevant information within our organization and, in some cases, withholding information from our independent directors*" and Roadrunner's "*Audit Committee*." This is a stinging indictment of the Executive Defendants, ex-CEO DiBlasi, and especially ex-CFO Armbruster.

111

Roadrunner's ongoing accounting manipulation was not the product of inadvertence or clerical error. Its ongoing failure to adjust for income diminishing expense items was one of many purposeful accounting manipulations that was instigated and directed from the highest level of Roadrunner's management. Armbruster himself issued top down directives not to record adverse financial items – manipulating accounting to enhance quarterly earnings.

246. As one example, and **_beyond the incomplete revelations and admissions_** of the Restatement and admissions by Roadrunner on **_January 31, 2018_**, the Company engaged in an ongoing top-down directed practice of not recording offsets or reductions to revenue and invoiced receivables, also known as "write-offs." The effect of this particular accounting manipulation was to falsely report higher net income for quarterly periods, thus undermining the fairness, completeness and integrity of Roadrunner's quarterly and annual financial results.

247. During the Class Period, Roadrunner maintained a billing department at its Cudahy, Wisconsin headquarters that was responsible for processing invoices that were refused by customers for a variety of reasons, including that their property was damaged or that the delivery was late and past required deadlines. Invoices to customers could be automatically generated by Roadrunner's accounting system. The billing department was assisted by staff in Roadrunner's pricing department at its Cudahy headquarters, which department played a back-up role and would assist in turning in the write-offs for the refused invoices at the end of every month. The billing department processed write-offs for refused invoices, which required advance approval from sales managers. These write-offs could be for the entire amount of the invoice, or a percentage of the invoice. Write-offs for refused invoices were submitted to management in Cudahy at the end of every month.

248. Beginning by no later than 2012, CFO Armbruster directed the Roadrunner Billing Manager in Cudahy to hold write-offs of refused invoices during approximately the last two weeks of the quarter and not enter those write-offs into Roadrunner's system.

249. This practice of holding write-offs to invoices at the direction of CFO Armbruster is confirmed by CW-1, a former Pricing Manager for the Customer Master File and Pricing Administrator. CW-1 was employed at Roadrunner commencing well before the Class Period and until into 4Q'15. CW-1's employment as a Pricing Manager prior to that time and from the advent of the Class Period required the management of approximately 15 pricing assistants. E-mails sent by the CFO Armbruster to the Billing Manager in which Defendant Armbruster gave the instruction to hold the write-offs were forwarded by the Billing Manager to CW-1.

250. Initially, CFO Armbruster verbally induced the Billing Manager to hold an invoice write-off until after the close of the quarter, but the Billing Manager asked for the instruction in writing before holding the write-off. CFO Armbruster's e-mails, which were forwarded to CW-1, who has personal knowledge of them, did not provide any reason for holding the write-off. CW-1 believed that not recording the write-offs was "improper," but notes that at Roadrunner "we did what we were told." This practice was ongoing and still continuing when CW-1 left the Company in the 4Q'15.

251. As a consequence of such systemic accounting practices practiced and implemented by Roadrunner through top-down directives from Armbruster, the Company's revenue, expenses, and resulting earnings were manipulated and skewed to appear more favorable than they actually were when Roadrunner reported its quarterly and annual financial results.

## B. Armbruster's Post Class Period Termination and Flight From Roadrunner Amid DiBlasi's Demotion

252. Those responsible for designing, maintaining, and exploiting Roadrunner's ineffective internal controls and disclosure procedures, which were fraught with material weakness, and which they could override to manipulate Roadrunner's accounting and financial reporting, needed to be held accountable. Demonstrating that they are culpable, and that they, in fact, engaged in wrongful misconduct with respect to Roadrunner's false and deceptive accounting and financial reporting, Armbruster and DiBlasi have rightfully been swept up in the Company's remedial house cleaning. On March 29, 2017, Armbruster was terminated by Roadrunner. The termination was the product of ample cause. The fact that Armbruster was terminated following the January 30-31, 2017 announcements demonstrates that the Company's false and misleading financial reporting was not the product of innocence or mere negligence but, instead, was the product of active and knowing deception, concealment, and malfeasance.

253. On May 2, 2017, it was reported that DiBlasi was demoted by Roadrunner and that Curtis Stoelting, who was serving as president of the Company, was elevated to the position of chief executive officer. DiBlasi's unceremonious demotion was the product of his malfeasance in office, further signifying that the need to restate the Company's previously false and misleading financial statements was not the product of innocence, mere negligence, nor mistakes unknown to senior management. His demotion, which was for cause, is *prima facia* confirmation that he was culpable in violating his duties and did so with the intent to deceive.

254. The termination of Armbruster and the demotion of DiBlasi were not executed cavalierly or lightly. They are the result of internal conclusions that both DiBlasi and Armbruster had engaged in manipulative and deceptive conduct necessitating the firing of Armbruster, for cause, and the demotion of DiBlasi, for cause. Replacing them at their highest level positions

114

was a necessary first step in new management's internal process of instituting corporate therapeutics and holding high level executive officers responsible for their malfeasance. These corporate measures, on the heels of announcing the need for a Restatement, strongly support the inference that the Executive Defendants possessed the requisite scienter with regard to the false statements attributed to them and the Company throughout the Class Period.

### C. Motive – Need For Capital Infusions via Expanded Credit Facilities To Successfully Operate and Fund Acquisitions

255. The maintenance of Roadrunner's credit facilities through willing lenders was critical to its success and expanded year to year throughout the Class Period. The funds that were devoted to Roadrunner's access by reason of the ever-expanding credit facility were used by the Company to fuel its strategy of growth through aggressive acquisitions, gobbling up company after company, thereby ostensibly improving its revenues and expanding its reach, until Roadrunner built itself into a substantially larger company than it was when it first became a publicly traded company.

256. The table below reflects the available funds each of Roadrunner's credit facilities during the Class Period:

| Credit Facility | Date | Aggregate Limit or Commitment |
|---|---|---|
| Credit Facility | May 18, 2010 | $55,000000 |
| Amended and Restated Credit Facility | May 31, 2011 | $85,000,000 |
| Second Amended and Restated Credit Facility | August 31, 2011 | $240,000,000 |
| Third Amended and Restated Credit Facility | August 3, 2012 | $295,000,000 |
| Fourth Amended and Restated Credit Facility | August 9, 2013 | $350,000,000 |
| Fifth Amended and Restated Credit Facility | July 9, 2014 | $550,000,000 |
| Sixth Amended and Restated Credit Facility | September 14, 2015 | $700,000,000 |

257. In each credit facility entered into by Roadrunner during the Class Period, the Company falsely certified that its financial statements were prepared in accordance with GAAP,

fairly presented its financial results, and were prepared in good faith and based on reasonable assumptions. In each credit facility agreement entered into by Roadrunner, it represented and warranted that it would "keep adequate and proper records and books of account in which full and correct entries shall be made of its dealings, business and affairs." Roadrunner's covenants in each of its credit facilities required it to report its financial results for certain quarterly periods and fiscal years to its lenders and a compliance certificate signed by Roadrunner's CFO or controller "showing the calculations necessary to determine compliance with this Agreement when stating that no Default or Event of Default exists, or if any Default or Event of Default exists, stating the nature and status thereof."

258.    Each of the credit facility agreements throughout the Class Period imposed upon Roadrunner two specific "financial covenants" entitled "*Fixed Charged Coverage Ratio*" and, most importantly, "*Total Cash Flow Leverage Ratio*," respecting which the Company was required to adhere in order to avoid default. Except for the fifth and sixth amended and restated credit agreements, each of the credit facility contracts also required the Company to adhere to a "capital expenditures" threshold which it was not permitted to exceed.

259.    The term "*Total Cash Flow Leverage Ratio*" was defined by the agreements to mean "the ratio of a) Total Funded Debt to b) EBITDA, or following…any Permitted Acquisition, Pro Forma EBITDA."

260.    Throughout the Class Period, Roadrunner's total cash flow leverage ratio (also known and reported as its "debt-to-EBITDA ratio" or "leverage ratio,") was always an important metric, as reflected in the dialogue between the Executive Defendants and the market, as more fully alleged above.

116

261. Under its credit facility agreements, Roadrunner could not exceed stated and agreed upon leverage ratios, doing so would trigger a default, which, in turn, triggered an obligation to repay the total amount of debt owed to the Lenders under the credit facility. The pressure to report total debt to EBITDA leverage ratio figures that abided by Roadrunner's leverage ratio covenants in order to avoid default was intense, and became increasingly more intense, especially as its corporate debt under the credit facilities expanded.

262. While the Executive Defendants routinely represented that Roadrunner was abiding by and maintaining leverage ratios that were in compliance with its debt covenants, in truth, the Company was in material violation of them from at least 2014 through 2016. The trend in this regard was increasingly unfavorable, the full and complete extent of which was concealed from the market until the Restatement. Defendants were strongly motivated to state and represent false financial results, including false favorable earnings numbers and, consequently false, more favorable leverage ratios, and routinely did so both in order to avoid the potential dire financial consequences of defaulting under the terms of the credit facilities and/or avoid an adverse impact on Roadrunner's stock price.

**D.      Motive: Growth by Acquisition – in Roadrunners' "DNA" – and Knowledge: Based on Representations and Admissions of Successful Integration of Acquired Companies**

263. In order to expand its business and increase its revenues, Roadrunner pursued an aggressive strategy of growth by acquisition, buying up over two dozen companies, fueled by an increasing debt burden. By the advent of the Class Period, the Roadrunner Defendants had repeatedly and continuously represented to and assured the market that Roadrunner had successfully integrated the many companies it had acquired. This was a key issue and representation comforting shareholder investors.

264.     Given these representations and assurances, as more fully listed below, DiBlasi and Armbruster **knew** Roadrunner operations and related cost metrics, particularly given their keen focus and obsession with costs and related performance, as also alleged below.

265.     After several acquisitions, DiBlasi assured investors on February 6, 2013 that their "[i]ntegration … is going well," adding "[o]ur acquisition pipeline is as robust as it has ever been … we are fully capable from a management standpoint to effectively assimilate each of these opportunities…." DiBlasi repeated his assurances that Roadrunner has "[a] robust pipeline of potential acquisitions" due in part to its "proven ability to smoothly integrate each acquired company."

266.     On May 1, 2013 when discussing Roadrunner's 1Q 2013 financial results, DiBlasi stated that "the integration of our fourth quarter acquisitions that I mentioned earlier went well," adding:

> [W]ith regard to acquisitions … [w]e are fully capable from a Management standpoint to effectively assimilate each of these opportunities … Our differentiated strategy and our strong reputation in the transportation community as well as our proven ability to smoothly integrate each acquired company, are large factors as to why our pipeline is at such a high level.

DiBlasi further assured the market by stating:

> [T]he pipeline is very full … the way in which we go about **supporting and integrating the companies that we acquire** … **you look at our track record** … **[w]e are very good at it. We have a great team that works on acquisitions with the benefit of HCI, the private equity firm that's the major shareholder. They do a great job in partnering with us to do the diligence on these companies and they're a main reason why we are uniquely successful in terms of acquisitions**…

267.     On July 31, 2013, DiBlasi assured the market by stating:

> [T]he teams that we've been able to strategically assemble in each of our business units are highly motivated to efficiently grow Roadrunner business and have the proven capability to do so. This strength in management team also enhances the smooth integration of our many acquisitions … [w]e are fully capable, from a management standpoint, to effectively assimilate each of these opportunities … our strong reputation

118

in the transportation community, as well as our proven ability to smoothly integrate each acquired company are large factors as to why our pipeline is at such a high level.

268.    On October 30, 2013 DiBlasi offered similar misrepresentations, gain reiterating Roadrunner's "strong reputation in the transportation community as well as its "proven *ability to smoothly integrate* each acquired company," stating that Roadrunner:

> will continue, and plan to continue, to be a very aggressive acquisitional company, buying the right type of companies, the right profitability in terms of companies … we're one of the few companies in transportation that has a *proven, effective, efficient way in which to acquire* companies *and integrate them* and we do it *in a very profitable managed way* in which we *systematically* and *incrementally improve our profitability*.

269.    On February 5, 2014, DiBlasi stated to the investment community that "we are seeing the highest levels of integration and communication of our Opcos that we have ever seen, so we are very positive and very encouraged by the integrated solutions, the cross-selling opportunities, the way in which the different operating companies are talking and working with each other to complement each other. That's working according to plan, and as I said, at an all time high."

270.    On February 4, 2015, CEO DiBlasi continued the familiar refrain about the Company's "proven ability to smoothly integrate each acquired company" and noted that "acquisitions going forward will more than likely be complimentary-type acquisitions that will be tuck-ins which are *easy to assimilate* and *easy to integrate* within the operation…"

271.    Then, in a conference call with securities analysts on April 29, 2015, DiBlasi explained that Roadrunner did not make any acquisitions in Q4 2014 or Q1 2015 because, instead, "we have been *focused really on assimilating the acquisitions* we made last year, which were only four acquisitions but they were the largest acquisitions we've made as a group in any year since we've a public company, so we've put a lot of effort into assimilating those four operations…." DiBlasi's statements on April 29, 2015, reinforced the impression and assurance

119

– as defendants intended — that the defendants were further strengthening their integration of the assimilated companies given their acquisition size.

272.    On a July 29, 2015 conference call with securities analysts, DiBlasi responded to the following exchange with an analyst on the call:

Q.    [L]ast question – on the M&A front – so you did a deal a week or two ago, or whatever that was – are you back in an acquisitive mode? Or is this more of a one-off in your mind?

DiBlasi: No, no. We have quite a bit in our pipeline … ***acquisition has always been part of our DNA*** … ***we've become more selective and focused*** on making sure that the operations we are running are running where we want them to. But ***M&A will continue to be part of our DNA going forward***.

273.    Beyond supporting their scienter with respect to costs and expenses, Roadrunner's "growth by acquisition" business model and strategy, fueled by undertaking loans in increasing magnitude from its lenders pursuant to credit facilities, provided a strong motive for the Roadrunner Defendants to disseminate false and misleading financial results to the market throughout the Class Period.

**E.    Motive: "At-Risk" Executive Compensation Plans Based on Meeting Performance Goals and Stock Price Performance**

274.    Throughout the Class Period, as set forth in its proxy statements, Roadrunner used a combination of fixed and variable compensation programs, established to reward and incentivize "strong performance," and "align the interest of our executives with those of our stockholders." Each year, Roadrunner's Compensation Committee, "together with our senior management," established "performance targets" for its annual cash incentive plan that "requires the achievement of significant financial results." Each year, the compensation committee would determine compensation by "assessing prior year performance against these established financial targets, as well as other factors…." Consequently, "at-risk pay is expected to comprise an

120

increasingly significant portion of our executive compensation, particularly for our most senior officers."

275. During the Class Period, Executive Defendants DiBlasi and Armbruster received significant compensation both in terms of base salary and through incentive awards and bonuses. In addition, during the Class Period, Executive Defendants DiBlasi and Armbruster received stock option grants which have value to them as long as Roadrunner's trading price at the time such options vest is higher than the strike price of those options as determined when they were granted.

276. The Company's "at-risk" compensation plan and scheme during the Class Period both impelled and forced Executive Defendants DiBlasi and Armbruster to remain cognizant of the Company's performance and business metrics that could bear on their compensation and provided a powerful motive to favorably skew Roadrunner's performance metrics. To that end, they knew, throughout the Class Period, the Company's true cost and expenses, revenue and income, the performance of its acquired entities, and its operational performance at a granular level. The Executive Defendants' motivation to attain performance goals or metrics to secure "at risk" compensation supplementing their base compensation pursuant to Roadrunner's "at-risk" compensation plans supports a strong inference of scienter.

**F.     Suspicious Insider Trading in Amounts Dramatically out of Line with Prior Trading History**

277. During the Class Period, DiBlasi and Armbruster engaged in stock sales that were suspiciously timed and dramatically out of line with their prior trading history. Through this insider trading, the Executive Defendants reaped substantial profits from artificial inflation imbedded in the trading price of Roadrunner common stock as a result of their false and

misleading public statements. The majority of these sales occurred during a period in which Roadrunner common stock was trading at or near record highs.

278.    Significantly, the insider sales by the Executive Defendants were wildly out of line with their prior trading practices. For the purpose of identifying historic trading patterns, the table below compares the total market value and volume of Class Period sales by the Executive Defendants, versus the total market value and volume of sales by the Executive Defendants from November 15, 2010, when the lockup period following Roadrunner's initial public offering expired, through March 14, 2013, (the "Pre-Class Period"). As indicated in the table below, the Executive Defendants did not engage in substantial stock sales at any point prior to the beginning of the Class Period. According to Form 4 documents filed with the SEC by the Executive Defendants, all of the very modest sales made by Executive Defendants DiBlasi and Armbruster during the pre-Class Period were made for the sole purpose of satisfying tax withholding obligations incurred when grants of restricted stock units vested.

279.    The HCI Entities, as defined in ¶10 above, which the Executive Defendants wanted to assist in the divestment of a significant portion of their investment in Roadrunner by driving Roadrunner's stock price to a level approaching $30 per share, never sold any shares prior to the Class Period, as illustrated below:

| | Proceeds from Class Period Sales | Proceeds from Pre-Class Period Sales | Shares Sold During the Class Period | Shares sold during the Pre-Class Period |
|---|---|---|---|---|
| DiBlasi | $3,733,837 | $85,316 | 191,870 | 4,072 |
| Armbruster | $2,646,654 | $41,439 | 197,886 | 1,962 |
| HCI | $159,271,713 | $0 | 6,445,000 | 0 |
| **Total:** | **$165,652,203** | **$126,755** | **6,831,972** | **6,304** |

280.    As the chart demonstrates, the Executive Defendants' trades are dramatically higher in value and share size than their trades made during the pre-Class Period. Their trades

122

during the pre-Class Period are, in fact, dwarfed, both in volume and market value by the Executive Defendants' Class Period trades.

281.     The table identifying each of defendant DiBlasi's trades during the pre-Class Period is set forth below:

| Date | Shares Sold | Proceeds |
|---|---|---|
| 3/1/2012 | 1,425 | $25,679 |
| 3/1/2013 | 2,647 | $59,637 |
| **Total:** | **4,072** | **$85,316** |

282.     A table identifying each of defendant DiBlasi's Class Period sales is set forth below:

| Date | Shares Sold | Proceeds |
|---|---|---|
| 5/20/2013 | 44,794 | $911,607 |
| 8/20/2013 | 44,794 | $957,754 |
| 11/20/2013 | 44,794 | $841,814 |
| 3/4/2014 | 44,795 | $776,284 |
| 3/1/2014 | 4,234 | $100,303 |
| 3/2/2015 | 5,675 | $146,075 |
| **Total:** | **189,086** | **$3,733,837** |

283.     The chart below reflects the fact that defendant DiBlasi's Class Period sales were timed at near-record highs for the trading price of Roadrunner stock.

123



284.    A table identifying each of defendant Armbruster's pre-Class Period trades is set forth below:

| Date | Shares Sold | Proceeds |
|---|---|---|
| 3/1/2012 | 613 | $11,046 |
| 3/1/2013 | 1,349 | $30,393 |
| **Total:** | **1,962** | **$41,439** |

285.    A table identifying each of defendant Armbruster's Class Period sales is set forth below:

| Date | Shares Sold | Proceeds |
|---|---|---|
| 5/20/2013 | 130,000 | $2,172,658 |
| 3/1/2014 | 2,251 | $53,326 |
| 2/12-2/18/15 | 8,405 | $44,641 |
| 2/13/2015 | 24,210 | $129,615 |
| 2/17/2015 | 11,237 | $56,258 |
| 2/18/2015 | 16,000 | $79,317 |
| 3/2/2015 | 3,048 | $78,456 |

| | | |
|---|---|---|
| 3/4/2016 | 2,735 | $32,382 |
| **Total:** | **197,886** | **$2,643,654** |

286.    As indicated by the chart below, defendant Armbruster's Class Period sales, especially his sales in May 2013, were made at or near Class Period highs for the trading price of Roadrunner stock.



287.    The large volume of Class Period sales by DiBlasi and Armbruster are suspicious and indicative of their scienter. They represent a substantial percentage of their Class Period holdings.  DiBlasi's Class Period sales represented 43% of the shares he held immediately prior to the beginning of the Class Period, while defendant Armbruster's Class Period sales represented 100% shares of the shares he held immediately prior to the beginning of the Class Period.

288.    As of April 2015, the HCI Entities owned 12,136,985 shares of Roadrunner common stock. As set forth in the table below, several of the entities controlled by HCI Equity Partners sold Roadrunner stock during the Class period:

|  | Number of Shares Sold | | | |
|---|---|---|---|---|
|  | **5/2/2013** | **8/19/2013** | **8/30/2013** | **8/7/2015** |
| **HCI Co-Investors III, L.P.** | 2,573 | 7,206 | 1,660 | 5,147 |
| **HCI Equity Partners III, L.P.** | 177,512 | 497,034 | 114,495 | 355,024 |
| **TC Roadrunner-Dawes Holdings, L.L.C.** | 1,711 | 4,789 | 1,103 | 3,421 |
| **TC Sargent Holdings, L.L.C.** | 1,717 | 4,806 | 1,107 | 3,433 |
| **Thayer Equity Investors V, L.P.** | 816,487 | 2,286,165 | 526,635 | 1,632,975 |

289.    During the Class Period, and as part of the Roadrunner Defendants' scheme, in which the Executive Defendants disseminated a series of false and misleading financial statements in order to inflate the Company's stock price, the HCI Entities unloaded a significant amount of their holdings in Roadrunner at a time when its stock price was trading at very favorable prices, artificially inflated by the Roadrunner Defendants' false statements. These sales, both in terms of share volume, dollar value and price per share, are summarized in the table below.

| **Date** | **Shares Sold** | **Proceeds** | **Price per Share** |
|---|---|---|---|
| 5/2/2013 | 1,000,000 | $22,460,000 | $22.46 |
| 8/19/2013 | 2,800,000 | $71,631,000 | $27.00* |
| 8/30/2013 | 645,000 | $16,500,713 | $27.00* |
| 8/7/2015 | 2,000,000 | $48,680,000 | $24.34 |
| **Total:** | **6,445,000** | **$159,271,712.50** | |

*Reflects the offering price from which an underwriting discount of $1.4175 per share was subtracted.

126

290.    As indicated by the chart below, the largest sales by the HCI Entities, in August 2013, were timed at near-record highs for the trading price of Roadrunner stock.



291.    The HCI Entities' Class Period sales equaled more than 45% of their total holdings in Roadrunner stock.

292.    The magnitude and timing of the sales of Roadrunner stock by the Executive Defendants, taking advantage of historically favorable trading prices during the Class Period, are highly probative of the Roadrunner Defendants' scienter. The Executive Defendants' Class Period sales were highly suspicious. Almost all of them were executed near the height of Roadrunner stock price during the Class Period, and were accomplished after the Company had engaged in accounting manipulations causing Roadrunner to report expenses that were materially understated, and net income, earnings per share, and EBITDA results that were materially inflated, and that concealed the true depth of risk of default respecting Roadrunner's leverage ratios.

127

293. The Executive Defendants and the HCI Entities were not required to sell in the amounts or volumes that they did when they did, nor at the prices at which they were sold.

294. Sales by the Executive Defendants are also highly suspicious given the fact that DiBlasi and Armbruster were, at all times material, the top level officers of the Company and, despite their many positive statements to the market, including the annual reports filed with the SEC on Forms 10-K, elected to sell substantial percentages of their own respective holdings rather than continue to hold Roadrunner stock in order to ostensibly enjoy the further appreciation in its stock trading price. The insider sales perpetrated by DiBlasi and Armbruster were in flagrant violation of their duty under the federal securities laws to "abstain or disclose." Those sales also constitute significant evidence demonstrating that the Executive Defendants, DiBlasi and Armbruster, acted with actual acknowledge or deliberate recklessness: indeed, they had a powerful motive to buoy or inflate the price of Roadrunner stock by making or otherwise rendering false statements and financial results to the market to benefit themselves and the Control Persons who enjoyed considerable influence over Roadrunner and, with seats on its board of directors, enjoyed considerable influence over the Executive Defendants' compensation awards. The Executive Defendants, and especially DiBlasi, who was appointed as Roadrunner's CEO at the behest of Rued and HCI Equity Partners, were beholden to HCI Equity Partners and Rued.

295. While the Executive Defendants DiBlasi and Armbruster, may contend that their sales were made pursuant to a 10b-5 trading plan, no such trading plan was referenced in the Executive Defendants' SEC filings made prior to their May 2013 sales. Indeed, both of the Executive Defendants filed Forms 4 on May 1, 2013, just days before their May 2013 sales that did not disclose the existence of 10b-5 trading plans. The absence of prior planned trades

128

suggests that any claimed adoption of 10b-5 trading plans by the Executive Defendants was done very shortly before their sales with the bad faith intention of inoculating them from potential liability. This, in and of itself, is suspicious, especially since neither the Executive Defendants, nor the HCI Entities, engaged in significant insider trading following the large decline in the trading price of Roadrunner stock after Q3 2015.

296.    Stock sales in the post-Class Period also reflect the suspicious nature of the Executive Defendants' Class Period stock sales. In the months following the end of the Class Period, defendant DiBlasi has sold just 3,407 shares. Similarly, since the end of the Class Period, defendant Armbruster has sold just 3,099 shares of stock.

### G.    Knowledge From Keen and Constant Focus On Controlling "Costs" – Critically Important to Roadrunner's Profitability and Success

297.    The statements in this subsection are Class Period admissions from the Roadrunner Defendants, conceding actual knowledge of all of the operational metrics important to the Company, including costs, expenses, revenues, payables, receivables, line-haul rates, and pricing, and other items related to or dependent upon the knowledge of the Company's costs and expenses. Roadrunner and the Executive Defendants, DiBlasi and Armbruster, each knew and had reason to know, or otherwise recklessly disregarded, all of the facts with respect to Roadrunner's expenses and operational performance. Numerous statements exemplify the Executive Defendants' admissions of knowledge.

298.    On a February 5, 2014 conference call with analysts, DiBlasi assured the market that "we're very confident in our ability to bring on acquisitions and continue to operate the company very well, very effective, and drive good margins."  And with regard to "line haul cost per mile," DiBlasi said in a conference call on April 30, 2014 that:

*[W]e look at that on a weekly basis* … it probably got to its highest point a couple of weeks in there. It was a buck 27. [sic] Stayed pretty consistent in the buck 26 range and a couple of weeks in the buck 25 range. [sic] So it all totaled, it came in just above a $1.26 and what we've seen in April is that it has gone back down by about half of a cent…

299. CFO Armbruster also demonstrated his facile ability to manage the Company's costs, as he explained on a July 30, 2014 conference call with analysts that "several high-claims accounts" were "culled out on purpose" in order to reduce claims in a the low-margin business of the LTL segment.

300. On February 4, 2015, DiBlasi reported that the Company had developed *"centralized line haul and load planning" to "ensure we consistently* utilized the most efficient line haul and delivery source, comprehensive metrics, and real time data to drive operation performance in every area." He discussed the Company's implementation of initiatives to centralize and upgrade its pricing department "to ensure we achieve pricing goals across the network." DiBlasi demonstrated the importance of even a penny difference in line haul cost, explaining "we've mitigated that cost so we think we can get that back to where it was pre-2014. We can drive that cost per mile down to $1.24, $1.25. We're at $1.26 right now."

301. In a conference call with analysts on April 29, 2015, DiBlasi represented that "even though our cost per mile from purchased power providers was substantially higher in the quarter compared to last year, we were able to mitigate the risk in costs through optimizing our capacity blends such that our blended cost per mile was down overall for the company." DiBlasi further commented that "[w]e're going to improve our pricing and *we have every confidence that* we've made the right moves in terms of our operation to mitigate any increase in cost per mile." On that April 29, 2015 call DiBlasi confirmed that "*we focused* on our core business. LTL has obviously had a significant improvement… the fact that we moved off of purchase

130

transportations so significantly in the first quarter obviously had a big impact on our cost per mile ….”

302.    On July 29, 2015, DiBlasi assured investors that “in our LTL segment, we continue to see incremental improvements in cost-control initiatives, as well as freight-mix changes resulting in lower tonnage and revenues, but higher margin and more profitable freight … Our line haul cost per mile was $1.25, down $0.03 from the previous year second quarter” while adding “*we’ve been very, very disciplined* in our pricing.”  Later on the call, with regard to assuring analyst that Roadrunner was not focused on “tonnage,” he represented “we’re not doing that. *We’re keeping our discipline.* We’re going to bring on quality freight.  And the decline and tonnage is not upsetting to us. *We’re much more focused* on good freight mix, proper yield, proper margins with that, which will translate into improved [operating revenues] as we move forward.”

303.    In a November 5, 2015 conference call with analysts reporting on the third quarter 2015, DiBlasi assured investors that “*we intend to aggressively manage our cost* in balance with current and anticipated business levels going forward,” while representing that “we have implemented appropriate cost controls and sales initiatives to align our cost with current business levels and to drive sales growth and productivity.” Responding to a question about erosion in the profitability and line haul costs, DiBlasi responded:

> [W]e got into the second week of September we’ve finally made the decision and we started to make cost control adjustment and take out some of that overhead that negatively impacted us for the whole quarter.

304.    DiBlasi’s November 5, 2015 response demonstrates the hands-on, intense, and vigilant monitoring of costs and operational metrics and the “flexible” approach Roadrunner was capable of taking in response to cost issues.  DiBlasi added regarding LTL margins “[w]e’ve got

the proper initiatives in place with regard to cost control given our current business levels … [*s*]*o we're very confident* that we'll get that back in line." DiBlasi further acknowledged:

> It's just a matter of ***monitoring and measuring*** and putting in the proper metrics with regard to sales productivity. And there's a lot of different metrics, calls per day and the number of pricings that take place. ***The amount of involvement from upper management***, and district managers … VP of sales … what we've put in place is quotas, and guidelines, and restrictions … putting the pricing in place that need to take place in order to bring on new business. ***Those are the metrics you can monitor … we've seen*** those metrics improve significantly.…
>
> *[A]m I working a little harder? Yes, of course I am*. Whenever you have a quarter like we've had, you work your butt off to correct it. But I can tell you with our current management structure, the current management we have in place, ***I'm very confident in our abilities to perform and execute***." He then added that the changes Roadrunner made in 2015 "opened up some doors and it made us look at some operations and some portions of our operations that needed correction and we've done that and we're undertaking that.

305.     Throughout 2016, Defendants demonstrated their knowledge of the Company's costs. On February 3, 2016, DiBlasi assured analysts and the market that "[f]rom a productivity and operational efficiency perspective, we significantly impacted our line-haul costs" adding, "we were able to drive our line-haul cost per mile down another $0.05," attributing the change to "a significant amount of initiatives" regarding "sales and operational concerns." In a July 27, 2016 conference call with securities analysts, Armbruster represented that "***our focus*** through 2016 has been an enhancing cash flow from operations, to reduce outstanding debt, and improve our leverage ratio," all of which implicitly depend upon monitoring and controlling costs. And in a conference call with analysts on November 2, 2016, after Stoelting stated "we have done a good job on the cost side … the team's done a good job on the cost side and ***continues to look at SG&A cost improvements***," DiBlasi assured analysts that a "significant amount of initiatives" were "in place" including those from a "*cost control perspective*."

306. Defendants' constant close attention to, and obsession with, controlling costs, even to the penny, is further exemplified by their continuously developing so-called cost-cutting "initiatives," as discussed numerous times during conference calls with securities analysts on July 30, 2014 ("cost and sales initiatives have been implemented"); July 29, 2015 ("incremental improvements in cost control initiatives"); November 5, 2015 (DiBlasi admitted Company would "aggressively manage our cost" and had "implemented appropriate cost controls"); February 3, 2016 (DiBlasi stated "We implemented specific metrics and productivity measures, target accounts … from a productivity and operational efficiency perspective"); July 27, 2016 (Roadrunner's second quarter 2016 financial results benefitted from "pickup and delivery cost improvements," "focus initiatives in claims expense and SG&A cost reductions" and "continued cost savings initiatives throughout the rest of 2016").

H. **Knowledge Arising From Access to Roadrunner's Sophisticated Systems Of Reporting Operational Metrics**

307. During the Class Period, Roadrunner maintained sophisticated reporting systems that apprised upper level management, including the Executive Defendants, of key operating metrics associated with its business, including operational costs and expenses, pricing and the performance of its business segments. This sophisticated system of reporting enabled the Roadrunner Defendants to assess costs associated with running a profitable enterprise, to the penny, and even to the half-penny, and enabled them to know, at all times, costs such as driver payables. The Roadrunner Defendants continuously assured the market that sophisticated technology was being extensively used in order to enable the Company to closely monitor its operations down to the granular level of specific shipments and pricing the cost associated with such shipments and deliveries all the way through the customer level.

308. The Company announced in its 2013 Form 10-K that it had acquired transportation management software, or "TMS" through a merger, stating that the Company "continuously enhance[s] our TMS technology system and have integrated other proven transportation management software packages with the goal of providing customers with broad-based, highly competitive solutions." The Company reported that it made "extensive use of database configuration and integration techniques, hardware and software applications, communication mediums, and security devices, … to design a customized solution to address each customer's unique shipping needs and preferred method of processing." The Company's TMS technology system is "web-based" and was used to "process and service customer orders, track shipments in real time, select optimal modes of transportation, execute customer billing, provide carrier rates, establish customer specific profiles, and retain critical information for analysis." The Company bragged that it used the system "to maximize supply chain efficiency through mode, carrier, and route optimization."

309. The market was reassured by additional reiterations of Roadrunner's sophisticated system of internal reporting with granular level detail of its operations from pick up through delivery. The Company's 2014 10-K and, again, the Company's 2015 10-K each restated and amplified the Company's sophisticated system. For example, the Form 10-K disclosures stated:

⌡ Our corporate headquarters and service centers are completely integrated, allowing data to flow in real time between locations.

⌡ As part of our ongoing initiative to enhance our information technology capabilities, our LTL operation has developed a proprietary carrier selection tool used to characterize carriers based on total cost to maximize usage of the lowest available line haul rates.

⌡ Our web-based technology approach allows our Global Solutions operation to process and service customer orders, track shipments in real time, select optimal modes of transportation, execute customer billing, provide carrier rates, establish customer-specific profiles, and retain critical information for analysis while providing a

134

company branded solution. We utilize this approach to maximize supply chain efficiency through mode, carrier, and route optimization.

310. As a consequence of the reporting systems that were utilized prior to and throughout the Class Period by Roadrunner, and especially combined with their many statements and comments to the market about controlling and managing costs and implementing cost initiatives, the Executive Defendants knew and had access to Roadrunner's operational costs and expenses, even to the penny, at all time material.

## I.    SOX Duties and False SOX Certifications

311. Throughout the Class Period, the Executive Defendants signed SOX Certifications as required by the Sarbanes-Oxley Act of 2002. The Executive Defendants' SOX Certifications accompanied Roadrunner's quarterly reports on Forms 10-Q and Roadrunner's 2013, 2014 and, 2015 annual reports on Forms 10-K during the Class Period. SOX requires certifying officers to effectively vouch for the reliability of corporate financial reporting.

312. Defendants DiBlasi and Armbruster undertook and bore responsibility for designing, developing, evaluating, and disclosing effective internal controls over financial reporting and related procedures and, making a good faith, informed determination that the Company's reports on Form 10-Q and Form 10-K did not contain any untrue statement of material fact, or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading, with respect to the period covered by the report. It was entirely incumbent upon CEO DiBlasi and CFO Armbruster to thoroughly vet the Company's reports with regard to its operations and financial results before allowing them to be issued to the public and the investment community in general. It was their

135

duty and responsibility to cause Roadrunner to file financial reports that were reliable and complied with GAAP, and to establish adequate internal controls respecting financial reporting.

313.    Throughout the Class Period, CEO DiBlasi's and CFO Armbruster's collectively executed and rendered SOX Certifications attesting with words such as "***based on my knowledge***" that among other things: 1) Roadrunner's financial statements did not contain untrue statements of material fact or omit to state material facts necessary to make the statements made not misleading; 2) the financial statements fairly presented in all material respects the financial condition, results and operations and cash flows of Roadrunner; 3) they had designed and evaluated the effectiveness of the Company's disclosure controls and controls over financial reporting and had disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrants ability to record, process, summarize and report financial information" and 4) that they had also disclosed, based on their most recent evaluation of controls over financial reporting, "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrants internal control over financial reporting."

314.    Each time that CEO DiBlasi signed a SOX Certification, he stated that he did so "***based on my knowledge***." Each time CEO Armbruster signed a SOX Certification, he also did so "***based on my knowledge***." And each time they did so, throughout the entirety of the Class Period, they affirmed and certified that Roadrunner's financial misstatements were true, not misleading, fairly presented in all material respects the financial condition, results of operation and cash flows of the Company and that they had designed and evaluated the Company's disclosure controls to ensure that material information "is ***made known to us*** by others within those entities, particularly during the period in which this report is being prepared" and

136

"*designed such internal control* over financial reporting" in order to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

315.     The Executive Defendants exploited these SOX certifications in order to deceive, not protect, investors. At a minimum, the Executive Defendants' SOX certifications demonstrate that their conduct respecting Roadrunner's financial reporting constituted an extreme departure from the standard of ordinary care, which they knew presented a significant risk of misleading investors as to Roadrunner's true financial condition.

## VIII.    DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES

316.     GAAP are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define accepted accounting practices at a particular time. GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading or inaccurate, despite footnote or other disclosures. SEC Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying the most recent annual financial statements. 17 C.F.R. § 210.10-01(a)(5). Additionally, SEC registrants are required under SEC rules to maintain sufficient systems of internal controls to ensure fair reporting in conformity with GAAP.

## A. Duties of the Chief Financial Officer and Chief Executive Officer under GAAP and SEC Regulations

317. Defendant Armbruster, during his tenure as CFO during the Class Period, was ultimately responsible for adopting, implementing, and enforcing sound accounting policies and for establishing and maintaining a system of internal controls sufficient to result in accurate and reliable recording of transactions and the fair presentation of the Company's financial results, including its revenues and expenses, assets and liabilities, and cash flows, in the books and records, of the Company. This responsibility included adequately supporting the journal entries recording, *inter alia*, Roadrunner's costs and expenses, its accounts payables and receivables, its guarantees on certain tractor leases and its goodwill acquired by acquisition.

318. Defendant Armbruster, during his tenure as CFO during the Class Period, was ultimately responsible for executing certifications to Roadrunner's Forms 10-Q and 10-K acknowledging such responsibilities. Such certifications, pursuant to Section 302 and 906 of the Sarbanes-Oxley Act of 2002, specifically acknowledged that defendant Armbruster, during his tenure as CFO during the Class Period, and other Roadrunner senior management, were responsible for establishing and maintaining disclosure controls and procedures, internal control over financial reporting and the fair presentation of the Company's financial statements, including related footnotes, in accordance with GAAP. Such certifications represented that the Company's consolidated financial statements: (a) did not contain any untrue statements of material facts; (b) did not omit any material facts necessary to make the statements in its consolidated financial statements not misleading; (c) fairly presented in all material respects the financial condition, results of operations, and cash flows, to management's (*i.e.*, Roadrunner's CEO's and CFO's) knowledge; and (4) complied with the Securities Exchange Act of 1934.

138

Roadrunner's CEO and CFO further certified that they evaluated the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting, and deemed them effective.

### B. Generally Accepted Accounting Principles and SEC Rules

319. Item 303 of SEC Regulation S-K requires the disclosure of Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), in both annual and quarterly financial statements, to provide information "***necessary to an understanding*** of [the registrant's] financial condition, changes in financial condition and results of operations." 17 C.F.R. § 229.303(a). In 1989, the SEC issued an interpretation providing guidance regarding MD&A, stating that the SEC had long recognized a "…need for narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance." This interpretation also stated that the general purpose of MD&A requirements is "…to give investors an opportunity to look at the registrant through the eyes of management…[,]" particularly with emphasis on the registrant's prospects for the future.[4] The SEC again, in December 2003, issued an interpretation that provided additional guidance regarding MD&A, stating that the MD&A requirements are intended to meet three principal objectives:

> ***[T]o provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;***
> [T]o enhance the overall financial disclosure and ***provide the context within which financial information should be analyzed***; and

---

[4] SEC Interpretation: *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures,* dated May 18, 1989.

[T]o provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

320.    Regulation S-K speaks to the importance of disclosures in a company's public filings and provides specific guidance on what the SEC expects to see in such filings. It requires the MD&A to include the following with respect to a company's results of operations, in relevant part:

Describe any ***known trends or uncertainties that have had or that the registrant reasonably expects will have material favorable or unfavorable impact*** on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues…, the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii); *see also* 17 C.F.R. § 229.303(a)(1).

321.    Additionally, SEC regulations require the MD&A to discuss the registrant's off-balance sheet arrangements, which include obligations under a guarantee contract and retained or contingent interests in assets transferred to an unconsolidated entity (such as Roadrunner's exposure under the Tractor Lease Guaranty Program), that have or are reasonably likely to have a current or future effect on the registrant's financial results that is material to investors. 17 C.F.R. § 229.303(a)(4).

### C.    Specifically Relevant GAAP Requirements

322.    GAAP provides guidance for accounting for expenses. Expenses are generally recognized when an entity's economic benefits are used up in delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations or when previously recognized assets are expected to provide reduced or no further benefits. Expenses are not recognized strictly when cash is disbursed or when invoices are received because GAAP permits accrual accounting.

323.    There are additional GAAP provisions that relate to the accounting matters at issue in this case, and specifically with respect to the Company's accounting and financial reporting for its costs and expenses, its accounts payables and receivables, its guarantees on certain tractor leases and its goodwill acquired by acquisition. In Roadrunner operations, the Company provided, in essence, protection (or a guarantee) to the independent contractors that leased trucks or tractors. In most cases, in the event maintenance costs caused the independent contractor to terminate the lease, the Company was required to acquire the trucks or tractors, and incur the ongoing maintenance costs. This remedy was an agreement under the terms of the lease. The required accounting disclosure for such obligations is governed by GAAP under "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others" ("FIN 45"), which in 2009 was codified as part of the FASB Accounting Standards Codification ("ASC"), Topic 460, Guarantees ("ASC 460"). Because a guarantee imposes a performance obligation, FIN 45 requires disclosure of guarantees, or groups of similar guarantees, *regardless of whether the likelihood of having to make payments is deemed unlikely or remote*. FIN 45, ¶ 9; ASC 460-10-25-3. The disclosure is required to provide: (a) the nature of the guarantee, including the approximate term of the guarantee, how the guarantee arose, and the events or circumstances that would require the guarantor to perform under the guarantee, and the current status of the payment/performance risk of the guarantee; (b) the maximum potential amount of future payments (undiscounted) that the guarantor could be required to make under the guarantee; and (c) current carrying amount of the liability, if any, for the guarantor's obligations under the guarantee. FIN 45 ¶ 13; ASC 460-10-50-2; ASC 460-10-50-3; ASC 460-10-50-4.

324. GAAP provides guidance on accounting for goodwill. Goodwill represents the excess of the purchase price of all acquisitions over the estimated fair value of the net assets acquired. GAAP in the form of ASC 350-20-35-1, provides that goodwill is tested for impairment at the reporting unit level. GAAP in the form of ASC 350-20-35-2 provides that impairment is the condition that exists when the carrying amount of goodwill exceeds its implied fair value. GAAP in the form of ASC 350-20-35-28 provides that goodwill of a reporting unit shall be tested for impairment on an annual basis; GAAP in the form of ASC 350-20-35-66 provides that where an event occurs or circumstances change that indicate that the fair value of the entity (or the reporting unit) may be below its carrying amount, goodwill is required to be tested for impairment in between required annual impairment tests. And GAAP in the form of ASC 350-20-35-3C provides that triggering events that may result in an interim goodwill impairment test include:

Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets;

Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development;

Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;

Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods;

Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation;
Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial

statements of a subsidiary that is a component of a reporting unit; and

If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers).

325.    In addition, GAAP provides guidance on restatements. The Financial Accounting Standards Board ("FASB") defines a restatement as a revision of a previously issued financial statement to correct an error. The determination of whether a prior period error will result in a restatement hinges on materiality. SEC Statement of Accounting Bulletin (SAB) 108 explains that correcting prior year financial statements for immaterial errors would not require previously filed reports to be amended. Since Roadrunner is restating financial statements, the errors leading to such restatements are material.

326.    GAAP in the form of ASC 250-10-45-23 provides that a restatement requires the following:

The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.

An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.

Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.

327.    Defendants' Class Period misstatements and omissions about the Company's accounting and financial reporting for its costs and expenses, its accounts payables and receivables, its guarantees on certain tractor leases and its goodwill acquired by acquisition, as alleged herein, caused material and knowing violations of these generally accepted accounting principles.

## IX. LOSS CAUSATION AND ECONOMIC LOSS

328. During the Class Period, as alleged herein, the Roadrunner Defendants engaged in a scheme to deceive the market in a course of conduct that artificially inflated the value of Roadrunner's securities and operated as a fraud on Class Period purchasers of Roadrunner securities, by issuing a series of material misrepresentations and omitting and concealing material information from the market, as alleged above, relating to, *inter alia*, (a) the accuracy of the company's financial statements; (b) its true earnings and expenses; (c) the effectiveness of the Company's disclosure controls and controls over financial reporting; (d) the true nature and depth of financial risk and boomeranging expenses onto its balance sheet arising from its Tractor Lease Guaranty Program; (e) its leverage ratios and compliance with its credit facilities; and (f) the value of the goodwill that the Company carried on its balance sheet. When the truth later entered the market, over time, in piecemeal fashion, the price of Roadrunner common stock materially declined, causing investors to suffer massive losses. As a result of their purchase of Roadrunner's securities during the Class Period at artificially inflated prices, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages under the federal securities laws, when subsequent disclosures slowly removed fraud related artificial inflation from the price of such securities. Had the full truth been disclosed to the market before the time of its ultimate disclosure, Lead Plaintiff would have been unwilling to purchase the Company's securities at the prices then being offered in the market.

329. The untrue and misleading statements and material omissions caused Roadrunner's common stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high closing price of $30.36 per share on July 30, 2013. However, as a direct and proximate result of a series of partial but corrective disclosures, as set forth herein,

revealing the truth that had been previously concealed by the defendants, the trading price of Roadrunner's common stock declined substantially.

330.    The market reacted negatively to this series of partial but corrective disclosures regarding Roadrunner's Tractor Lease Guaranty Program commencing on October 26, 2015, falling from a close on that date of $17.67 a share to a close on October 27, 2015 of $9.34 on volume of over 4.7 million shares. Then, after the price of Roadrunner common stock continued to trade at artificially inflated prices, tainted and distorted by defendants' materially false and misleading statements and omissions, and as a consequence of the partial but corrective disclosures regarding Roadrunner's financial results, performance metrics, lease program and goodwill on January 30, 2017 and January 31, 2017, the trading price of its common stock, which closed at $11.54 a share prior to such disclosures on January 30, 2017, fell to a closing price of $7.92 a share on January 31, 2017, on volume of over 1.4 million shares. Additional partial but corrective disclosures after the close of trading on that day caused the price of Roadrunner's common stock to fall further, closing at $7.54 a share on February 1, 2017 and lower still thereafter. Subsequently, as a consequence of the revelation of improprieties, including "management override of internal controls" and related corrective disclosures in Roadrunner's January 31, 2018 Restatement, its shares price tumbled further, from $7.14 per share at the close of trading on January 30, 2018, to close at $5.46 per share on January 31, 2018, falling further still thereafter to as low as $3.52 per share on February 20, 2018.

331.    These fraud related corrective disclosures demonstrated that the Company's prior materially false and misleading statements and omissions associated with the accuracy of its financial statements, the effectiveness of its disclosure controls and controls over financial reporting, including, among other things, the true financial exposure and cost associated with its

guaranteed lease obligations that it made in connection with its tractor lease program, were materially untrue or misleading.

332.    The price declines directly and proximately resulting from the above-discussed disclosures were not caused by market conditions, industry news, random market movements, or by Roadrunner-related information unrelated to the alleged misleading statements. Each of the above-referenced disclosures partially corrected the untrue or misleading information previously provided to the market for which the Lead Plaintiff, on behalf of itself and the Class, seek to be compensated for their resulting losses.

## X.    PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET

333.    At all relevant times, the market for Roadrunner securities was an efficient market for the following reasons, among others:

(a)    Roadrunner securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

(b)    During the Class Period, Roadrunner securities were actively traded, demonstrating a strong presumption of an efficient market;

(c)    As a regulated issuer, Roadrunner filed with the SEC periodic public reports during the Class Period;

(d)    Roadrunner regularly communicated with public investors via established market communication mechanisms;

(e)    Roadrunner was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Many of the reports were also publicly available and/or otherwise entered the public marketplace; and

146

(f)     Unexpected material news about Roadrunner was rapidly reflected in and incorporated into the Company's stock price during and at the end of the Class Period.

334.     As a result of the foregoing, the market for Roadrunner stock promptly digested current information regarding Roadrunner from all publicly available sources and reflected such information in Roadrunner's stock price. Under these circumstances, all purchasers of Roadrunner common stock during the Class Period suffered similar injury through their purchase of Roadrunner's common stock at artificially inflated prices, and a presumption of reliance applies.

335.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's true net losses and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in Roadrunner.

## XI.     NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

336.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

337.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements"

147

when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

338. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Roadrunner who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## XII.    CLASS ACTION ALLEGATIONS

339. Lead Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Roadrunner common stock on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

340. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Roadrunner securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Lead

Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Roadrunner or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of January 26, 2018, Roadrunner had 38,423,391 outstanding shares of common stock. Upon information and belief, these shares are held by many thousands of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

341.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

342.    Lead Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

343.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b)    whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

149

(c)     whether the price of Roadrunner securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

344.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.    CLAIMS

### COUNT I

#### *Violation of Section 10(b) and Rule 10b-5 Against Defendants Roadrunner, DiBlasi and Armbruster*

345.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

346.    During the Class Period, defendants Roadrunner, DiBlasi, and Armbruster – the Roadrunner Defendants – carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (2) cause Lead Plaintiff and other members of the Class to purchase Roadrunner securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the defendants took the actions set forth herein.

347. The Roadrunner Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Roadrunner common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The Roadrunner Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

348. The Roadrunner Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Roadrunner as specified herein.

349. The Roadrunner Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Roadrunner's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Roadrunner and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Roadrunner common stock during the Class Period.

350. Executive Defendants DiBlasi's and Armbruster's primary liability, and controlling person liability, arise from the following facts: (1) they were high-level executives and/or director at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of them, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of them enjoyed significant personal contact and familiarity with the other and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of them were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

351. The Roadrunner Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The fact the Company restated its financial statements means that all pertinent information existed and was available to the Roadrunner Defendants when they issued the false financial statements throughout the Class Period. It further serves as an admission that the financial statements were materially false when issued. Such Roadrunner Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Roadrunner's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by their overstatements and misstatements of the Company's financial condition throughout the Class Period, the Roadrunner Defendants, if they did not have actual knowledge of the

misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

352.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Roadrunner's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Roadrunner's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Roadrunner Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Roadrunner Defendants but not disclosed in public statements by the Roadrunner Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Roadrunner's common stock during the Class Period at artificially high prices and were damaged thereby.

353.     At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding Roadrunner's financial results, which was not disclosed by the defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Roadrunner common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

354.     By virtue of the foregoing, the Roadrunner Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

153

355.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

356.    This action was filed within two years of discovery of the fraud and within five years of the events giving rise to the cause of action.

## COUNT II

### *Violation of Section 20(a) Against DiBlasi and Armbruster*

357.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

358.    Defendants DiBlasi and Armbruster acted as controlling persons of Roadrunner within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, DiBlasi and Armbruster had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. DiBlasi and Armbruster were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

359.    In particular, defendants DiBlasi and Armbruster had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have

had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

360. As set forth above, Roadrunner, DiBlasi, and Armbruster each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

361. By virtue of their positions as controlling persons, DiBlasi and Armbruster are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT III

### *Violation of § 20(a) Against Defendants HCI Equity Partners, HCI Equity Management and Rued*

362. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

363. HCI Equity Partners, L.L.C. ("HCI Equity Partners") is a private investment management firm comprised of HCI Equity Management L.P. ("HCI Equity Management") and several other interrelated investment advisors and affiliated organizations. According to filings with the SEC, "HCI Equity Partners is primarily engaged in the business of serving as the ultimate general partner or managing member of private equity funds engaged primarily in the business of investing and managing private equity investments[.]" The private equity funds that HCI Equity Partners is the general partner or managing member of, are, in turn, the general partners or managing members of the HCI Entities.

364. As set forth in detail in ¶48, above, following the 2010 initial public offering, HCI Equity Partners controlled approximately 52% of the outstanding stock of Roadrunner, or 16.576

155

million shares, consisting of 14.25 million shares of Roadrunner common stock as well as warrants for the purchase of an additional 2.336 million shares held by the HCI Entities.

365. HCI Equity Partners also exercised control of the HCI Entities through its role as general partner of HCI Equity Management. HCI Equity Management is identified as the "sole manager" of two of the HCI Entities, TC Sargent Holdings, L.L.C. and TC Roadrunner-Dawes Holdings, L.L.C. In addition, HCI Equity Management also manages HCI Equity Partners III, L.P., Thayer Equity Investors V, L.P., and serves as the investment adviser of HCI Co-Investors III, L.P.

366. HCI Equity Management utilizes its control of stock to direct and influence its investment targets. As set forth in an Investment Adviser Brochure filed with the SEC by HCI Equity Management, "When investing in portfolio companies, the senior principals or other personnel of HCI [Equity Management] or its affiliates serve on such portfolio companies' respective boards of directors or otherwise act to influence the management of portfolio companies held by a Fund, generally until the Fund exits the investment."

367. HCI Equity Partners maintained substantial control over Roadrunner through their appointment of three members, including board chair Rued, to the Roadrunner board of directors through the Class Period until April 3, 2014, and two members thereafter. The influence and control that HCI Equity Partners and HCI Equity Management exercised over the selling entities during the Class Period was, in turn, exercised by one man, Scott Rued. Rued is a "principal owner" of HCI Equity Management. Rued is one of three co-founders and managing partners of HCI Equity Partners. Rued "oversees the origination, management and development of the Firm's investments[,]" specifically including the management of HCI Equity Partners' investment in Roadrunner. Indeed, at all times material, Rued was the only managing partner at

156

HCI Equity Partners who was also responsible for its management of Roadrunner. According to the Investment Adviser Brochure filed by HCI with the SEC, Rued was "part of a team that is responsible for implementing and overseeing the investment strategy of HCI Equity Partners. Rued is not subject to the direct supervision of any other individual . . . ."

368. Rued was, throughout the Class Period, identified as the beneficial owner of all of the shares controlled by HCI Equity Partners. In addition to his position as the managing partner of HCI Equity Partners, throughout the Class Period, Rued exerted substantial influence and control over Roadrunner as chair of Roadrunner's board of directors. Rued participated in the management of Roadrunner, was intimately involved in the Company's acquisition strategy and implementation, and in securing its credit lines and financing at the highest levels. Rued signed the 2012, 2013, 2014, and 2015 Form 10-Ks that were filed by Roadrunner with the SEC and were disseminated from this District, and which contained false and misleading financial results and related statements that deceived the investing public and caused Lead Plaintiff and other shareholders to purchase Roadrunner stock at artificially inflated prices. Rued also caused Roadrunner to appoint and maintain DiBlasi as CEO.

369. HCI Equity Partners trumpets its significant influence over Roadrunner. For example, its website notes that it has been "*actively engaged in the development and implementation of key initiatives at RRTS*," including "*[r]ecruiting Mark DiBlasi* as CEO," and building Roadrunner's management team, as well as "assisting RRTS in completing a process to bid out all significant LTL lanes to top-tier carriers and second-tier carriers, while also achieving a reduction in rates paid to its growing independent contractor base, result[ing] in annual savings of approximately $8 million." http://www.hciequity.com/portfolio/casestudy-rrts.php, last visited February 8, 2018.

370.     HCI Equity Partners also highlighted its efforts in "[a]ssisting RRTS in reacting swiftly to the credit crisis and economic downturn with $15 million in cost savings ($12 million of which represented fixed costs) to sustain profitability and position the Company to gain market share from struggling asset-based peers[.]"

371.     According to its website, ***HCI Equity continues to work closely with RRTS' management to further improve the Company's operating efficiency, drive market share gains, and identify and assimilate strategic acquisitions***.

372.     As admitted by Roadrunner in proxy statements filed with the SEC, neither Rued nor the other HCI-affiliated directors were considered independent directors "as a result of their relationships with HCI, which is affiliated with investment funds that hold a large amount of our stock." And as the Restatement admits, executive management did not withhold information from the non-independent directors as it did with respect to independent directors. Non-independent director Rued, consistent with his influence and control over Roadrunner and that of the HCI Entities, was privy to the Company's financial-related information that was not shared with the independent directors or the Audit Committee by executive management.

373.     Owing to its substantial ownership of Roadrunner's outstanding common stock, throughout the Class Period, Roadrunner consistently acknowledged in filings with the SEC that the HCI Equity Partners:

> . . . will have ***significant influence*** over the election of our board of directors and our decision to enter into any corporate transaction and ***may have the ability to prevent any transaction that requires the approval of stockholders***, regardless of whether or not other stockholders believe that such a transaction is in their own best interests. Such concentration of voting power could have the effect of delaying, deterring, or preventing a change of control or other business combination that might otherwise be beneficial to our stockholders or could limit the price that some investors might be willing to pay in the future for shares of our common stock. The interests of these stockholders may not always coincide with our interests as a company or the interests of our other stockholders. Accordingly, ***these stockholders could cause us to enter into transactions or***

*agreements that you would not approve or make decisions with which you may disagree*.

374.    Indeed, even after the massive stock sell-off by the HCI Entities, in the Form 10-K filed with the SEC for the year ending December 31, 2015, Roadrunner reported that, as a result of HCI's ownership of 20.4% of Roadrunner's outstanding stock, "[s]uch *concentration of voting power could have the effect of delaying, deterring, or preventing a change of control or other business combination that might otherwise be beneficial to our stockholders or could limit the price that some investors might be willing to pay in the future for shares of our common stock.*"

375.    In addition to exercising substantial control over Roadrunner resulting from its significant ownership of Roadrunner stock, the "significant influence" that the HCI Entities and Rued maintained over the operations of Roadrunner throughout the Class Period was further strengthened by a long term agreement (the "Advisory Agreement") between HCI Equity Management and Roadrunner under which HCI Equity Management maintained substantial influence and control over Roadrunner' strategies for acquisitions and financing. HCI Equity Management is, in turn, controlled by its managing partner, HCI Equity Partners, allowing HCI Equity Partners and Rued to maintain responsibility for, and guidance of the Company with regard to acquisition targets and debt financing. As set forth in the Proxy Statement dated April 6, 2015 (the "2015 Proxy Statement"), Roadrunner acknowledged that:

> HCI Equity Management continues to provide advisory services to us. *These services include identification, support, negotiation, and analysis of acquisitions and dispositions and support, negotiation, and analysis of financing alternatives*. In exchange for such services, HCI Equity Management is reimbursed for its expenses and can be paid a transaction fee in connection with the consummation of each acquisition or divestiture by us or our subsidiaries, excluding certain specified transactions, and in connection with any public or private debt offering by us or our subsidiaries negotiated by HCI Equity Management. The amount of any such fee will be determined through good faith negotiations between our board of directors and HCI Equity Management.

159

In 2014, we paid $0.8 million to HCI Equity Management for services performed in conjunction with acquisitions and debt financing.

376.    The Advisory Agreement, last amended on September 12, 2011, had an initial term lasting until May 7, 2020. Pursuant to the terms of the Advisory Agreement, HCI Equity was responsible two key aspects of Roadrunner' operations during the Class Period:

(a) ***identification, support, negotiation, and analysis of acquisitions*** and dispositions by the Company and its subsidiaries; and

(b) ***support, negotiation, and analysis of financing alternatives***, including, without limitation, in connection with acquisitions, capital expenditures, and refinancing of existing indebtedness.

377.    Pursuant to the Advisory Agreement, HCI Equity Management was paid transaction fees in relation to "each acquisition or divestiture by the Company or its subsidiaries (excluding purchases or sales of equipment or inventory in the ordinary course of business) that is introduced or negotiated by the Advisor or any of its affiliates," as well as transaction fees relating to "any public or private debt or equity financing by the Company or any of its subsidiaries negotiated by the Advisor…." Both of these clauses allowed HCI Equity Management to profit from Roadrunner's acquisition spree. On May 2, 2017, the advisory agreement between Roadrunner and HCI Equity Management was cancelled. Thereafter, on November 22, 2017, the same day that defendant DiBlasi was removed from the Roadrunner board of directors, Rued was removed as chairman of the Roadrunner board.

378.    Beyond demoting DiBlasi, who the HCI defendants recruited to be installed as CEO, the removal of Rued as chairman of the board was another remedial effort intended to change the "tone from the top" respecting Roadrunner's management, which had fueled the fraudulent scheme and, among other things, had failed to promote a culture of ethical values and integrity.

160

379.     HCI Equity Partners and Rued, and via him, HCI Equity Management, exercised substantial influence and control over the business and operations of the Company, directly benefitted from its fraudulent conduct, and acted as a controlling persons of Roadrunner within the meaning of Section 20(a) of the Exchange Act. Rued, and in turn HCI Equity Partners and HCI Equity Management, had the power and authority to control Roadrunner and its executive management. By reason of the foregoing, HCI Equity Partners, HCI Equity Management, and Rued are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Lead Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Lead Plaintiff's counsel as class counsel;

(b)     Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a jury trial.

Dated: March 12, 2018

Respectfully submitted,

**CROSS LAW FIRM, S.C.**

Nola J. Hitchcock Cross
SBN: 1015817
Mary C. Flanner
SBN: 1013095
The Lawyers' Building
845 N. 11th Street
Milwaukee, WI 53233
(414) 224-0000 (phone)
(414) 273-7055 (facsimile)
mflanner@crosslawfirm.com
njhcross@crosslawfirm.com

*Local Counsel for Lead Plaintiff*

**BARRACK, RODOS & BACINE**
_/s/STEPHEN R. BASSER_
STEPHEN R. BASSER

SAMUEL M. WARD
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874
sbasser@barrack.com
sward@barrack.com

JEFFREY A. BARRACK
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jbarrack@barrack.com

*Lead Counsel for Lead Plaintiff the Public Employees' Retirement System of Mississippi and the Proposed Class*

162

**Of Counsel:**

**GADOW TYLER, PLLC**
Blake Tyler, Esquire
Jason M. Kirschberg, Esquire
511 E. Pearl Street
Jackson, Mississippi 39201
T: 601.355.0654
F: 601.510.9667
blake@gadowtyler.com
jason@gadowtyler.com

*Counsel for the Public Employees' Retirement
System of Mississippi*

Public Employees' Retirement System of Mississippi
Roadrunner Transportation Systems, Inc.
Class Period: 03/14/2013 through 01/30/2017

| | PURCHASES | | | SALES | |
|---|---|---|---|---|---|
| **DATE** | **SHARES** | **PRICE/SH** | **DATE** | **SHARES** | **PRICE/SH** |
| **Account #1** | | | | | |
| 5/7/2014 | 607 | 25.8735 | | | |
| 6/9/2014 | 381 | 27.7965 | | | |
| 6/12/2014 | 459 | 27.0178 | | | |
| 7/14/2014 | 454 | 27.0935 | | | |
| 8/26/2014 | 496 | 25.1071 | | | |
| 9/15/2014 | 405 | 25.6094 | | | |
| 10/13/2014 | 568 | 21.1002 | | | |
| 3/12/2015 | 413 | 25.8317 | | | |
| 3/18/2015 | 554 | 26.1327 | | | |
| 3/23/2015 | 673 | 26.3065 | | | |
| 3/25/2015 | 771 | 25.9924 | | | |
| 3/26/2015 | 500 | 25.4990 | | | |
| 3/31/2015 | 986 | 25.2547 | | | |
| 4/2/2015 | 899 | 24.3208 | | | |
| 4/10/2015 | 432 | 24.3292 | | | |
| 5/1/2015 | 430 | 25.1090 | | | |
| 8/11/2015 | 427 | 24.4050 | | | |
| 8/18/2015 | 437 | 23.9800 | | | |
| 8/19/2015 | 376 | 23.7499 | | | |
| 8/28/2015 | 482 | 21.7082 | | | |
| 12/6/2016 | 4,899 | 10.6544 | | | |
| 12/7/2016 | 968 | 11.0708 | | | |
| 12/8/2016 | 827 | 11.1650 | | | |
| 12/9/2016 | 1,500 | 11.6040 | | | |
| 12/15/2016 | 954 | 11.1568 | | | |
| 12/16/2016 | 1,125 | 10.9141 | | | |
| 12/19/2016 | 1,448 | 10.7960 | | | |
| 12/29/2016 | 985 | 10.5633 | | | |
| 1/3/2017 | 1,112 | 10.7449 | | | |
| **Account #2** | | | | | |
| 11/15/2013 | 193,100 | 25.4416 | 9/26/2014 | 6,000 | 23.4828 |
| | | | 11/24/2014 | 89,835 | 23.3300 |
| | | | 11/25/2014 | 15,277 | 23.6000 |
| | | | 12/2/2014 | 11,507 | 22.2636 |
| | | | 12/3/2014 | 6,496 | 22.3015 |
| | | | 12/5/2014 | 12,250 | 22.3425 |
| | | | 12/9/2014 | 5,105 | 21.4669 |
| | | | 12/10/2014 | 3,985 | 20.6897 |
| | | | 12/11/2014 | 10,355 | 20.6719 |
| | | | 12/11/2014 | 7,971 | 20.8000 |
| | | | 12/12/2014 | 24,319 | 21.3922 |