UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

IN RE ROADRUNNER TRANSPORTATION          Case No.: 17-cv-144-LA
SYSTEMS, INC. SECURITIES LITIGATION

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND
REIMBURSEMENT OF LITIGATION EXPENSES**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     HISTORY OF THE LITIGATION ........................................................................ 3

III.    SUMMARY OF THE ALLEGATIONS OF THE COMPLAINT ........................... 5

IV.     THE APPLICATION FOR AN AWARD OF ATTORNEYS FEES SHOULD   BE
        APPROVED .................................................................................................... 7

        A.    The Court Should Award Attorneys Based on the Percentage-of-The-Fund
              Method ................................................................................................. 7

        B.    The Requested Fee is Fair and Reasonable ............................................ 10

              1.    The 17% Requested Fee is Modest, Especially Compared to Higher
                    Percentages Supported by Seventh Circuit Authority and the Marketplace ... 10

              2.    A Lodestar Analysis Supports Lead Counsel's Fee Request ...................... 13

              3.    Plaintiff's Counsel's Request for Attorneys' Fees is Fair and Reasonable in
                    Light of the Contingent Nature of the Representation and Significant Risks of
                    the Litigation ................................................................................. 15

              4.    Lead Counsel Provided the Class with Quality Legal Services that Produced
                    Excellent Results ............................................................................. 22

              5.    Lead Plaintiff Independently Assessed and Approved the 17% Fee Request  26

              6.    The Reaction of the Settlement Members Supports the Reasonableness of the
                    Requested Award ............................................................................. 26

V.      PLAINTIFF'S COUNSELS' EXPENSES ARE REASONABLE AND WERE
        NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED ..... 27

VI.     CONCLUSION ................................................................................................ 29

i

# TABLE OF AUTHORITIES

Cases                                                                                           Page(s)

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) ........................................................................... 19, 20

*Anixter v. Home-Stake Prod. Co.*,
   77 F.3d 1215 (10th Cir. 1996) ...................................................................... 16, 19

*Backman v. Polaroid Corp.*,
   910 F.2d 10 (1st Cir. 1990) .......................................................................... 16, 19

*Barbosa v. Cargill Meat Sols. Corp.*,
   297 F.R.D. 431 (E.D. Cal. 2013) ........................................................................ 28

*Beesley v. Int'l Paper Co.*,
   No. No: 3:06-cv-703-DRH-CJP, 2014 WL 375432 (S.D. Ill. Jan. 31, 2014) ............ 25, 26, 28

*Berger v. Xerox Corp. Ret. Income Guar. Plan*,
   Case No: 00-584-DRH, 2004 U.S. Dist. LEXIS 1819 (S.D. Ill. Jan. 22, 2004) ............... 11-12

*Chu v. Sabratek Corp.*,
   100 F. Supp. 2d 815 (N.D. Ill. 2000) ................................................................... 15

*City of Livonia Emple. Ret. Sys. v. Boeing Co.*,
   711 F.3d 754 (7th Cir. 2013) .............................................................................. 18

*Colin v. Onyx Acceptance Corp.*,
   31 F. App'x 359 (9th Cir. 2002) ........................................................................ 18

*Cooper v. IBM Pers. Pension Plan*,
   Case No. 99-829-GPM, 2005 U.S. Dist. LEXIS 17071 (S.D. Ill. Aug. 16, 2005) ..... 10-11, 12

*DeMarco v. DepoTech Corp.*,
   32 F. App'x 260 (9th Cir. 2002) ........................................................................ 18

*Eminence Capital, L.L.C. v. Aspeon, Inc.* (*In re Aspeon Secs. Litig.*),
   168 F. App'x 836 (9th Cir. 2006) ...................................................................... 18

*Florin v. Nationsbank of Ga., N.A.*,
   60 F.3d 1245 (7th Cir. 1995) .............................................................................. 13

*Florin v. Nationsbank, N.A.*,
   34 F.3d 560 (7th Cir. 1994) ........................................................................ 8, 9, 10

*Franco v. Ruiz Food Prods.*,
   Case No. 1:10-cv-02354-SKO, 2012 U.S. Dist. LEXIS 169057
   (E.D. Cal. Nov. 27, 2012) ................................................................................. 28

*Gaskill v. Gordon*,
   160 F.3d 361 (7th Cir. 1998) .............................................................................. 12

*Geinko v. Padda*,
   No. 00 C 5070, 2001 WL 1163728 (N.D. Ill. Sept. 28, 2001) ............................... 15

Case 2:17-cv-00144-LA   Filed 08/19/19   Page 3 of 36   Document 96

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) ............................................................... 16

*Goldberg v. Household Bank, F.S.B.*,
  890 F.2d 965 (7th Cir. 1989) ............................................................... 14-15

*Gottlieb v. Wiles*,
  150 F.R.D. 174 (D. Colo. 1993) ........................................................... 28

*Great Neck Capital Appreciation Inv. P'ship, L.L.P. v. PricewaterhouseCoopers, L.L.P.*,
  137 F. Supp. 2d 1114 (E.D. Wis. 2001) ............................................... 15

*Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*,
  212 F.R.D. 400 (E.D. Wis. 2002) ........................................... 3, 9, 10, 13

*Harrison v. Dean Witter Reynolds, Inc.*,
  974 F.2d 873 (7th Cir. 1992) ............................................................... 17

*Haw. Structural Iron Workers Pension Tr. Fund v. Apple Comput., Inc. (In re Apple
  Comput., Inc.)*, 127 F. App'x 296 (9th Cir. 2005) ............................... 18

*Heekin v. Anthem, Inc.*,
  No. 1:05-cv-01908-TWP-TAB, 2012 WL 5878032 (S.D. Ind. Nov. 20, 2012) .................. 11

*In re Abbott Labs. Sec. Litig.*,
  No. 92-c-3869, 1995 WL 792083 (N.D. Ill. July 3, 1995) .................... 11

*In re Apollo Grp., Inc. Secs. Litig.*,
  No. CV 04-2334-PHX-JAT(Consolidated), 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4,
  2008) ................................................................................................... 16

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
  792 F. Supp. 2d 1028 (N.D. Ill. 2011) ................................................. 27

*In re BankAtlantic Bancorp, Sec. Litig.*,
  Case No. 07-61542-CIV-UNGARO, 2011 U.S. Dist. LEXIS 48057 (S.D. Fla. Apr. 25, 2011)
  ............................................................................................................ 18-19

*In re Clarent Corp. Sec. Litig., Case No. C-01-3361 CRB*,
  slip op. (N.D. Cal. Feb. 16, 2005) ...................................................... 16

*In re Cont'l Ill. Sec. Litig.*,
  962 F.2d 566 (7th Cir. 1992) ........................................................ 8, 9, 28

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*,
  80 F. Supp. 3d 838 (N.D. Ill. 2015) .................................................... 11

*In re Ikon Office Sols., Inc. Sec. Litig.*,
  194 F.R.D. 166 (E.D. Pa. 2000) .......................................................... 15

*In re Immune Response Sec. Litig.*,
  497 F. Supp. 2d 1166 (S.D. Cal. 2007) ............................................... 28

*In re JDS Uniphase Corp. Sec. Litig., Case No. C-02-1486 CW*,
  (N.D. Cal. Nov. 27, 2007) ........................................................ 15-16, 19

Case 2:17-cv-00144-LA   Filed 08/19/19   Page 4 of 36   Document 96

*In re Mex. Money Transfer Litig.*,
   164 F. Supp. 2d 1002 (N.D. Ill. 2000) ................................................................. 12

*In re Ready-Mixed Concrete Antitrust Litig.*,
   No. 1:05-cv-00979-SEB-JMS, 2010 U.S. Dist. LEXIS 30776 (S.D. Ind. Mar. 30, 2010) ... 7, 9

*In re Synthroid Mktg. Litig.*,
   325 F.3d 974 (7th Cir. 2003) ............................................................................. 9

*In re Synthroid Mktg. Litig.*,
   264 F.3d 712 (7th Cir. 2001) ....................................................................... 10, 19

*In re Toys "R" Us-Del., Inc. Fair & Accurate Credit Transactions Act Litig.* ,
   295 F.R.D. 438 (C.D. Cal. 2014) ...................................................................... 28

*In re Visa Check/Mastermoney Antitrust Litig.*,
   297 F. Supp. 2d 503 (E.D.N.Y. 2003) ................................................................ 22

*In re Warner Commc'ns Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985) .................................................................... 22

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) .................................................................. 8

*In re Xcel Energy, Inc.*,
   364 F. Supp. 2d 980 (D. Minn. 2005) ................................................................ 19

*Kirchoff v. Flynn*,
   786 F.2d 320 (7th Cir. 1986) ....................................................................... 8, 10

*Maiden v. Merge Technologies*, No.
   No. 06–C–349, 2008 WL 4643538 (E.D. Wis. 2008) ......................................... 15

*McKinnie v. JP Morgan Chase Bank, N.A.*,
   678 F. Supp. 2d 806 (E.D. Wis. 2009) ................................................................ 8

*McKinnon v. Berwyn*,
   750 F.2d 1383 (7th Cir. 1984) ........................................................................ 12

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ........................................................................ 18

*Meyenburg v. Exxon Mobil Corp.*,
   No. 3:05-cv-15-DGW, 2006 U.S. Dist. LEXIS 52962 (S.D. Ill. July 31, 2006) ................... 11

*Miller v. Asensio & Co.*,
   364 F.3d 223 (4th Cir. 2004) ......................................................................... 19

*Redwen v. Sino Clean Energy, Inc.*,
   No. CV 11-3936 PA (SSx), 2013 U.S. Dist. LEXIS 100275 (C.D. Cal. July 9, 2013) .......... 28

*Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3d Cir. 2005) .......................................................................... 12

*Robbins v. Koger Props.*,
   116 F.3d 1441 (11th Cir. 1997) ................................................................... 16, 19

iv

*Rubke v. Capitol Bancorp, Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ................................................................ 18

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ................................................ 11, 19

*Silverman v. Motorola Sols., Inc.*,
    739 F.3d 956 (7th Cir. 2013) ..................................................... *passim*

*Silverman v. Motorola, Inc.*,
    No. 07 C 4507, 2012 WL 1597388 (N.D. Ill. May 7, 2012) ................... 9

*Sutton v. Bernard*,
    504 F.3d 688 (7th Cir. 2007) ............................................................... 10

*Taubenfeld v. Aon Corp.*,
    415 F.3d 597 (7th Cir. 2005) ......................................................... 19, 22

*Teamsters Local Union No. 604 v. Inter-Rail Transp. Inc.*,
    2004 WL 768658 (S.D. Ill. Mar. 19, 2004) .......................................... 11

*Ward v. Succession of Freeman*,
    854 F.2d 780 (5th Cir. 1988) ......................................................... 16, 19

*Zucco Partners, L.L.C. v. Digimarc Corp.*,
    No. 06-35758, 2009 U.S. App. LEXIS 7025 (9th Cir. Feb. 10, 2009) ................... 18

Statutes

15 U.S.C. § 10(b) .......................................................................... 17, 18, 20

15 U.S.C. § 20(a) .......................................................................... 5, 17, 21

15 U.S.C. § 78j(b) (2018) ....................................................................... 5

15 U.S.C. § 78u-4(a)(6) (2018) .............................................................. 8

v

Lead Counsel, Barrack, Rodos & Bacine ("Barrack"), on behalf of itself and participating Plaintiff's Counsel, the Cross Law Firm S.C. of Milwaukee, Wisconsin and Gadow Tyler, PLLC, of Jacksonville, Mississippi, respectfully submits this memorandum of law in support of (1) an award of attorneys' fees to Plaintiff's Counsel and (2) reimbursement of their litigation expenses.

## I. INTRODUCTION

As set forth in the Stipulation of Settlement and Agreement ("Settlement Agreement") entered into between the settling parties on March 29, 2019 (ECF No. 81-1), Defendants have agreed to pay $20 million ("Settlement Fund") to secure the settlement and release of all claims alleged in this class action arising from the public statements of Roadrunner Transportation Services, Inc. ("Roadrunner" or the "Company") and its former chief executive officer, Robert A. DiBlasi ("DiBlasi"), and former chief financial officer, Peter R. Armbruster ("Armbruster"), between March 14, 2013 and January 30, 2018, inclusive, which statements include the Company's reported financial statements filed with the Securities and Exchange Commission ("SEC") that were restated on January 31, 2018. This excellent recovery on behalf of Settlement Class Members, who purchased Roadrunner's common stock during the Settlement Class Period, is the result of the unyielding efforts, skill, effective advocacy, and strategic acumen of Plaintiff's Counsel. The Settlement constitutes an outstanding result considering the eroding financial condition of Roadrunner, risk of its voluntary or involuntary bankruptcy, and the eroding nature of Defendants' available insurance coverage proceeds, which likely would have fully evaporated had this case continued through motions proceedings, discovery, summary judgment, trial and appeal. Indeed, Lead Counsel structured the Settlement with terms and conditions designed to safeguard the $20 million Settlement Fund from claims in bankruptcy, should one ever be filed by or respecting Roadrunner, in an effort to preserve the entire fund for the benefit of the Class. *See* Settlement Agreement, ECF No. 81-1 at ¶ 3.13(j).

The Settlement was achieved only after Lead Counsel's (1) extensive investigation, including interviews with approximately 30 confidential witnesses; (2) analysis of Roadrunner's

1

complex and detailed financial statements and filings with the SEC; (3) extensive internet research; (4) consultation with an expert in the trucking industry, a forensic financial accountant, and an economic and damages expert; (5) preparation and filing of a detailed and comprehensive 161 page Consolidated Amended Complaint ("Complaint") ECF 34; (6) vigorous opposition to five motions to dismiss by the six defendants; (7) engagement in comprehensive mediation briefing and extensive arms-length mediations and negotiations; (8) development of a deep understanding of the issues of liability and damages; and (9) study and assessment of the financial condition of Roadrunner, in particular, and assessment of the reasonable likelihood of collectability of a damages verdict, if any. The strategies and tactics developed by Lead Counsel, with assistance from Lead Plaintiff, the Public Employees' Retirement System of Mississippi – a formidable institutional investor – and participating Plaintiff's Counsel, were both timely and highly successful.

Plaintiff's Counsel undertook the prosecution of this case on an entirely contingent basis. As compensation for their efforts, Lead Counsel requests that the Court grant the fair and modest sum of 17% of the Settlement Fund achieved by Plaintiff's Counsels' efforts, together with granting an order paying and reimbursing litigation expenses in the total amount of $222,122.67, plus interest thereon. The Court appointed Lead Plaintiff has reviewed and approves the fee and expense request as fair and reasonable. The approval of this sophisticated institutional investor is especially significant given its active involvement in this Action, at every level, including the Settlement of the case. *See* Declaration of Special Assistant Attorney General Jacqueline H. Ray on Behalf of the Public Employees' Retirement System of Mississippi in Support of: (A) Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (B) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Ray Decl."), attached as Exhibit 2 to the Declaration of Stephen R. Basser in Support of (1) Final Approval of Settlement, (2) Approval of Plan of Allocation and (3) Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Basser Decl.").

The reaction of Settlement Class Members supports this fee and cost reimbursement request. Indeed, pursuant to the Preliminary Approval Order of June 19, 2019, a Postcard Notice was disseminated or is in the process of being disseminated to more than 46,400 potential Class Members, and a Summary Notice was published in *Investor's Business Daily* and transmitted over the *PR Newswire. See* Declaration of Sandy Pappas Regarding Dissemination of the Notice to the Class ("Pappas Decl."), attached as Exhibit 1 to the Basser Decl. at ¶¶ 4-8. The Claims Administrator also sent the Postcard Notices to brokerage firms and other financial entities. *Id.* ¶ 4. The Court-approved Notice Program advised that Lead Counsel intended to apply to the court for an award of attorneys' fees in an amount not to exceed 17% of the Settlement Fund, together with reimbursement of litigation expenses in an amount not to exceed $295,000, plus interest thereon.

While the deadline for Class Members to object to the request for attorneys' fees and expenses has not yet passed, so far, no objection has been received to this request. Basser Decl. ¶ 69. The lack of objections – by institutional investors in particular – is particularly notable given that, according to Yahoo Finance, institutional investors are estimated to hold over 91% of Roadrunner stock. *See* Basser Decl. ¶ 69, *Silverman v. Motorola Sols., Inc.,* 739 F.3d 956, 959 (7th Cir. 2013) (finding relevant that there were no objections by institutional investors who held over 70% of the securities). Indeed, the 17% fee request is well within, and below, percentage fees previously granted by this Court and should be approved. *See Great Neck Capital Appreciation Inv. P'Ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400 (E.D. Wis. 2002) (J. Lynn Adelman).

## II. HISTORY OF THE LITIGATION

Lead Plaintiff, via Lead Counsel, filed an initial complaint in this Action on March 12, 2017 after Roadrunner disclosed that there were "errors" in its prior financial reporting and material weakness in its internal controls over financial reporting that would necessitate a restatement of prior financial reports, including interim periods. Lead Plaintiff was appointed by

3

the Honorable Pamela Pepper by Order dated May 19, 2017, at which time Lead Counsel was appointed to serve as Lead Counsel, ECF No. 27. From the very outset, Lead Counsel began investigating Roadrunner's financial statements and related business practices and conditions, in order to more fully develop a comprehensive complaint that could withstand scrutiny by the Court and meet the heightened pleading standards of the PSLRA.

To that end, Lead Counsel worked with a private investigator to identify confidential witnesses – former employees of Roadrunner – that could provide relevant information supporting Lead Plaintiff's claims. It also assembled a team of experts, including a trucking industry expert and, importantly, a qualified forensic accountant with considerable background and expertise in investigating, assessing, and analyzing the financial reports of publicly traded companies being accused of or otherwise sued for filing false and misleading financial statements. During the course of its intensive investigation of Class Members' claims, Lead Counsel reviewed a wealth of information regarding Roadrunner, the transportation industry and systems, driver contracts, and the Company's acquisition history, which information was secured through internet research. Lead Counsel, assisted by a private investigation firm, interviewed or caused to be interviewed approximately thirty confidential witnesses, and spent many hours with experts, while absorbing significant consultation fees charged by them for their necessary and helpful work.

All the while working on a contingent fee, without any promise or guarantee of recovery in this complex and risky securities fraud class action, Lead Counsel ultimately developed and filed a comprehensive 161-page Consolidated Class Action Complaint against Roadrunner, its former CEO DiBlasi, former CFO Armbruster and certain investors alleged to have "control" over Roadrunner – Scott D. Rued, HCI Equity Management, LLP, and HCI Equity Partners, LLC. During the course of the litigation, the Defendants filed five motions to dismiss the Complaint. Lead Plaintiff vigorously opposed all of them – and efficiently did so – filing one omnibus opposition to the motions to dismiss of Roadrunner, DiBlasi, and Armbruster, and one omnibus opposition to the motions to dismiss filed on behalf of Rued and the HCI entity defendants.

4

Lead Counsel's substantial efforts with respect to fashioning a comprehensive complaint, and two strong opposition briefs in response to Defendants five motions to dismiss, succeeded in securing the Defendants' and their insurance carriers' willingness to negotiate a fair and reasonable resolution before insurance proceeds evaporated in the face of Roadrunner's faltering financial condition. This was an important development given Roadrunner's troubling financial profile.

Ultimately, from May 2018 through November 19, 2018, and after two in-person mediation sessions with an experienced and highly regarding private mediator, the Honorable Layn R. Phillips, a retired United States District Court Judge for the District of Oklahoma, as well as many direct communications between Lead Counsel and Defendants' legal representatives, the parties entered into a memorandum of understanding ("MOU") defining the essential material terms of Settlement, including payment of $20 million by the Defendants in satisfaction of Settlement Class Members' claims and full releases. Thereafter, it was necessary to engage in significantly greater and somewhat more intensive discussions fleshing out all of the remaining material terms of a Settlement Agreement – including terms designed to safeguard and insulate the recovery from possible bankruptcy proceedings respecting Roadrunner – which was executed on March 29, 2019. Basser Decl. ¶ 53. The achievement of this $20 million Settlement, creating a common fund for the benefit of Settling Class Members in this Action, constitutes an excellent result.

## III. SUMMARY OF THE ALLEGATIONS OF THE COMPLAINT

The Complaint alleges that Roadrunner, DiBlasi, and Armbruster violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 78aa, by making allegedly material misstatements and omissions relating to Roadrunner's business and financial statements and results, and asserts claims against Rued and the HCI entities for violating Section 20(a) of the Exchange Act as control persons.

Summarizing briefly, Lead Plaintiff's Complaint alleges that, over an extended period of time, Roadrunner's statements of its financial results under-reported more than $94 million of operating expenses incurred by the Company, consequently overstating its net income,

5

performance metrics, and earnings per share, and causing its debt leverage ratios to appear more favorable. The Complaint further alleges that the Company's statements did not adequately disclose the flaws and the depth of costs or expense exposure occasioned by its independent driver tractor lease purchase guarantee program, which had been designed as a recruiting inducement, while assuring the investment community that associated lease guarantees had no material impact on the Company's financial results, that any guaranteed payments were "*de minimis*" and that its "off balance sheet arrangements" did not present a material risk to investors.

Lead Plaintiff alleges that the falsity of the Company's previously reported financial statements dating back to 2012, and the flaws and embedded cost exposure of its independent driver tractor lease guarantee program, began to be revealed to investors on January 30, 2017. Among other things, the Company stated at that time that it had discovered "errors" in its accounting with respect to two acquired operational subsidiaries and that investors should no longer rely on its previously reported financial results, while further disclosing that it had discovered material weakness in its internal controls. One year later, on January 31, 2018, the Company issued a formal Restatement of its previously reported financial results dating back to 2012, acknowledging material weaknesses in controls over financial reporting and disclosing additional adverse facts and events associated with the costs and structure of its independent driver tractor lease purchase guarantee program. Meanwhile, during the Class Period, the Company secured $40.5 million from the investment community via a public offering dated August, 2013, and defendants DiBlasi and Armbruster engaged in insider selling of substantial portions of their Roadrunner stock.

Defendants denied and continue to deny: (i) all the claims alleged by Lead Plaintiff on behalf of the class, including all claims asserted in any pleading, including the Complaint; (ii) all allegations of wrongdoing, fault, liability, loss causation, or damages to Lead Plaintiff and the Settlement Class; and (iii) that they committed any act or omission giving rise to any liability or violation of law, including the federal securities laws. Defendants contended and continue to contend that, at all times, they acted properly, in good faith, and consistent with their legal duties and obligations. *See* Settlement Agreement, ECF No. 81-1 at I, page 3-4.

## IV. THE APPLICATION FOR AN AWARD OF ATTORNEYS FEES SHOULD BE APPROVED

### A. The Court Should Award Attorneys Based on the Percentage-of-The-Fund Method

The Supreme Court recognizes that private securities actions provide "a most effective weapon in the enforcement" of securities laws and are a 'necessary supplement to action'" brought by the United States Securities and Exchange Commission ("SEC"). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318-19 (2007) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964). Furthermore, the Supreme Court has consistently held that where a "common fund" has been created for the benefit of the Class as a result of counsel's efforts, then counsel is entitled to a reasonable fee based on a percentage of that fund – otherwise referred to as the "common fund doctrine." *See e.g. Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-79 (1980); *Blum v. Stenson*, 465 U.S. 886, 900, n. 16 (1984) ("under the 'common fund doctrine' … a reasonable fee is based on a percentage of the fund bestowed on the Class").[1] The Seventh Circuit follows this time-honored precedent, holding that when a case results in the creation by plaintiff's counsel of a common fund for the benefit of the plaintiff class, "the district court [is] required to determine a reasonable attorneys' fee for Counsel to be paid out of the common fund." *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007). *See also McKinnie v. J.P. Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 815 (E.D. Wis. 2009) (*Statdmueller, J.*) (citing the *Boeing Co. v. Van Germert*, 444 U.S. 472, 478 (1980); *Florin v. Nations Bank of Georgia, N.A.*, 34 F.3d 560, 563 (7th Cir. 1994); *Williams v. Rohm & Haas Pens. Plan*, 658 F.3d 629, 637 (7th Cir. 2011) (rejecting objectors' appeal and declining to "disturb the District Court's assessment of fees" on a percentage-of-the-fund basis);

---

[1]    From the very outset, upon retaining the Barrack firm, which was ultimately appointed by the Court to serve as Lead Counsel, Lead Plaintiff recognized that attorneys' fees in this case should be based on a contingency arrangement, thus aligning the interest of Plaintiff's Counsel with those of all Class Members. Lead Plaintiff's approach was entirely prudent. *See In re Ready-Mixed Concrete Antitrust Litig.*, 2010 U.S. Dist. LEXIS 30776, at *25 (S.D. Ind. March 30, 2010) ("it would be financially impossible, or irrational, for any of the named plaintiffs to have agreed to pursue" complex class action "on any basis other than a contingency arrangement with expenses advanced by counsel").

7

*Taubenfeld v. AON Corp.*, 415 F.3d 597, 598-600 (7th Cir. 2005) (affirming percentage-of-the-fund fee award); *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) (stating that "[w]hen a class suit produces a fund for the Class, it is commonplace to award the lawyers for the Class a percentage of the Fund" and affirming award).[2]

The Private Securities Litigation Reform Act of 1995 ("PSLRA") affirmatively supports awarding attorneys' fees in securities class actions cases using the percentage-of-the-fund method, by providing that "[t]otal attorneys' fees and expenses awarded by the Court to counsel for the Plaintiffs Class should not exceed a reasonable **percentage** of the amount of any damages and prejudgment interest actually paid to the Class." 15 U.S.C. § 78u-4(a)(6) (emphasis added). *See also In re Worldcom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005) (observing that the PSLRA contemplates that "the percentage method will be used to calculate attorneys' fees in securities fraud class actions").

The percentage-of-the-recovery method has been recognized to possess advantages, including the relative objectivity and ease of administration. *See In re Continental Ill. Sec. Litig.*, 962 F.2d 566 572-73 (7th Cir. 1992).[3] When determining the appropriate fee percentage to award in common fund cases, the Seventh Circuit further notes that "attorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services." *Silverman*, 739 F.3d at 957 (citing *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (*Syntrhoid I*); *In re Synthoid Mktg. Litig.*, 325 F.3d 974, 975 (7th Cir. 2003)); *see also McKinnie*, 678 F. Supp. 2d 814 ("[C]ourts must attempt to award the marketplace for legal services when determining appropriate

---

[2]     In *Florin*, 34 F.3d at 560, the Seventh Circuit noted that "[t]he common fund doctrine is based on the notion that not one plaintiff, but all 'those who have benefitted from litigation should share its costs.'" *Id.* at 563 (quoting *Skelton v. General Motors Corp.*, 860 F.2d 250, 252 (7th Cir. 1988)).

[3]     *See also Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986) (In the marketplace the "contingent fee uses private incentives rather than careful monitoring to align the interest of lawyer and client. The lawyer gains only to the extent his client gains). "A contingent fee arrangement is appropriate in such a case because it insulates the plaintiff from any economic risk if their litigation is ultimately unsuccessful." *McKinnie*, 678 F. Supp. 2d at 815.

8

fees in common-fund cases, 'in light of the risk of non-payment and the normal rate of compensation in the market at the time," *Taubenfeld*, 415 F.3d at 599) (quoting *Synthroid Mktg. Litig.*, 264 F.3 712)).[4]

The district court has discretion in determining the hypothetical market price of attorneys' fees in common fund cases, utilizing either the percentage of the fund or the lodestar approaches. *Great Neck Capital*, 212 F.R.D. at 411. Using a percentage approach alone is well within the discretion of the district court. *Florin*, 34 F.3d at 566. Moreover, jurists within the Seventh Circuit commonly approve percentage-of-the-fund fees without any regard to lodestar. *Silverman v. Motorola, Inc.*, 2012 WL 1597388, *4 (N.D. Ill. May 7, 2012) (stating it was unnecessary to consider lodestar); *see also In re Ready-Mixed Concrete Antitrust Litig.*, 2010 U.S. Dist. LEXIS 30776, at *25 (S.D. Ind. Mar. 30, 2010) (it would be financially impossible, or irrational, for any of the named plaintiffs to have agreed to pursue the [complex class action] matter on any basis other than a contingency arrangement with expenses advanced by counsel"). As Judge Easterbrook observed, "[t]he client cares about the outcome alone" and Class Counsels' **efficiency** should not be used "to reduce class counsel's percentage of the fund that their work produced." *See In re Synthroid Mktg. Litig.*, 325 F.3d 974, 978-80 (7th Cir. 2003). (Emphasis added). Indeed, courts have expressed concern regarding the complexity of applying the lodestar method. *Id.; see also In re Continental Ill. Sec. Litig.*, 962 F.2d at 573 (finding that it is easier to establish marketplace contingency fee percentages "than it would be to hassle over every item or category of hours and expense and what multiple to fix and so forth."). The percentage method is also consistent with, and is intended to mirror, the private marketplace for negotiated contingent fee arrangements.

Upon making the determination as to what constitutes the appropriate fee percentage, the court is required to consider "the risk of non-payment a firm agrees to bare … the quality of the

---

[4] As Judge Posner noted *in In re Continental Ill.*, 962 F.2d at 572, "[t]he object in awarding a reasonable attorney's fee ... is to simulate the market.... class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client."

[firms] performance … the amount of work necessary to resolve the litigation and … the stakes of the case." *Synthroid I*, 264 F.3d at 721. And the court must assess "the riskiness of the litigation by measuring the probability of success of this type of case at the outset of the litigation". *Florin*, 34 F.3d at 565.

Notably, and following Seventh Circuit precedent, in *Great Neck Capital*, upon awarding a fee of 30% of a $10 million common fund, this Court echoed the Seventh Circuit and considered the following relevant criteria when determining the appropriate percentage to award Class Counsel: "[1] the contingent nature of the case, [2] the quality of services rendered, [3] the benefits derived by the class, and [4] the public service aspects of the case." *Great Neck Capital*, 212 F.R.D. at 411. Here, upon consideration of the successful result achieved in this complex Action, the contingent nature and risk of litigating this Action, and the quality and extent of the work that has been provided by Plaintiff's Counsel to the Class in **efficiently and timely** generating a $20 million settlement, a request that the Court award a legal fee of 17% of the Settlement Fund is clearly fair and reasonable.

**B.      The Requested Fee is Fair and Reasonable**

**1.      The 17% Requested Fee is Modest, Especially Compared to Higher Percentages Supported by Seventh Circuit Authority and the Marketplace**

In the Seventh Circuit, attorneys' fees in class actions are deemed "reasonable" if they comply with the "market value" standard, as recognized by the court in the decision of *In re Synthroid Mktg. Litig.*, 264 F.3d 712 at 718.[5] *Cooper v. IBM Pers. Pension Plan, 2005* U.S. Dist. LEXIS 17071, at *13 (S.D. Ill. Aug. 16, 2005) ("'[T]he approach favored in the Seventh Circuit

---

[5]      *See Kirchoff v. Flynn,* 786 F.2d 320, 324 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee is the market rate."). *Sutton v. Bernard*, 504 F.3d 688, 693 (7th Cir. 2007) ("In determining attorneys' fees, the Seventh Circuit has consistently looked to the marketplace as its guide to what is reasonable.").

10

is to compute attorneys' fees as a percentage of the benefit conferred on the class,' particularly where that percentage of the benefit approach replicates the market.") (citation omitted).

Lead Counsel's requested 17% fee from the Settlement Fund is actually lower than what could be replicated in the market in a case such as this. Objectively speaking, the result achieved in this Action on behalf of the Settlement Class is truly excellent. In the opinion of Lead Counsel, the fee of 17% of the $20 million Settlement Amount is modest compared to contingent fee percentages prevailing in the legal marketplace.[6]

Numerous courts within the Seventh Circuit have awarded percentage fees greatly in excess of 17% of the common fund achieved in class actions, including in securities class actions. *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 597 (N.D. Ill. 2011) (awarding one-third of settlement fund); *Meyenburg v. Exxon Mobil Corp.*, 2006 U.S. Dist. LEXIS 52962, at *5 (S.D. Ill. July 31, 2006) ("33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation"); *Teamsters Local Union No. 604 v. Inter-Rail Transp. Inc.*, 2004 WL 768658, *1 (S.D. Ill. Mar. 19, 2004) ("In this Circuit, a fee award of 33 1/3% in a class action in [sic] not uncommon. The utilization of the market percentage method, as one district court has observed, results in awards of attorneys' fees 'equal to approximately one-third or more of the recovery.'") (citations omitted); *In re Abbott Labs. Sec. Litig.*, No. 92-c-3869, 1995 WL 792083, *11 (N.D. Ill. July 3, 1995) ("This data provides considerable comfort that the requested fee in the amount of 30.76% of the recovery falls within a reasonable range. Theoretically, petitioners would have been well within bounds, to request a fee up to one-third or more of the recovery, if typical contingent fee factors in tort cases were applied."). *Heekin v. Anthem, Inc.*, 2012 WL 5878032, at *4-*5 (S.D. Ind. Nov. 20, 2012) (approving 33% fee for $90 million settlement); *In re Dairy Farmers of Am., Inc.*, 80 F.

---

[6] Class Counsel's opinion, based on experience and familiarity with the market for legal services in cases like this one, constitutes further evidence of the market rate for the type of services provided in this case. *See, e.g., Berger v. Xerox Corp. Ret. Income Guar. Plan*, Case No. 00-584-DRH, 2004 U.S. Dist. LEXIS 1819, at *6 (S.D. Ill. Jan. 22, 2004) (relying on class counsel's affidavit to support conclusion that market rate for services was contingent rate of 29% or higher). *See also* Basser Decl. ¶ 96.

11

Supp. 3d 838, 842 (N.D. Ill. 2015) (awarding 33 1/3% fee request of $46 million settlement in antitrust case); *Berger*, (awarding 29% of $239 million settlement fund, plus expenses, and finding that "an auction for legal services in this litigation would have produced a percentage at or higher than the 29% fee awarded"); *Cooper*, 2005 U.S. Dist. LEXIS 17071, at *15 (S.D. Ill. Aug. 16, 2005) (noting that 30% appears to be "'just about the benchmark'") (citation omitted); *In re Mexico Money Transfer Litig*., 164 F. Supp. 2d 1002, 1033 (N.D. Ill. 2000) (recognizing "the established 30% benchmark for an award of fees in class actions"), *aff'd sub nom, In re Mexico Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001); *Gaskill v. Gordon,* 160 F.3d 361, 362-64 (7th Cir. 1998) (Posner, J.) ("no basis for upsetting the district judge's fee award" of 38% of settlement fund, or roughly $8 million); *McKinnon v. Berwyn,* 750 F.2d 1383, 1393 (7th Cir. 1984) (40% is common); *Weiner v. Quaker Oats Co.,* No. 98 C 3123 (N.D. Ill. Sept. 14, 2001) (Pallmeyer, J.) (33.33%); *Kaufman v. Motorola, Inc.,* No. 95-CV-1069 (N.D. Ill. May 24, 2001) (Gettleman, J.) (33.33%); *In re Nanophase Techs. Corp. Sec. Litig.,* No. 98 C 3450 (N.D. Ill. Mar. 27, 2001) (Court, J.) (33.33%); *In re First Merch. Acceptance Corp. Sec. Litig.,* No. 97 C. 2715 (N.D. Ill. Apr. 21, 2000) (Coar, J.) (33.33%); *In re Spyglass, Inc. Sec. Litig.,* No. 99 C 0512 (N.D. Ill. May 23, 2000) (Guzman, J.) (33%); *First Interstate Bank of Nevada, N.A. v. Nat'l Republic Bank of Chicago,* No. *80 C* 6401 (N.D. Ill. Feb. 12, 1988) (Plunkett, J.) (awarding 39% of settlement fund and recognizing "that this percentage is within the generally accepted range of fee awards in class action securities lawsuits").

Certainly, the modesty of the requested fee of 17% is illustrated when it is compared to empirical studies of percentage fees in securities cases, as noted by the Third Circuit of Appeals, in *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005), wherein it stated:

> In comparing this fee request to awards in similar cases, the District Court found persuasive three studies referenced by Professor Coffee: one study of securities class action settlements over $10 million that found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period that found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million that found recoveries in the 25-30% range were "fairly standard." We see no abuse of discretion in the District Court's reliance on these studies. *Id.* at 303.

There is simply no question that the requested 17% fee is a "reasonable percentage" award and that it easily satisfies the criteria set forth by this very Court. In *Great Neck Appreciation Inv. P'Ship. L.P.*, 212 F.R.D. at 400, this Court awarded a fee of 30% of a $10 million common fund secured in a securities class action arising under the PSLRA. This Court noted that the PSLRA specifically requires a "reasonable percentage" award of fees, and further commented that "the Seventh Circuit recognizes that there are advantages to utilizing the percentage-of-fund method in common fund cases including its relative objectivity and the fact that it is easily administered." *Id.* at 411. Upon awarding a 30% fee, the Court concluded:

> [Plaintiffs] counsel achieved a good recovery for the Class. Counsel is skilled in securities fraud class actions and used their expertise to the advantage of the Class. The case presented a number of difficult issues and the risks of not prevailing were considerable. The litigation pursued by plaintiffs was also socially beneficial because a securities fraud class action is a mechanism for holding corporations accountable for wrongdoing. Finally, although the settlement was reached relatively early in the litigation (after PwC's motion to dismiss had been denied), class counsel put in a substantial amount of work. Thus, a fee in the range requested by class counsel [30%] is appropriate.

*Id.* at 412.

Here, Lead Counsel and its colleagues timely and efficiently achieved an excellent settlement produced by substantial skill, expertise, and effort in a case fraught with complexity and unique risks. Importantly, the pursuit of shareholder claims in this Action was socially beneficial, and helps maintain the integrity of our capital markets, as intended by Congress in passing the Securities Exchange Act of 1934, as amended by the PSLRA. A fee award of 17% is merited.

### 2. A Lodestar Analysis Supports Lead Counsel's Fee Request

While the lodestar approach may be disfavored and imposes an undue burden on the Court, in this instance, Lead Counsel, mindful of the Court's discretion, respectfully submits that its fee request would also be fair and reasonable should the lodestar method be deployed. Lead Counsel's

"lodestar" alone represents over 4,900 hours of work at current billing rates ranging from $615 to $790 per hour for partners and $390 to $435 per hour for other attorneys, which compare favorably to peer defense-side firms litigating matters of similar magnitude.[7] The total hours and lodestar of all Plaintiff's Counsel is 5,638.35 and $3,693,712.80 respectively. *See* Basser Decl. ¶ 94 and Exs. 9-11. Notably, given this lodestar, the requested fee of 17% of the Settlement amount translates to a negative lodestar multiplier.[8] A *National Law Journal* survey of law billing rates in 2014 showed that average partner billing rates among the Nation's largest defense firms ranged from $745 to $1,055 per hour and average associate billings rates ranged from $395 to $620 per hour. Basser Decl. ¶ 96 and Ex. 12.

Lead Counsel's billing rates are also reasonable when compared to securities class action law firms of a comparable level of experience and sophistication. For example, on December 27, 2018, Judge Pamela Pepper of the United States District Court for the Eastern District of Wisconsin approved a 25% contingency fee from a $20 million settlement fund in a securities class action in which a comparable plaintiff's class action firm provided a lodestar affidavit stating hourly rates for lawyers ranging from $375 an hour for "Staff Attorneys" to as high as $900-$1,000 an hour for "Partners." *Duncan v. Joy Global, Inc., et al.*, Civil No. 2-16-cv-01229-PP (E.D. Wis.), Basser Decl. ¶ 96 and Exs. 13 and 14. While Judge Pepper based her award of 25% fee using the "percentage-of-recovery" method, (Basser Decl. Ex. 14 at pg. 2), the fee application in that recently approved settlement is noteworthy because it demonstrates that the hourly rates charged in this Action by Lead Counsel are quite modest in comparison to its peers.

---

[7] The Barrack firm's hourly rates of $550-$850 for partners and $375-$510 for other attorneys were recently approved in *In re DFC Global Secs. Litig.*, Civ. A. No. 2:13-cv-06731-BMS, Dkt. No. 141 (E.D. Pa. Sept. 20, 2017), Basser Decl. ¶ 96.

[8] The Seventh Circuit has approved multipliers at and above 1.3, *See Florin*, 60 F.3d at 1248 (1.53 multiplier was reasonable). Moreover, this fee petition does not include any time that will be incurred attending the final approval hearing, or ensuring that the settlement is properly and completely administered, or responding to further inquiries from the class members.

14

### 3. Plaintiff's Counsel's Request for Attorneys' Fees is Fair and Reasonable in Light of the Contingent Nature of the Representation and Significant *Risks* of the Litigation

As a threshold matter, Lead Plaintiff and Lead Counsel took on significant risk upon being appointed to represent the interests of the Class in this securities fraud action. The fact that the case was triggered by Roadrunner's January 30, 2017 announcement of the need to restate prior financial results, or that it had discovered material weakness in its internal controls over financial reporting, did not make the prosecution of this case without risk. It is well settled that financial restatements, standing alone, do not automatically, in and of themselves, establish securities fraud. *Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 967 (7th Cir. 1989) ("Restatements of earnings are common... only intentional misstatements violate Section 10(b) and Rule 10b–5."). Allegations of "erroneous financial statements alone are insufficient" to raise inference that the company's management committed fraud. *Geinko v. Padda*, No. 00 C 5070, 2001 WL 1163728, *8 (N.D. Ill. Sept. 28, 2001); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 824 (N.D. Ill. 2000); *Maiden v. Merge Technologies*, No. 06–C–349, 2008 WL 4643538, *2 (E.D. Wis. 2008) (accounting violations "insufficient to survive a motion to dismiss"); *Great Neck Capital Appreciation Investment P'ship, L.P. v. PricewaterhouseCooper, LLC*, 137 F. Supp. 2d 1114, 1124 (E.D. Wis. 2001) ("violations of GAAP without more do not establish scienter").

While courts have always recognized that securities class actions carry significant risks, post-PSLRA rulings make it clear that the risk of no recovery (and hence no fee) has increased exponentially. *See In re Ikon Office Sols., Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) (noting that "securities actions have become more difficult from a plaintiffs perspective in the wake of the PSLRA"); *see also Redwen v. Sino Clean Energy, Inc.*, No. CV 11-3936 PA (SSx), 2013 U.S. Dist. LEXIS 100275, at *19 (C.D. Cal. July 9, 2013) ("Courts experienced with securities fraud litigation, 'routinely recognize that securities class actions present hurdles to proving liability that are difficult for plaintiffs to clear.'" (quoting *In re Flag Telecomm. Holdings*, No. 02-CV-3400 (CM) (PED), 2010 U.S. Dist. LEXIS 119702, at *48 (S.D.N.Y. Nov. 5, 2010)).

For example, since the enactment of the PSLRA, there have been numerous dismissals of actions with prejudice at the pleading or summary judgment stage. A 2019 study, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review*, Stefan Boettrich & Svetlana Starykh (NERA Jan. 29, 2019) (the "NERA Report"), states that between 2000 and 2018, motions to dismiss were granted, in whole or in part, in 75% of securities class actions in which they were filed. *See* Basser Decl. Ex. 4 at 20.

Getting past a motion to dismiss and successfully opposing a motion for summary judgment is not a guarantee that plaintiffs will prevail at trial. Indeed, while only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Corp. Sec. Litig.*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007), or substantially lost as to the main case, such as *In re Clarent Corp. Sec. Litig.*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005). Moreover, even plaintiffs who succeed at trial may find their verdict overturned on appeal. *See, e.g.*, *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiff's verdict obtained after two decades of litigation); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (*en banc*) (reversing plaintiff's verdict for securities fraud and ordering entry of judgment for defendants); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988) (reversing plaintiff's jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (same).

Even when plaintiffs win a jury verdict, they still face substantial challenges in securing a recovery. *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, Case No. CV-04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008), *rev'd*, 2010 U.S. App. LEXIS 14478 (9th Cir. 2010) (trial court tossing unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals and judgment re-entered after denial by the Supreme Court of the United States of the defendants' Petition for Writ of Certiorari).[9] Courts within the Seventh Circuit are no doubt cognizant of such uncertainty and risk, especially the risk of a prolonged delay in securing

---

[9] The *Apollo* Shareholders did not start to receive a distribution of settlement proceeds in Apollo until 2015, more than eleven years from the day the litigation commenced in 2004.

a recovery, even after a favorable jury verdict. For example, in *Jaffe v. Household International, Inc.*, No. 1:02-cv-05893 (N.D. Ill.) plaintiff obtained a jury verdict for the class in May 2009 after a month-long-trial and seven years of litigation. Due to prolonged post-verdict challenges, judgment was not entered until October 2013 – which was then appealed. Finally, after thirteen years of litigation and six years after the favorable jury verdict, the Seventh Circuit ruled in May 2015 that the defendants were entitled to a new trial on the issue of loss causation. *See Glickenhaus & Co. v. Household Int'l., Inc.*, 787 F.3d 408 (7th Cir. 2015). The case ultimately settled in 2016 – **fourteen years** after litigation commenced, and on the eve of a second trial.

Although the ultimate final Restatement may have identified material misstatements in Roadrunner's financial reporting, there were still significant hurdles that needed to be overcome to plead and prove violations of § 10(b) of the '34 Act, including pleading a strong inference of defendants' *scienter* sufficient to overcome anticipated motions to dismiss; pleading the false statements with the requisite particularity under Federal Rules of Civil Procedure Rule 9(b); demonstrating loss causation and damages; overcoming challenges that interim purchasers could not reasonably rely on the Company's prior financial results; and contending with potential "storm warning" defenses and resulting "truth-on-the-market" defenses. In addition, there were non-Restatement components to the case involving expenses and reserves for the independent driver lease purchase guarantee program and related statements that necessitated: (1) pleading falsity with particularity; (2) proving that Defendants misrepresented or concealed the true facts associated with the independent driver lease purchase guarantee program from the market; (3) demonstrating a strong inference of *scienter* with respect to such allegedly false reserves and related statements; (4) establishing that such related misstatements were material; (5) proving that there was fraud-related loss causation with respect to such lease guarantees; and (6) overcoming various defenses, including that such reserves and expenses and related issues involved complex judgments and opinions of auditors and accountants that are inactionable.

Additionally, in order to survive dismissal with respect to the HCI Defendants and Rued as to § 20(a) "control person" claims, Lead Plaintiff needed to not only prevail with respect to the

primary predicate § 10(b) securities fraud claims, but, beyond adequately pleading "direct" or "indirect" control by Rued and HCI, had to also overcome the affirmative defense provided by § 20(a) that they did not directly or indirectly "induce" the act or acts constituting the violations of § 10(b) by the Roadrunner defendants. *Harrison v. Dean Witter Reynolds*, 974 F.2d 873, 880-881 (7th Cir. 1992). This presented a formidable challenge, especially since, during the Class Period, Rued did not sell any of the Roadrunner shares he owned that Lead Plaintiff alleged were tainted by the accounting fraud. There was also no indication that Rued, HCI's agent, who chaired Roadrunner's board of directors, had a hand in the Company's financial accounting or related decisions, including accounting for operating expenses. Collectively, Rued and the HCI Entity Defendants posited that the Complaint failed to adequately plead that they directly or indirectly exercised their influence or control over Roadrunner specific to the conduct giving rise to its issuance of false financial results, while continuously maintaining that they did not directly or indirectly induce the making of any false statements. ECF Nos. 50-1, 52.

The case law is replete with instances of courts dismissing cases for a failure to adequately plead (or prove) the required elements of a securities fraud action brought under Section 10(b) of the Securities and Exchange Act of 1934. *See, e.g., Zucco Partners, LLC v. Digimarc Corp.,* No. 06-35758, 2009 U.S. App. LEXIS 7025 (9th Cir. Feb. 10, 2009); *Rubke v. Capitol Bancorp, Ltd.,* 551 F.3d 1156 (9th Cir. 2009); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049 (9th Cir. 2008); *In re Aspeon, Inc. Sec. Litig.,* 168 F. App'x 836 (9th Cir. 2006); *In re Apple Computer, Inc.,* 127 F. App'x 296 (9th Cir. 2005); *DeMarco v. DepoTech Corp.*, 32 F. App'x 260 (9th Cir. 2002); *Colin v. Onyx Acceptance Corp.*, 31 F. App'x 359 (9th Cir. 2002). *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754 (7th Cir. 2013) (affirming District Court's dismissal for failure to sufficiently allege *scienter*); *Metzler Inv. GMBH*, 540 F.3d 1049 (9th Cir. 2008) (affirming dismissal for failure to plead loss causation, *scienter* and falsity); *Oran v. Stafford*, 226 F.3d 275, 285 (3rd Cir. 2000) (Defendants' alleged misstatements deemed immaterial as a matter of law; *See*, *e.g.*, *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Digi Int'l, Inc. Sec. Litig.*, 14 Fed. Appx. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*,

249 F.3d 29 (1st Cir. 2001); *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998); *Silver v. H&R Block, Inc.*, 105 F.3d 394 (8th Cir. 1997).

Moreover, even plaintiffs who proceed to trial may not prevail or, if they do, may nonetheless find a favorable verdict overturned on appeal. *See In re BankAtlantic Bancorp Sec. Litig.*, No. 07-61542-CIV-UNGARO, 2011 U.S. Dist. LEXIS 48057 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law after jury rendered verdict in favor of plaintiffs); *In re JDS Uniphase Corp. Sec. Litig.*, 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) (jury verdict in favor of all defendants); *Anixter*, 77 F.3d 1215 (overturning verdict in favor of plaintiffs after a decade of litigation); *Backman*, 910 F.2d 10 (reversing plaintiff's verdict for securities fraud and ordering entry of judgment for defendants); *Ward*, 854 F.2d 780 (reversing plaintiff's verdict for securities fraud); *Robbins*, 116 F.3d 1441 (same); *Miller v. Asensio & Co.*, 364 F.3d 223, 225 (4th Cir. 2004) (upholding jury verdict finding no cognizable damages); *see also, In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 994 (D. Minn. 2005) ("preceden[t] is replete with situations in which attorneys representing a class have devoted substantial resources in terms of time and advance cost, yet have lost the case despite their advocacy").

Significantly, Lead Counsel undertook its role purely on a contingent basis, another relevant consideration. "Contingent fees compensate lawyers for the risk of non-payment. The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Silverman*, 739 F.3d at 958; *see also Taubenfeld*, 415 F.3d at 600 (courts should consider "the contingent nature of the case" and the fact that "lead counsel was taking on a significant degree of risk of nonpayment"). Courts consider the stakes of the case in determining reasonable attorneys' fees. *Synthroid I*, 264 F.3d at 721. As noted in *Schulte*, "there was no certainty that plaintiff's would win, or that the case would settle; and if plaintiffs had lost, 'class counsel' would receive no fees at all.'" 805 F. Supp. 2d at 597-98 (citation omitted). Recognizing the significant challenges investors face under the PSLRA, in a *per curiam* opinion, the Fifth Circuit

19

stated that **"[t]o be successful, a securities class action plaintiff must thread the eye of the needle made smaller and smaller** over the years **by judicial decree and congressional action**." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009). (Emphasis provided).

Defendants' five motions to dismiss clearly unveiled the many risks Lead Plaintiff and Lead Counsel were confronting from the outset of the case. Roadrunner contended that the Company never stated or admitted that the Restatement of "accounting errors," as disclosed in January 2017 and later formally restated in January 2018, arose from any "intentional misconduct or material weakness in financial controls." ECF No. 49 at 16. According to Roadrunner, "neither the restatement nor the Complaint relate the accounting errors disclosed in January 2017 to any intentional misconduct or material weakness in financial controls." *Id.* Instead, Roadrunner posited that the Company's dramatic growth from the acquisition of 25 small private companies rendered it plausible – "perhaps more likely" – that the $20-$25 million in accounting errors at two of the Company's operating subsidiaries as disclosed in January 2017 "resulted from innocent mistakes than from intentional fraud or extreme recklessness." *Id.* The Defendants vigorously challenged Lead Plaintiff's ability to adequately plead the requisite mental state (*scienter*) for the alleged false statements. The Roadrunner Defendants would seek to establish that they relied upon internal accountants, and an outside auditor. Defendants would have waged a vigorous attack on issues such as loss causation, contending that either all, or at least a part, of the stock drops following corrective disclosures were actually due to information that was "non-fraud" related, rather than fraud related. Defendants would undoubtedly attempt to demonstrate, as part of the "*scienter*" "defense," that, to the extent there were accounting misstatements, they were not the product of intentional reckless or knowing misconduct but instead, were the product of "errors" and/or the failure of disparate reporting systems, including those that were acquired in mergers with or purchases by Roadrunner of other companies, to keep an accurate track of expenses. This would complicate the *scienter* element of proof for which Lead Plaintiff bears the burden. Had Defendants prevailed with respect to the issue of *scienter* – possibly after a long drawn out

litigation with substantially greater sums of money expended on experts, deposition cost, etc., and possibly even after lengthy appeals – Lead Plaintiff's claims for violations of Section 10(b) of the Securities and Exchange Act of 1934 would have been entirely eviscerated.

Furthermore, if the alleged "control person" entities such as Rued and the HCI entities were able to demonstrate that they did not directly or indirectly "induce" the fraudulent acts, any such claims against them would have been entirely eviscerated as well. In that event, even if the claims against the Roadrunner Defendants – the Company, DiBlasi and Armbruster – proved victorious at trial and were sustained on appeal, the great uncertainty with regard to collectability of any substantial damages award would be increased. And the fact that the HCI entities themselves are limited liability enterprises created significant concerns with respect to their ability to handle a significant judgment, even if they were held liable on the § 20(a) control person claims.

Lead Plaintiff and Lead Counsel believe that the claims have merit and that they could overcome these obstacles. However, neither of them could control the eroding economic condition of Roadrunner, which had been in serious economic decline since the institution of the Action that, standing by itself, created enormous risk. Despite their valiant efforts and vigorous prosecution, they could be left in a position in which insurance proceeds had been entirely wasted after a vigorous defense through trial and appeal, or and/or the Company was in bankruptcy, creating even more risk and complications, and/or in which the Roadrunner Defendants could not satisfy a judgment in any event. Basser Decl. 53. The risk of bankruptcy was significant enough that Lead Counsel negotiated settlement terms designed to protect the Class in the event that Roadrunner declared bankruptcy. Settlement Agreement, ECF No. 81-1 at ¶ 3.13(j).

Lead Plaintiff and Lead Counsel strived earnestly at all times material to secure a recovery in the best interest of Class Members, not building counsel's lodestar. Lead Counsel realized that the Action had reached an inflection point owing to the Company's economic struggles, at which it was prudent to achieve a significant settlement and avoid the increasing risk of collectability from Roadrunner, beyond the normal difficulties, uncertainties and attendant risks of securities fraud litigation. To that end, Lead Counsel developed a strategy that brought Defendants and their

insureds to the negotiating table while there were still sufficient insurance proceeds to support a meaningful and fair settlement, and before such proceeds would ultimately be eroded by continuing, multiple layers of defenses on different fronts. Basser Decl. ¶ 53. In the end, after a thorough review and study of the claims and defenses, aided by Defendants' five separate motions to dismiss, and Lead Plaintiff's vigorous oppositions, a successful and significant resolution was achieved that may very well have been eluded had Lead Plaintiff and Lead Counsel failed to act timely, and appropriately, in the best interests of the Class.

Such risks, combined with the contingent nature of the representation, and the substantial recovery of $20 million, justifies the requested – indeed modest – 17% fee.

### 4. Lead Counsel Provided the Class with Quality Legal Services that Produced Excellent Results

Courts may consider the "quality of legal services rendered" in evaluating counsel's fee request. *Taubenfeld*, 415 F.3d at 600 (7th Cir. 2005); *See also In re Visa Check/ Mastermoney Antitrust Litig.,* 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003) (quotation omitted) ("The quality of representation is best measured by results."); *In re Warner Commc'ns Sec. Litig.,* 618 F. Supp. 735, 748 (S.D.N.Y. 1985), aff'd 798 F.2d 35 (2nd Cir. 1986) (same). Lead Counsel mustered all of its experience and expertise – which is significant – in conducting a detailed and sophisticated investigation of Roadrunner's financial accounting and business operations in pursuit of developing sufficient facts capable of withstanding a vigorous attack by multiple defendants on various fronts and concerning many legal issues. Basser Decl. ¶ 13.[10] In doing so, counsel ultimately achieved on excellent result.

Lead Counsel consulted and worked with an industry expert, a forensic accountant,[11] and an econometric and damages expert. Basser Decl. ¶¶ 32-36. Lead Counsel meticulously reviewed

---

[10]     Lead Counsel's extensive experience in litigating securities class actions is set forth in the firm biography. *See* Basser Decl. ¶¶ 98-99 and Ex. 6.

[11]     In order to frame the financial accounting allegations supporting the complaint it was necessary for Lead Counsel, working with its forensic accounting consulting expert, to have an

22

the Company's financial reports, and extensively studied and analyzed the Restatement. Basser Decl. ¶ 13. Investigative interviews of approximately thirty potential witnesses, including independent contractor truck drivers, were conducted. Many thousands of pages of SEC filings by Roadrunner covering a number of years, and information on the internet regarding the Company and its many acquisitions over the course of its corporate existence, were accessed and studied. Lead Counsel also reviewed analyst reports, press releases and other media sources of information. And with the assistance of an in-house forensic expert, Lead Counsel meticulously studied the insider trading patterns of individual defendants, DiBlasi, Armbruster, and Rued; and the HCI defendants. Basser Decl. ¶ 28.

Upon conclusion of its extensive and detailed investigation, Lead Counsel prepared a robust 161-page complaint, which included numerous charts and graphs. ECF No. 34. Thereafter, Lead Counsel prepared vigorous oppositions to the Defendants' five motions to dismiss (ECF Nos. 48-57, 59-60), filing two lengthy opposition briefs after exhaustive research. Prior to and during the private mediation process with Judge Phillips, Lead Counsel prepared extensive mediation briefs advancing Lead Plaintiff's theories of liability and claims in pursuit of the best possible result. Basser Decl. ¶ 6. No stone was left unturned.

As a result of Plaintiff's Counsel's diligent efforts, skill and expertise, a favorable result was negotiated that completely neutralized the ever present risks associated with Roadrunner's deteriorating financial condition and eroding insurance coverage, and the potential risk presented by the possibility of not being able to fully collect on a verdict and final judgment in this case, thus achieving no more than a "pyrrhic victory." Basser Decl. ¶¶ 58-61.

---

intimate and deep understanding and knowledge of generally accepted accounting principles ("GAAP") and related SEC regulations, including financial FASB Accounting Standards codification ("ASC" 460-10-25-3, and related provisions) and accounting disclosure requirements governed by GAAP under "Guarantor's Accounting and Disclosure Requirements that Guarantees, Including Indirect Guarantees of Indebtedness of Others" ("*FIN* 45") codified as part of FASB Accounting Standards Codification ("ASC") Topic 460, Guarantees ("ASC 460"). It was further necessary for Lead Counsel, with the assistance of a forensic accountant to be fully familiar with accounting for goodwill as required by GAAP in the form of ASC 350-20-35-1 and related provisions ASC 350-20-35-2, 350-20-35-28, 350-20-35-66, and 350-20-35-3C.

As the chart below illustrates, the Company's stock price had fallen so extensively that, at about 50 cents a share as of mid-October 2018, it was basically becoming a "penny stock":



Hence, the $20 million settlement amount represented about 87% of Roadrunner's market capitalization of November 19, 2018. In addition, its cash on hand and cash equivalents had substantially eroded from $38.813 million when suit was initiated by Lead Plaintiff in March 2017 to $11.179 million by the end of the fourth quarter of 2018, ending December 31, 2018. As of March 31, 2019, it was only $4.612 million. This financial illiquidity is illustrated in the chart below:

24



The $20 million recovery is even more impressive when compared to empirical evidence demonstrating that it is significantly higher than the median settlement amount in securities fraud cases.[12]  Basser Decl. ¶¶ 8, 58.  It is also substantially higher than the median settlement amount achieved in cases involving allegations of violations of GAAP as reported by Cornerstone Research in a study entitled *"Accounting Class Action filings and Settlements, 2018 Review and Analysis,"* in Figure 19 at page 19 thereof, demonstrating that such amounts ranged from $10 million to $14.8 million in 2018 and $7.3 million to $12.3 million in the years 2009-2017. ("2018 Cornerstone Report").  Basser Decl. Ex. 8.  The quality of defense counsel is also an important factor in evaluating the quality of the work done by Plaintiff's Counsel.  *See e.g. Beesley v. Int'l Paper Co.*, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014).  Here, the Lead Plaintiff and Lead

---

[12]    As recently reported by NERA Economic Consulting, the median settlement amount in securities fraud cases between 2009 and 2018 ranged from $6-$13 million.  *See* Basser Decl.  ¶ 8 (citing the NERA Report at 30).

Counsel were opposed by highly skilled and respected counsel from premier, formidable defense law firms, including Greenberg Traurig, LLP, Crowell & Moring, LLP, Loeb & Loeb, LLP, White & Case, LLP, and Gibson Dunn & Crutcher, LLP. Defense counsel spared no effort in their zealous defense of their clients. In the face of this formidable opposition, Lead Counsel vigorously pressed forward, developing a robust complaint, and strong oppositions to five motions to dismiss, that were sufficient to persuade the Defendants and their insurance carriers to settle this case on terms favorable to the Class. Certainly, the quality of Lead Counsel's advocacy and representation of the Class is reflected both in the quality of the work and the ability to secure a successful result while litigating against such potent defense firms, which further weighs in favor of the Court granting the requested fee.

### 5. Lead Plaintiff Independently Assessed and Approved the 17% Fee Request

Lead Plaintiff, the Mississippi Public Employees' Retirement System, is a sophisticated institutional investor. Representatives of Lead Plaintiff were directly involved in the prosecution and settlement of the case on behalf of the Class. Lead Plaintiff worked with counsel and was able to directly evaluate the quality and effectiveness of their work. Lead Plaintiff has approved the 17% fee request, especially after taking into account the high quality of Plaintiff's Counsel's representation, diligence, effectiveness, and efficiency in prosecuting the Action, the complex issues involved, the real risks presented from the outset of the case and the result achieved. *See* Ray Decl. ¶ 9, Basser Decl. Ex. 2. Lead Plaintiff believes that the 17% fee is eminently reasonable. *Id.* This too weighs in favor of the reasonableness of the fee request and supports its award. *See Silverman*, 739 F.3d at 959 (7th Cir. 2013).

### 6. The Reaction of the Settlement Members Supports the Reasonableness of the Requested Award

As described in the Pappas Declaration, Basser Decl. Ex. 1, the Claims Administrator mailed, or is in the process of mailing, over 46,400 Postcard Notices to Settlement Class Members

and nominees. The Notice Program included mailing a Postcard Notice, publishing a Summary Notice in the national edition of the *Investor's Business Daily,* with its dissemination over the *PR Newswire*. *See* Pappas Decl. ¶¶ 3-8, 11. Settlement Class Members were informed via this Notice Program that Lead Counsel would apply for attorneys' fees of 17% of the Settlement Fund, and reimbursement of litigation expenses in an amount not to exceed $295,000.00, together with interest thereon, and were advised of their right to object to Lead Counsel's fee and cost reimbursement request. While the deadline to file objections has not yet passed, to date, no objection to the fee and cost reimbursement request has been received. To the extent any objections is received, it will be addressed in Lead Plaintiff's Reply Brief filed in advance of the Final Approval Hearing.

## V. PLAINTIFF'S COUNSELS' EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED

Lead Counsel, Barrack, Rodos & Bacine, and assisting counsel, the Cross Law Firm PC, and Gadow Tyler, PLLC, have submitted declarations itemizing and attesting to the amount and accuracy of their expenses. *See* Basser Decl. Exhibits 9-11. Lead Counsel's litigation expenses total $193,458.43. The expenses of Plaintiff's Counsel total $197,262.67. *Id.* Lead Plaintiff also seeks reimbursement of $24,860.00 for costs incurred in the course of Lead Plaintiff's institution, prosecution, and resolution of the claims in the Action. Ray Decl. ¶¶ 11-13, Basser Decl. Ex. 2. In toto, this is a relatively modest expense request of $222,122.67, representing less than 1.2% of the total $20 million Settlement amount.[13] The expenses for which payment and reimbursement is being sought here from the common fund, include charges for several forensic experts and consultants, private investigation fees, mediation fees, necessary travel and related expenses with respect to attending mediations in Newport Beach, California (and include already booked air and hotel

---

[13] According to an empirical study of the cost and expense of class actions, the average request for expenses equals four percent of the relief obtained. *See Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies, 27, 70 (2004); *cited with approval* in *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d at 1040-41 (N.D. Ill. 2011).

27

expenses for attending the Final Approval Hearing in Milwaukee, Wisconsin), filing fees, and expenses related to photocopying, telephone, postal, and express mail charges. The expenses also include the costs of computerized research such as LexisNexis and Westlaw. These types of expenses are ordinarily charged to hourly paying clients, and were absolutely necessary and appropriate for the prosecution of this complex securities class action. *See* Basser Decl. Ex. 9, ¶ 7. Such expenses are properly reimbursable from a fund recovered by counsel for the benefit of the Class. *See e.g. In re Continental Ill. Sec. Litig.*, 962 F.2d at 570 (finding "clear error" where a district court refused to allow reimbursement for computerized legal research services); "It is well established that counsel who create a common fund like this one are entitled to the reimbursement of litigation costs and expenses, which includes such things as expert witness costs; computerized research; court reports; travel expense; copy, phone and facsimile expenses and mediation." *Beesley*, 2014 WL 375432, at *3 (citation omitted). *In re Immune Response*, 497 F. Supp. 2d 1166, 1178 (S.D. Cal. 2007) (approving computerized research costs); *Gottlieb v. Wiles*, 150 F.R.D. 174, 186 (D. Colo. 1993), *rev'd and remanded on other grounds sub nom, Gottlieb v. Barry*, 43 F.3d 474, 484 (10th Cir. 1994) (In approving expenses for computerized research, the court underscored their timesaving attributes as a reason reimbursement should be encouraged and noted that fee-paying clients reimburse counsel for computerized legal and factual research). *See In re Toys "R" Us FACTA Litig.*, 295 F.R.D. 438, 469 (C.D. Cal. 2014) ("Expenses such as reimbursement for travel . . . are typically recoverable) (citation and internal quotation marks omitted); *Franco v. Ruiz Food Prods.,* No. 1:10-cv-02354-SKO, 2012 U.S. Dist. LEXIS 169057, at *60 (E.D. Cal. Nov. 27, 2012) (noting that mediation fees are among the "types of fees" that are "routinely reimbursed"). *Redwen*, 2013 U.S. Dist. LEXIS 100275, at *32 (reimbursing "expenses for mediation fees, copying, telephone calls, expert expenses, research costs, travel, postage, messengers, and filing fees."); *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 454 (E.D. Cal. 2013) (noting that "travel, mediation fees, photocopying, [a] private investigator to locate missing Class Members, and delivery and mail charges" are "routinely reimbursed"). *Synthroid I*, 264 F.3d at 722 (rejecting district court's refusal to authorize full reimbursement for expenses, explaining that "reducing

28

[expenses] because the district judge thinks cost too high in general is not [fine]." These expenses and costs were necessary and reasonable, and should be approved for reimbursement from the Settlement Fund.

## VI.    CONCLUSION

In conclusion, and for the reasons more fully discussed above, Lead Counsel respectfully requests that the Court approve an award of fees of 17% of the Settlement fund and expenses of $222,122.67, plus interest thereon.

DATED: August 19, 2019

<u>/s/ STEPHEN R. BASSER</u>
STEPHEN R. BASSER

STEPHEN R. BASSER
SAMUEL M. WARD
600 West Broadway, Suite 900
San Diego, CA  92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

JEFFREY A. BARRACK
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jbarrack@barrack.com

CROSS LAW FIRM, S.C.
Nola J. Hitchcock Cross
Mary C. Flanner
The Lawyers' Building
845 N. 11th Street
Milwaukee, WI 53233
Telephone: (414) 224-0000
Facsmile: (414) 273-7055
mflanner@crosslawfirm.com
njhcross@crosslawfirm.com

GADOW TYLER, PLLC

Blake Tyler, Esquire
Jason M. Kirschberg, Esquire
511 E. Pearl Street
Jackson, Mississippi 39201
Telephone: (601) 355-0654
Facsmile: (601) 510-9667
blake@gadowtyler.com
Jason@gadowtyler.com

*Counsel for Lead Plaintiff Public Employees'*
*Retirement System of Mississippi and the*
*Class*